No. 05-999 T
(Judge Margaret Sweeney)

# *IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

EPSOLON LIMITED, BY AND THROUGH
SLIGO (2000) COMPANY, INC.,
TAX MATTERS PARTNER,

Plaintiff

v.

THE UNITED STATES,

Defendant

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUSPENDED PROCEEDINGS

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
DAVID R. HOUSE
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 616-3366

Page

## TABLE OF CONTENTS

Brief in Support of Defendant's Motion to Suspend Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Appendix:**

Declaration of David House

| Exhibits | Description |
|---|---|
| 1 | KPMG Deferred Prosecution Agreement. |
| 2 | Conspiracy Indictment, United States v. KPMG LLP<br>KPMG Information. |
| 3 | KPMG Statement of Facts. |
| 4 | Superseding Indictment, United States v. Stein, et al.,<br>05 Crim 888 (LAK) (SDNY). |
| 5 | Superseding Indictment Press Release. |
| 6 | Declaration of Keith Tucker filed in John Doe 1 & John Doe 2 v. United States, 398 F.3d 685 (5th Cir. 2005). |
| 7 | Letter from Shirah Neiman to David Gustafson, Acting Chief, Court of Federal Claims Section requesting stay. |
| 8 | Sidley Austin Brown & Wood response to IRS Summons. |
| 9 | Page entitled "Epsolon Limited" detailing options transactions. |

Page

**Appendix (Continuation):**

Declaration of David House


| Exhibits | Description |
|---|---|
| 10 | Memorandum to Eugene Schorr, 1/18/2001. |
| 11 | Facsimile to Keith Tucker from Timothy Speiss dated 12/16/200, KTTC001310. |
| 12 | Email from Speiss to Mox Tan, KTTC3217. |
| 13 | Email to R.J. Ruble KTTC2768. |
| 14 | Letter from Brown & Wood to Keith Tucker 12/26/2000, KTTC2755. |
| 15 | Email to Ruble Tucker letters, KTTC2772. |
| 16 | Email from Haber to Ruble re Tuckere Opinion, KTTC2773. |
| 17 | Memo from Tilevitz to Rublee re opinion to Sligo (200), KTTC2774. |
| 18 | Email from Mox Tan to R.J. Ruble re rep letters, KTTC3168. |
| 19 | Email from Ruble to Haber re Tucker, KTTC2780. |
| 20 | Email from Haber to Ruble re Tucker. |
| 21 | Fax from Hber Sodano/Ruble re Tucker, KTTC2781. |
| 22 | Fax from Haber to Ruble re timing of Tucker tax opinion, KTTC2793. |
| 23 | Facsimile from Harber to Sodano/Ruble re Tucker letter, KTTC2980. |
| 24 | Letter from Sidley Austin Brown & Wood re opinion letter, KTTC2759. |
| 25 | Copy of deposition transcript to R.J. Ruble in Shasta v. United States. |

Page

## TABLE OF AUTHORITIES

**Cases:**

*Afro-Lecon, Inc. v. United States* , 820 F.2d 1198 (Fed. Cir. 1987) . . . . . . . . . . . . . . 21-22

*Ampetrol v. United States*, 30 Fed. Cl. 320 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Belford Strategic Investment Fund and Presidio Growth LLC v. United States*, Dkt No. C-04-4309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*C3, Inc. v. United States*, 4 Cl. Ct. 7901 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*C3, Inc. v. United States*, 5 Cl. Ct. 6591 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

*Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962), *cert. denied*, 371 U.S. 955 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Crawford Property v. Commissioner*, Docket No. 2052-01 . . . . . . . . . . . . . . . . . . . . . . 28

*Diversified Capital Services v. Commissioner*, Docket Nos. 2053-01, 13330-01, 13331-01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Diversified Group Inc., et al. v. Commissioner*, Docket No. 2051-01 . . . . . . . . . . . . . . 28

*Goddard v. Commissioner*, Docket No. 1144-05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Goddard v. Commissioner*, Docket No. 1145-05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Greenburg v. Commissioner*, Docket No. 1143-05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*John Doe 1 & John Doe 2 v. United States*, 398 F.3d 686 (5th Cir. 2005) . . . . . . . . . . 4-5

*Landis v. North American Co.*, 299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Litton Systems, Inc. v. United States*, 215 Ct. Cl. 1056 (1978) . . . . . . . . . . . . . . . . . . . . 22

*Meruelo v. Commissioner*, Docket No. 624-04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Page**

**Cases (Continuation):**

*Penden v. United States*, 512 F.2d 1099 (Ct. Cl. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Pointe Du Hoc v. Commissioner*, Docket No. 006041-05 . . . . . . . . . . . . . . . . . . . . . . . . 28

*Presidio Advisors, LLC, Norvest Ltd. v. United States*, Fed. Cl. No. 05-411 . . . . . . . . . . 2

*Prestop Holdings v. United States*, Fed. Cl. No. 05-576 T . . . . . . . . . . . . . . . . . . . . . . . . 2

*Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir.), *cert. denied* 449 U.S. 993 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Starlike Properties v. Commissioner*, Docket No. 2484-04 . . . . . . . . . . . . . . . . . . . . . . . 28

*St. Paul Fire & Marine Ins. Co. v. United States*, 24 Cl. Ct. 513 (1991) . . . . . . 23, 24, 29

*Keith A. & Laura B. Tucker v. Commissioner*, Docket No. 12307-4 . . . . . . . . . . . . . 26, 29

*United States v. Stein, et al., 05 Crim. 888 (LAK)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 29

**Statutes:**

Crimes and Criminal Procedures (18 U.S.C.):

§ 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Internal Revenue Service Code of 1986 (26 U.S.C.):

§ 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§ 7201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

§ 7212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Page**

**Miscellaneous:**


Fed.R.Civ.P 6(e) . . . . . . . . . . 26

Fed.R.Crim.P. 6(e) . . . . . . . . . . 26

IRS Notice 2000-44, (August 13, 2000) . . . . . . . . . . 7

United States Court of Federal Claims Rules:

R. 26 . . . . . . . . . . 25

United States Tax Court Rules:

R. 70 . . . . . . . . . . 27

R.74 . . . . . . . . . . 27

R.75 . . . . . . . . . . 3, 27

R.91 . . . . . . . . . . 3, 27

*"The Role of Professional Firms in the U.S. Tax Shelter Industry," Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs, at 11, Senate Report 109-54, 109th Cong., 1st Session (2005)* . . . . . . . . . . 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Judge Margaret M. Sweeney)

No. 05-999 T

EPSOLON LIMITED, by and through
SLIGO (2000) COMPANY, INC.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUSPEND PROCEEDINGS

This lawsuit is one of several dozen in this Court, the district courts, and the Tax Court, that involve the so-called "Son of Boss" tax shelter. The United States has moved this Court to suspend proceedings because of a major criminal investigation that overlaps with this civil suit. Where discovery in a civil lawsuit threatens to interfere with a related criminal prosecution and ongoing investigation, courts routinely stay the civil case, so the criminal matter may proceed unimpeded. The United States Attorney for the Southern District of New York is prosecuting an illegal tax shelter criminal conspiracy indictment which alleges that various advisors conspired with their wealthy clients to fraudulently reduce or eliminate their taxes by making false and misleading statements in opinion letters and other transaction documents used to execute various

fraudulent tax shelters. The type of shelter involved here (which was referred to by the alleged conspirators as an "SOS") and its variants, and the specific Tucker/Epsolon transactions at issue in this suit, are encompassed by the indictment. *United States v. Stein, et al.*, S05 Crim. 888 (LAK) (SDNY). Among the persons indicted in *Stein* is Raymond J. Ruble, also known as "R.J. Ruble", the opinion letter writer and a potential witness in this case, as well as other KPMG personnel involved in the review and marketing of SOS shelters. Also referenced in the Indictment is the tax shelter boutique that was involved in the Tucker/Epsolon transactions. The stay request is intended to prevent prejudice to the Government's criminal case and ongoing investigation. In addition, because of the pendency of the *Stein* criminal trial, critical witnesses in this case who have information about Keith Tucker and his motivations and considerations in first considering, and ultimately participating in, the Epsolon tax shelter transaction, have already and/or will likely assert their Fifth Amendment privilege and refuse to provide testimony necessary for the Government to fully and fairly defend this case.

To make their initial disclosures, to take discovery, and to prepare this case for trial, both sides will necessarily have to address matters that directly implicate – and will likely interfere with – prosecution of the *Stein* criminal case and the ongoing criminal investigation.. Accordingly, the Court should stay all proceedings in this case until the criminal case is resolved.

In two other cases to which the criminal tax shelter case is related, this Court has granted Motions to Stay filed by the United States on grounds similar to those presented below. *Presidio Advisors, LLC, Norvest Ltd. v. United States*, Fed. Cl. No. 05-411 T; *Prestop Holdings v. United States*, Fed. Cl. No. No. 05-576 T. The motion in *Presidio Advisors* was granted by this Court on November 17, 2005, and the motion filed in *Prestop Holdings* was granted on December 8, 2005.

Similarly, in the case *Belford Strategic Investment Fund and Presidio Growth LLC v. United States*, Dkt No. C-04-4309 VRW, (N.D. Cal.), the District Court entered an order on November 7, 2005, staying that case pending the criminal proceeding in the Southern District of New York.

Keith Tucker is the individual who, by means of the Epsolon entity, utilized the tax shelter at issue in this case in an effort to reduce his individual tax liabilities. He is also one of the persons receiving the Notice of Final Partnership Administrative Adjustment. Exhibit A to plaintiff's Complaint. Mr. Tucker has filed a petition in Tax Court with respect to his individual taxes involving the illegal tax shelter which relates to both this case and the criminal case referenced above. *Keith A. and Laura B. Tucker v. Commissioner*, Docket No. 12307-04. The Commissioner filed a Motion to Stay that proceeding. That motion was denied by Order dated December 13, 2005.[1]

**INTRODUCTION**

The individuals, entities, and transactions involved in this case are intimately related to a broad-based conspiracy to develop, promote, sell, and implement various illegal tax shelters by the worldwide accounting firm KPMG LLP and others.[2] On August 29, 2005, KPMG admitted

---

[1]While the Tax Court denied the Commissioner's Motion without explanation, it is possible that the Tax Court considered that its rules do not permit the broad, far-reaching discovery encouraged in the Rules of the United States Court of Federal Claims. *See, e.g.* Rule 75 of the Rules of the United States Tax Court (limiting the taking of depositions). Further, Tax Court practice encourages the use of stipulations at trial. Rule 91 of the Rules of the United States Tax Court. Thus, the Tax Court may have believed that proceeding with trial in that case would not have an impact on the criminal case. The Government does not agree.

[2] *See "The Role of Professional Firms in the U.S. Tax Shelter Industry,"* Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs, at 11, Senate Report 109-54, 109th Cong., 1st Session (2005) ("Subcommittee Report").

and accepted responsibility for violations of law with respect to its involvement in developing, promoting, selling, and implementing illegal tax shelters during the period from 1996 through 2002 and has agreed to pay $456,000,000 to the United States as a punitive fine, restitution, and penalties to the IRS stemming from its involvement with the illegal tax shelters.[3] Among the fraudulent tax shelter transactions designed, marketed, sold, and implemented by KPMG were FLIP (Foreign Leveraged Investment Program), OPIS (Offshore Portfolio Investment Strategy), BLIPS (Bond Linked Issue Premium Structure), and SOS (Short Option Strategy) shelters.[4]

## BACKGROUND

Plaintiff filed this action on September 15, 2005, seeking a redetermination of adjustments that the Internal Revenue Service proposed to the partnership income tax return (Form 1065) that Epsolon Limited (Epsolon) filed for its taxable year ended December 31, 2001.[5] Plaintiff asks the Court to overturn the IRS's determinations in the Notice of Final Partnership Administrative Adjustment (FPAA). In the FPAA, the IRS determined that Epsolon had utilized a tax shelter involving option positions in foreign currency to produce an artificial loss for the year 2001 to be reflected on the partners' income tax returns in the amount of $13,890,954. (Exhibit A to plaintiff's complaint.) The IRS determined, *inter alia*, that the transactions giving

---

[3] *See KPMG Prosecution Agreement* (attached to the Declaration of David House (hereinafter, House Decl.), as Ex. 1); *KPMG Information* (House Decl., Ex. 2); *KPMG Statement of Facts* (House Decl. Ex. 3.).

[4] *KPMG Information*, ¶ 11 (House Decl., Ex. 2).

[5]This brief generally assumes arguendo that the events happened as plaintiff alleges. Although reference is made in this Memorandum to the "partnership" and various purported entities, defendant does not concede that, under the applicable law, a viable partnership or the alleged entities existed.

rise to the claimed loss were not entered into with a profit motive, lacked economic substance, had no bona fide business purpose, and were shams. Part of the option transactions culminated in a "paper" loss, generated as a result of partnership interests with an artificially pumped-up basis. The United States expects to prove at trial that these losses were calculated to be used by Tucker to avoid paying income taxes on substantial amounts of income.

Tucker commenced a legal proceeding against KPMG under the pseudonym "John Doe 1" in the United States District Court for the Northern District of Texas to enjoin KPMG from responding to an IRS summons as to Tucker and his transactions. See John Doe 1 and John Doe 2 v. United States, 398 F.3d 686 (5th Cir. 2005). A true and correct copy of Tucker's Declaration submitted in that action is attached hereto as Ex. 6 to the Declaration of David House,[6] and is the basis for several of the facts detailed below. Other documents were obtained by the Commissioner through informal discovery in the Tax Court case, true and correct copies of which are attached to the Declaration of David R. House.

**The KPMG Tax Shelter Transactions At Issue In This Case**

In the Declaration of Keith A. Tucker (House Decl., Ex. 6), Tucker stated that in December 2000, Timothy Speiss, a partner in KPMG's "Innovative Strategies" group, advised Tucker that KPMG could develop a solution to Tucker's 2000 tax planning needs. (Ex. 6, paras. 6, 12.) Tucker stated that KPMG recommended he engage Brown & Wood "to provide a legal opinion that would give me additional comfort in the face of an IRS challenge," and that Brown & Wood provided him with such an opinion. (Ex. 6, para. 16.) Tucker further stated that based

[6]Although the declaration was originally submitted under seal, the District Court unsealed the document by Order entered April 12, 2004.

on the tax and legal advice of KPMG and Brown & Wood, he engaged KPMG to implement and execute the transaction for him in December 2000. (Ex. 6, para. 17.)

The KPMG transaction produced a claimed Schedule E loss from foreign currency options allegedly entered into by Tucker's Subchapter S corporation, Sligo (2000) Company, Inc., ("Sligo"), and Epsolon Limited ("Epsolon"), a foreign entity claimed to have been owned and controlled by Sligo. The complaint alleges that, on December 20, 2000, Epsolon *purchased* multiple foreign currency options from Lehman Brothers, N.A., for a premium of $156,041,001. (Compl., para. 18a.1.) On the same date, Epsolon *sold* to Lehman multiple foreign currency options for a premium of $157,500,000. (Compl., para. 18a.2.) The next day, Epsolon supposedly sold those options it had acquired for a sale price of $50,531,399, and realized an alleged gain of $51,260,455, which Epsolon contends was not taxable due to its status as a foreign corporation not engaged in a United States trade or business. (Compl. paras. 18a.3-4.) On December 21, 2000, Epsolon alleges, it used the proceeds to purchase additional foreign currency options. (Compl. para. 18a.5.) Epsolon then alleges that it elected to be classified a partnership on December 27, 2000, with the result that the shareholders became partners in the Epsolon partnership with a basis in their partnership interests equal to the basis Epsolon had in its assets prior to the partnership election. (Compl. para. 18a.6.)

The complaint then alleges that Epsolon realized a $39,584,511 loss for 2000 as a result of the foreign currency options disposed of in 2000, and a further loss of $13,890,954 for 2001 as a result of foreign currency options transactions which took place on January 8, 2001. (Compl. para. 18a.7-8.)

The strategy detailed above is that of the "SOS" variant of the Son of BOSS tax shelter, a

transaction invalidated as an abusive tax shelter by IRS Notice 2000-44, released August 13, 2000, four months before the transactions were implemented in this case. According to the complaint, the Tucker transactions were implemented and completed in less than one month's time.

**The KPMG Deferred Prosecution Agreement**

On August 26, 2005, KPMG and the United States entered into a Deferred Prosecution Agreement. (House Decl. Ex. 1.) At page 3 of the Deferred Prosecution Agreement, KPMG admitted that as set forth in an incorporated Statement of Facts, it had:

> Assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars of capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters. A number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual statements and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners and the high net worth individual clients knew they were not true; (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and (v) impeding the IRS by knowingly failing to locate and produce all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters.

In the section of the Statement of Facts (House Decl., Ex. 3), entitled "The Fraudulent Tax Shelter Activities," KPMG admitted at paragraph 5 that "KPMG tax partners helped design or sell the following tax shelters (and <u>variations of them</u>) to high net worth United States citizens during the period in question." (Emphasis added.) Among the shelters so described was the Short Options Strategy ("SOS") and its variations.

Paragraph 20 of the Statement of Facts recited that "SOS and variations on that shelter

were designed to generate a substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of offsetting options on foreign currency."

Paragraph 28 of the Statement of Facts recites that in early 2002, the IRS issued 25 summonses to KPMG calling for information relating to tax strategies in which KPMG was involved. In paragraph 30 of the Statement of Facts, KPMG admits that "KPMG tax partners understood that documents relating to BLIPS and SOS were called for" in response to IRS summonses, but that KPMG "did not produce any documents relating to SOS," and that "on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses."

In paragraph 32 of the Statement of Facts, KPMG further admits that "in May 2003, IRS agents directly asked KPMG, through its outside counsel, what role KPMG had played in the SOS shelters," that a KPMG tax partner "falsely advised that the only role that KPMG had played with respect to SOS was to assist a couple of high net worth individual clients in preparing and filing tax returns that reflected the tax losses from SOS transactions," and that "[t]his false representation was then relayed to the firm's counsel, and then made to the IRS." KPMG further admits that "none of the SOS transactions marketed and sold by KPMG tax partners were provided to the IRS until late 2003 and early 2004."

**The August 29, 2005 Indictment**

On August 29, 2005, an Indictment was unsealed in the Southern District of New York, charging seven former KPMG tax partners, one former KPMG tax manager, and Brown & Wood attorney, Raymond J. Ruble, with criminal violations under 18 U.S.C. § 371 stemming from their involvement in KMPG tax shelters, including the Short Options Strategy and its variants. (House Decl., Ex. 4.) The indictment charged at paragraph 15 that:

> During the period from at least in or about 1996 through at least in or about 2003, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, RAYMOND J. RUBLE, also known as "R.J. Ruble," and MARK WATSON, and others known and unknown to the Grand Jury (hereinafter their "co-conspirators") participated in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses, and by fraudulently concealing from the IRS those shelters.

Paragraph 7 of the indictment identified JEFFREY STEIN as a KPMG tax partner who, in or about 2000, became Vice Chairman of KPMG Tax Services.

Paragraph 10 of the indictment identified JEFFREY EISCHEID as a KPMG tax partner who, during the year 2000, was head of KPMG's Innovative Strategies Group.

Paragraph 13 of the indictment identified RAYMOND J. RUBLE, also known as"R .J. Ruble," as a tax partner in the New York, New York office of a prominent national law firm.

Paragraph 18 of the Indictment charged that "[a]mong the fraudulent tax shelter transactions designed, marketed and implemented by the defendants . . . and their co-conspirators were FLIP ("Foreign Leveraged Investment Program"), OPIS ("Offshore Portfolio Investment

Strategy"), BLIPS ("Bond Linked Issue Premium Structure"), SOS ("Short Option Strategy") and their variants." (Emphasis added.)

Paragraph 32 of the indictment charged that "SOS and its variants were designed to generate substantial capital and ordinary losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency options positions with a bank,...transferring the offsetting options positions to a partnership or other entity and then withdrawing from the transaction, claiming a loss in the desired amount." Paragraph 32 further stated that "for many of these SOS-type transactions, KPMG did not issue an opinion letter, but instead certain lawyers, including RUBLE, issued 'more likely than not' opinion letters with respect to those transactions. The SOS opinion letters, and other associated documents, were false and fraudulent in a number of ways well known to the defendants SMITH, EISCHEID and RUBLE...."

As to Obstruction of IRS investigations, the Indictment, relative to "SOS tax shelters," states that "SMITH and others caused KPMG falsely to claim to the IRS that the production of documents and information relating to the summonses was substantially complete" (para. 40) and that "EISCHEID intentionally caused KPMG's representatives to falsely respond that KPMG was not involved in SOS, but may have prepared a couple of tax returns containing SOS losses." (para. 41)

**The October 17, 2005 Superseding Indictment**

On October 17, 2005, a superseding indictment was unsealed in the Southern District of New York. (House Decl., Ex. 5.) The superseding indictment charged at paragraph 25 that the original nine defendants, as well as ten additional defendants:

> participated in a scheme to defraud the Internal Revenue Service by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses, and by fraudulently concealing from the IRS those shelters.

The superseding indictment, at paragraph 28, repeats the charge from the August 29 indictment that among the fraudulent tax shelter transactions designed, marketed, and implemented by the defendants (including Ruble) were FLIP, OPIS, BLIPS, and "SOS ('Short Options Strategy') and their variants."

At paragraph 47, under the heading "The Fraudulent SOS Shelters," the superseding indictment states that "these shelters were referred to by various names, including Short Option Strategy, Spread Option Strategy, SOS, Binary Option, Digital Option, Gain Mitigator, Loss Generator, COINS, BEST, [and] FX Transaction (hereinafter 'SOS')."

Paragraph 47 further states that KPMG's Washington National Tax Office "reviewed draft 'more likely than not' SOS opinion letters prepared by the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," and other firms, and determined that the transactions described therein were not more likely than not to withstand IRS challenge." Paragraph 47 of the superseding indictment further charges that "nevertheless, between 1998 and 2002, the defendants JEFFREY STEIN, ... JEFFREY EISCHEID, ... and RAYMOND J. RUBLE ... and their co-conspirators, assisted in marketing and implementing SOS transactions for KPMG clients ...."

Paragraph 32 of the superseding indictment alleges that "SOS was marketed and sold from at least in or about 1998 through at least in or about 2002 to at least 165 wealthy individuals, and generated at least $1.9 billion in phony tax losses ...."

Paragraph 78.e of the indictment alleges that on or about December 15, 1997, Ruble stated that Ruble's managing partner had approved his working with KPMG on a joint basis to develop and market tax products and jointly to share in the fees.

Paragraph 47 of the superseding indictment further alleges that for many SOS transactions, "KPMG did not issue an opinion letter, but instead certain lawyers, including RUBLE, issued 'more likely than not' opinion letters with respect to those transactions so that clients would claim the fraudulent SOS losses and evade taxes." Paragraph 49 of the superseding indictment further alleges that the SOS opinion letters were false and fraudulent in a number of ways.

Paragraph 27 of the superseding indictment charges that the conspirators issued such false and fraudulent opinion letters "with the intent that the clients would claim the fraudulent tax shelter losses on tax returns and provide the opinion letter and other false and fraudulent transactional documents and/or the false and fraudulent representations and statements contained therein to the IRS if and when the client was audited."

At paragraph 51, the superseding indictment alleges that many SOS transactions marketed by KPMG were arranged and implemented by an unnamed New York, New York, tax shelter firm pseudonymously identified as "the Shelter Boutique."

Paragraphs 52 and 53 of the superseding indictment allege that in addition to the fees collected by the Ruble law firm for the issuance of opinion letters on SOS and other tax shelter transactions, Ruble accepted side payments from the Shelter Boutique relating to his participation in devising, marketing, and implementing tax shelters. At paragraphs 81-83, the superseding

indictment charges Ruble with the additional crime of tax evasion under 26 U.S.C. § 7201 for failing to report those side payments as income during the period 1998-2001.

The superseding indictment, at paragraph 54, alleges that RUBLE, STEIN, EISCHEID and the other named defendants, in addition to preparing false and fraudulent documentation relating to the shelter transactions, and preparing and causing to be prepared tax returns that incorporated the phony tax shelter losses, also fraudulently concealed the transactions by, inter alia, not registering the shelters with the IRS as required by law and obstructing IRS and Senate investigations into their tax shelter activities.

As to obstruction of the IRS, paragraph 60 of the superseding indictment states that IRS summonses called for the production of documents relating to SOS tax shelters, and that although KPMG personnel directing responses to those summonses were aware of KPMG's involvement in marketing and implementing SOS transactions, nevertheless, none of the SOS tax shelters marketed or implemented by KPMG, or in which KPMG personnel participated, were disclosed to the IRS. Paragraph 60 further alleges that various KPMG personnel falsely claimed that the production of documents and information relating to the summonses was substantially complete.

Paragraph 61 of the superseding indictment further alleges that when the IRS in May 2003, inquired about KPMG's failure to produce SOS information, JEFFREY EISCHEID and another person caused KPMG's representatives to falsely respond that KPMG was not involved in SOS. As a result, paragraph 85 of the superseding indictment charges EISCHEID with Attempts To Interfere With The Internal Revenue Laws under 26 U.S.C. § 7212.

**<u>The Connections Between Petitioners' Transactions, The Criminal Defendants, And The Criminal Prosecution</u>**

As set forth in a letter dated January 13, 2006 from Shirah Neiman (Chief Counsel to the United States Attorney for the Southern District of New York) to David Gustafson, Acting Chief, Court of Federal Claims Section, Department of Justice (House Decl., Ex. 7), the Tucker tax shelter transaction at issue in this civil case is a shelter which KPMG referred to as an SOS shelter, and the specific Tucker/Epsolon transaction is encompassed within the charges in the superseding indictment, including paragraphs 32, 47-51. The facts and issues relevant to both this case and the criminal proceeding include, among others, KMPG's review and evaluation of the SOS shelter and Ruble's opinion letter and its determination that neither would withstand an IRS challenge; KPMG's decision nevertheless to market SOS shelters to taxpayers including the Tuckers and to prepare tax returns encompassing purported SOS losses; KPMG's actual marketing of the shelter to the Tuckers; Ruble's opinion letter and the veracity of the representations contained therein made by among others the taxpayers; and the role of the shelter boutique, its principle owner and related parties in implementing the Tucker shelter. (House Decl., Ex. 7.)

The fact that petitioners' transactions are among the SOS transactions described in the superseding indictment is also confirmed by the following:

The petitioners' description of the foreign currency options transactions of Sligo and Epsolon as set forth in the Complaint corresponds to the description of the SOS Shelters as set forth at paragraph 47 of the superseding indictment.

Paragraph 47 of the superseding indictment notes that the SOS shelters were referred to by various names, including "Spread Option." On June 29, 2004, the IRS received a response to a "John Doe" summons that had been served on Sidley Austin Brown & Wood (the successor firm to Brown & Wood) relative to tax shelter transactions in which SABW had participated. (House Decl., Ex. 8.) The response identified Keith Tucker as a participant in "Diversified – Spread Options." Additional documents referenced below also refer to petitioners' transactions as "options spreads."

Paragraph 47 of the superseding indictment also states that the SOS shelters were referred to as "digital options." In response to informal discovery received by the government in the Tax Court case brought by Keith Tucker,[7] the Tuckers provided the document entitled "Epsolon Limited." (House Decl., Ex. 9). That document, at item 4), claims that on December 20, 2000, Epsolon entered into a series of "digital" options, which options correspond to those option transactions alleged in plaintiff's complaint in this case.

The documents referred to below demonstrate that, at a minimum, three of the indicted individuals, R.J. Ruble, Jeffrey Eischeid and Jeffrey Stein, had direct involvement in planning, approving, executing, or providing legal opinions with respect to Keith Tucker's KPMG tax shelter transactions. The documents also illustrate the central role of KPMG's Timothy Speiss in developing, coordinating, and arranging Tucker's transactions. Speiss has stated in writing his intention to claim the protection of the Fifth Amendment at any deposition or trial in the Tax

[7] Most of the Exhibits referenced in the following discussion were supplied by petitioners in the Tax Court case in response to the Commissioner's informal discovery requests in that case and are attached to the Declaration of David R. House, filed herewith. All documents referred to herein that were produced by petitioners in the Tax Court case are identified with a "KTTC" Bates number prefix.

Court case, and will, presumably, claim that protection at any deposition or trial in this case as well. In his Declaration (House Decl., Ex. 6, pars. 12, 17), Mr. Tucker indicates that KPMG Tax Partner Timothy Speiss advised him in December 2000 that KPMG could analyze and develop a customized solution to his tax planning needs, and that based on tax and legal advice of both KPMG and Brown & Wood, he engaged KPMG to implement and execute that transaction.

In response to informal discovery in the Tax Court case, Keith Tucker provided the Service with a copy of a "Memorandum For Record re: Keith Tucker," dated January 18, 2001, prepared and signed by KPMG Tax Partner Eugene Schorr (House Decl., Ex. 10, KTTC 588-591). Under the page 2 heading: "Background," Schorr states that

> Mr. Tucker anticipated substantial income for the year 2000 resulting from the increasing value of Waddell & Reed shares. Mr. Tucker earned substantial income from the exercise of options in August of 2000. Accordingly, I asked Mr. Timothy Speiss, the northeast PIC of Innovative Strategies, to meet with Mr. Tucker to discuss certain KPMG strategies to mitigate his year 2000 tax liabilities. Mr. Speiss met with Tucker to present various KPMG strategies.

Under the page 2 heading: "KPMG Innovative Tax Solution For Mr. Tucker," Schorr states that on or about December 14, 2000, Speiss advised him that he had discussed proposing a tax solution for Mr. Tucker with the KPMG "tax leadership" (including, specifically, criminal defendants JEFFREY EISCHEID and JEFFREY STEIN), who agreed that Speiss could develop such a solution for Mr. Tucker.

Schorr states in Ex. 10., p. 2, that "Tim [Speiss] conferred with Diversified and Brown & Wood to develop a 'customized solution' for Mr. Tucker." Schorr relates at page 3 that:

- Tim developed the tax and investment structure with Helios and Brown & Wood
- Tim obtained KPMG approval for this "customized solution" for Mr. Tucker
- Tim communicated the transaction to Mr. Tucker

- Tim orchestrated the transaction including engaging Frank Montgomery to provide the legal services necessary to complete the transaction
- Tim issued an engagement letter under my signature as engagement partner (I did not sign the letter)
- Tim coordinated the transaction for Mr. Tucker during Christmas week while Mr. Tucker was on vacation
- Tim reviewed all investment decisions with Diversified
- Tim arranged for the wire transfer of fees to KPMG

Speiss' central involvement in arranging the Tucker transactions, as related by Schorr, is confirmed by a facsimile dated December 16, 2000, from Speiss to Tucker (House Decl., Ex.11), in which Speiss discusses the pre-planning of the transactions, including the formation of the required entities, the planning of the options transactions, the planned generation of tax losses in 2000 and 2001 ("review point 4"), and "the ability to be exempted from penalty based upon obtaining tax opinion reliance and investor due diligence" ("review point 24").

The early involvement of Brown & Wood in Tucker's transactions was in the person of criminal defendant R.J. Ruble. This is evidenced by a December 18, 2000, email (House Decl. Ex. 12), from Speiss to several recipients regarding "Project Epsolon," wherein Speiss states: "Finally, we were able to speak with R. J. Ruble this evening and he answered our questions WRT opinion matters."

As shown by an email string (House Decl., Ex. 13), on December 19, 2000, Speiss sent an email to Jimmy Haber of the Diversified Group, requesting that Haber forward Keith Tucker's address to R.J. Ruble for purposes of the "engagement letter." The email string indicates that

Haber acted on that request by forwarding Tucker's name and address to Ruble on December 20, 2000.

A Brown & Wood letter to Tucker dated December 26, 2000 (House Decl., Ex. 14), recited that Tucker had asked the firm to act as special U.S. income tax counsel for him in connection with "various *digital foreign currency option trades*," (emphasis added). Ruble, in an December 27, 2000 email, acknowledges receipt of the Tucker letter. (House Decl., Ex. 15).

R.J. Ruble was also deeply involved in drafting and providing opinion letters for Tucker in connection with his options transactions. In a January 26, 2001 email string under the heading "[Redacted] and Tucker opinions," Ruble writes to James Haber of the Diversified Group that "I just got a call from Tim Speiss of KPMG asking how these two opinions were progressing." (House Decl., Ex. 16.) Haber's reply states that:

> These opinions will be two opinions. One is increase in outside basis by virtue of a 351 contribution of two options into an S Corp. and the second, a loss generated by the CFC strategy. You do not have information on these opinions as yet. Orrin just finished a form opinion for the CFC part with the help of Bryan Cave. I am reviewing the opinion and putting together the closing documents to send to you in the next day or two.

In a January 30, 2001 Memorandum from Orrin Tilevitz, Esq., of the Diversified Group to R.J. Ruble (House Decl., Ex. 17), Tilevitz wrote:

> You will need to write opinions to Sligo (2000) Company, Inc., [Redacted], and [Redacted]. Each is an S Corporation that acquired a series of options through a CFC [controlled foreign corporation]. The CFC's trading activities resulted in gain recognized at the CFC level (but not passed through to the S corporation) and loss recognized at the S corporation level. Also, the shareholder of each corporation separately acquired an option spread through a single-member LLC and contributed the LLC interest to the S corporation in a section 351 transaction with the tax goal of increasing outside basis sufficiently that a shareholder could deduct the S corporation's loss. Each shareholder will also need an opinion on this issue (separate from the one issued to the S corporation). Jimmy will be sending you, under separate cover, detailed descriptions of these transactions.

On March 14, 2001, Mox Tan of Helios Financial sent an email to R.J. Ruble that attached draft letters containing taxpayer representations "for the basis step opinions for [redacted], Tucker, and [redacted]. (House Decl., Ex. 18.)

On March 16, 2001, James Haber of the Diversified Group sent Ruble an email asking if the taxpayer representation letters for Tucker were "okay." (House Decl., Ex. 19.) By an email of the same date, Ruble responded that "the rep lettere (sic) should just repeat the reps in the opinions." (House Decl, Ex. 20.)

By facsimile dated March 23, 2001, James Haber of the Diversified Group faxed to Susan Sodano/R.J Ruble a draft taxpayer representation letter for Keith Tucker and requested "[p]er our conversation, can you please substitute #14 of the attached revised Rep. letter into the opinion." (House Decl., Ex. 21.)

On April 10, 2001, Haber sent an email to Ruble inquiring about when the Tucker and Hechler tax opinions would be completed. (House Decl., Ex. 22.)

On April 18, 2001, James Haber sent Susan Sodano and R.J. Ruble a five-page facsimile attaching proposed revisions to a legal opinion for Keith Tucker captioned "Re: Investment in Foreign Entity." (House Decl., Ex. 23.)

By letter dated June 28, 2001, (House Decl., Ex. 24), R.J. Ruble advised Keith Tucker that:

> Brown & Wood LLP previously issued to you a more-likely-than not opinion, dated December 31, 2000,[8] ("Letter") regarding certain United States federal income tax consequences of investing in a foreign entity that acquires an option spread and other investment assets as described more fully therein ("Transactions").
>
> We are unaware of any change in law, or interpretation of law, that would adversely affect the United States federal income tax treatment of the Transactions, since the date of the Letter and through March 26, 2001 (the date you filed your 2000 tax year individual income tax returns).
>
> Very truly yours,
>
> (SIGNED)
>
> R.J. Ruble

Keith Tucker states at paragraph 26 of his Declaration, attached as Ex. 6 to the House declaration, that "In April 2002, KPMG advised me that it had received summonses from the IRS. KPMG advised me that the investment structure was not subject to disclosure to the IRS pursuant to those summonses and that KPMG would not disclose to the IRS KPMG's tax advice to me." Tucker further states at paragraph 27 of his Declaration that "[i]n a telephone conference on August 27, 2003, Mr. Speiss, a tax partner at KPMG, advised me for the first time that KPMG had changed its view and reached the conclusion that my name and the tax advice I received from KPMG with respect to the investment structure planned for me by KPMG were responsive to an IRS summons and, therefore, were going to be disclosed to the IRS."

[8] Given the preceding facts, it is apparent that the tax opinion referenced in Ruble's letter was backdated to December 31, 2000.

**ARGUMENT**

The leading case in the Court of Appeals for the Federal Circuit on the issue of whether proceedings in a civil case should be suspended pending the resolution of a related criminal case is *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198 (Fed. Cir. 1987).[9] As the Federal Circuit stated, "[t]he Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings. A court, however, has the discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions 'when the interests of justice seem [ ] to require such action, sometimes at the request of the prosecution, . . . sometimes at the request of the defense[.]'" *Id.* at 1202 (citations omitted). The Federal Circuit in *Afro-Lecon* went on to endorse the view taken by the D.C. Circuit in *Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir.), *cert. denied*, 449 U.S. 993 (1981), that the court must "make a case-by-case determination of whether to grant a stay of civil proceedings." *Afro-Lecon* at 1202 (citations omitted); *C3, Inc. v. United States*, 4 Cl. Ct. 790,791 (1984).

When related criminal and civil cases proceed simultaneously, there can be dangerous implications for both parties. For a criminal defendant, allowing the civil case to proceed may put his or her Fifth Amendment privilege against self-incrimination at risk, may expand the discovery in the criminal case beyond the limits of the Federal Rules of Criminal Procedure (FRCP), and may expose the basis of the defense to the prosecution in advance of the criminal trial. *Afro-Lecon* at 1203, quoting *Dresser* at 1375-1376. The danger to the prosecution is that

[9] The seminal case on this issue is *Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962), *cert. denied*, 371 U.S. 955 (1963), in which the court noted the significant number of factors which favor staying a civil case to allow a related criminal prosecution to run its course.

the civil proceedings may act as "a dress rehearsal for a criminal trial, in which all the Government witnesses testify and are cross-examined at length, but the defendant to be does not, [and it] is potentially a big lift to the criminal defense and could well be decisive in securing an acquittal, if anything could." *Afro-Lecon* at 1203, quoting *Penden v. United States*, 512 F.2d 1099, 1104 (Ct. Cl. 1975). The criminal defendants may use the more liberal discovery available in the civil case to gain knowledge regarding the Government's criminal case to which they would not otherwise have access. *See*, e.g. *Litton Systems, Inc. v. United States*, 215 Ct. Cl. 1056 (1978) (criminal defendant alleged to be using civil discovery to obtain evidence that would not be available in the criminal proceedings).

The court in *Penden* stated that "[I]t has long been the practice to 'freeze' civil proceedings when a criminal prosecution involving the same facts is warming up or under way . . . . The 'freeze' we think is not for the protection of the [criminal defendant] only, but also rises out of a sense that deferrable civil proceedings constitute improper interference with the criminal proceedings if they churn over the same evidentiary material." *Penden* at 1103. In making the decision to stay a civil case, courts must weigh the competing interests of the parties and must maintain an even balance. *Landis v. North American Co.*, 299 U.S. 248, 254 (1936) (citations omitted); *Ampetrol v. United States*, 30 Fed. Cl. 320, 321 (1994) (quoting *Landis*).

The Fifth Circuit in *Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962), *cert. denied*, 371 U.S. 955 (1963), set forth the policy considerations supporting the deferral of civil discovery pending the trial of a criminal proceeding as follows:

> The very fact that there is a clear distinction between civil and criminal actions requires a government policy determination of priority: which case should be tried first. Administrative policy gives priority to the public interest in law

> enforcement. This seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities.

In *St. Paul Fire & Marine Ins. Co. v. United States*, 24 Cl. Ct. 513, 515 (1991), the Claims Court enumerated three tests that a movant seeking a stay of a civil trial on the basis of a concurrent criminal trial must satisfy:

> (1) the movant must make a clear showing, by direct or indirect proof, that the issues in the civil action are "related" as well as "substantially similar" to the issues in the criminal investigation;
>
> (2) the movant must make a clear showing of hardship or inequity if required to go forward with the civil case while the criminal investigation is pending; and
>
> (3) the movant must establish that the duration of the requested stay is not immoderate or unreasonable.

This three-part test was used most recently by the court in *Ampetrol*, which granted a stay despite the fact that Ampetrol was not a defendant in the criminal proceedings. *Ampetrol*, 30 Fed. Cl. 320 at 321.

The court in *C3, Inc. v. United States*, 5 Cl. Ct. 659, 661 (1984), stated that "the resolution of Issue #1 requires no extensive comparative factual analysis by this court in order to conclude that the issues in the civil action are 'related' as well as 'substantially similar' to those in the criminal investigation." In fact, "defendant may satisfy its burden to make a *prima facie* showing of the ultimate fact, circumstantially." *St. Paul Fire*, 24 Cl. Ct. at 516.

Entitlement to a stay also requires the movant to "make out a clear case of hardship or

inequity in being required to go forward . . ." *Landis* at 255. *See also C3* at 792. In *Ampetrol*, the court found that the mere fact of deposition discovery in the civil case would be a sufficient hardship on the prosecution in the criminal case. In particular, the court found that "[i]t would be impossible to limit the educational effect of a deposition on a witness, or the impact that the mere designation of discovery here might have in affecting strategy in the criminal proceeding." *Ampetrol,* 30 Fed. Cl. at 322.

In *St. Paul Fire*, the court allowed a stay of six to nine months to allow for the completion of the criminal investigation and/or grand jury proceedings and, if an indictment was issued, through the period of trial. *St. Paul Fire* at 517. In *Ampetrol*, the court allowed a stay of at least 6 months, pending completion of the related criminal trial. *Ampetrol* at 322.

Defendant's motion to suspend the present action satisfies the *St. Paul Fire* three-part test. First, based on the Subcommittee Report, the KPMG deferred prosecution documents, and the superseding indictment, it is clear that the transactions engaged in by the Tucker entities– Epsolon and SLIGO – were part of the KPMG illegal tax shelter conspiracy. KPMG developed, sold, and implemented the transactions for Tucker. The facts surrounding the shelter involved in this case are inseparably intertwined with the individuals (indicted and unindicted), entities, and facts that will be the subject to the criminal trial.

Among the areas of inquiry in this matter are whether Tucker entered this transaction with a profit motive as required by § 165(c); whether the transaction lacked economic substance; whether it had no *bona fide* business purpose; and whether the transaction was a sham. From the facts described above, it is apparent that R.J. Ruble, an indicted person, was involved in the Tucker transaction at least from December 18, 2000 through June 28, 2001, that he conferred

with KPMG in the development of the shelter, arranged for Brown & Wood's representation, and was centrally involved in the preparation of the Tax Opinion. Tucker himself acknowledges in his Declaration that KPMG, and individuals connected with that firm, provided him with his tax planning. Among the individuals referred to by Tucker is Timothy Speiss, a partner in KPMG's "Innovative Strategies" group, which was described in the indictment (House Decl., Ex. 5, para. 2) as "focused on designing, marketing, and implementing tax shelters for individual clients." Depositions of Ruble, Speiss, and the other individuals connected with KPMG will be crucial in establishing Tucker's motives for entering into the shelter transactions. The facts in this case are more than sufficiently related to the criminal case to warrant a suspension of proceedings here.[10]

With respect to the second part of the test, to allow discovery to proceed in this case now will create clear hardship and inequity. If discovery is allowed to go forward in this case, including the initial disclosures required by RCFC 26(a)(1), it could interfere with the criminal case and ongoing investigation in New York by allowing the criminal defendants in that case to gain a preview of the criminal case against them. Specifically, they would be able to obtain testimony of potential Government witnesses in the criminal case through depositions in this case. On the other hand, it is likely that indicted persons, and witnesses still under criminal investigation who may have knowledge about the facts of this case, would invoke their Fifth Amendment rights if depositions are taken in this case before the criminal case is resolved

---

[10] The facts relied upon to support this motion are taken from public information, information obtained in the Tax Court proceeding, and the letter from the New York United States Attorney's Office. If the Court is unable to determine whether the facts in this case and the criminal case are sufficiently related based on that public information, defendant requests that it be given an opportunity to submit a sealed affidavit from the New York United States Attorney's Office to establish the factual relationship between this case and the criminal case.

because of the overlapping factual matters. In fact, R. J. Ruble has already claimed the protection of the Fifth amendment in a deposition seeking to discover facts about a transaction which is related to the criminal case and it is clear that Speiss and other individuals will do the same. A true and correct copy of the deposition transcript of R.J. Ruble is attached to the Declaration of David House as exhibit 25.

In addition, proceeding with the initial disclosures and other discovery at this juncture would impair the case development by the Tax Division attorney assigned to defend this case because he lacks access to information currently protected from disclosure by FRCP 6(e). It is possible that cooperating witnesses exist in the criminal matter which cannot be disclosed to the trial attorney defending this case pending resolution of the criminal case. Waiting until the criminal case and ongoing investigation are resolved would enable the Tax Division attorney to obtain access to information developed by the grand jury, either by showing a particularized need sufficient to obtain an order of disclosure under Fed.R.Crim.P. 6(e), or by obtaining access to information which may be made public after the prosecution of the criminal case is complete.[11] Discovery at this time would also undermine defendant's effective examination of witnesses because its attorney in this case does not have access to grand jury materials that could be critical to effective and complete examinations. Thus, it is clear that there would be hardship, inequity, and prejudice to both the criminal case and this case if the proceedings in this case are not stayed while the criminal case goes forward.

The fact that the Tax Court has denied a Motion to Stay in *Tucker v. Commissioner*,

[11] Additionally, if a conviction is obtained in the criminal case, it may lead to a more efficient resolution in this case.

Docket No. 12307-04, without explanation, should not operate to prevent a stay in this case. The United States does not agree with that denial. It is possible that the nature of Tax Court proceedings may have been a consideration. Proceedings in the Tax Court do not have the broad discovery permitted in this Court. Rule 75 of the Rules of the United States Tax Court severely limits the taking of depositions without an Order of the Court or upon consent of the parties.[12] Further Rule 91 of the Rules of the United States Tax Court requires the parties to attempt to agree upon stipulations of fact which can prevent the need for testimony at trial.[13] Thus

---

[12]Tax Court Rule 75 provides in pertinent part:

> **(a) When Depositions May Be Taken.** After a notice of trial has been issued or after a case has been assigned to a Judge or Special Trial Judge of the Court, and within the time for completion of discovery under Rule 70(a)(2), any party may, without leave of Court, take a deposition for discovery purposes of a nonparty witness in the circumstances described in paragraph (b) of this Rule. . . .
>
> **(b) Availability.** The taking of a deposition of a nonparty witness under this Rule is an extraordinary method of discovery and may be used only where a nonparty witness can give testimony or possesses documents or things which are discoverable within the meaning of Rule 70(b) and where such testimony, documents, or things practicably cannot be obtained through informal consultation or communication (Rule 70(a)(1)) or by a deposition taken with consent of the parties (Rule 74). If such requirements are satisfied, then a deposition may be taken under this Rule, for example, where a party is a member of a partnership and an issue in the case involves an adjustment with respect to such partnership, or a party is a shareholder of an electing small business corporation . . . .
>
> **(d) Objections.** Within 15 days after service of the notice of deposition, a party or a nonparty witness shall serve on the party seeking the deposition any objections to the deposition. The burden shall be upon the party seeking the deposition to move for an order with respect to any such objections or any failure of the nonparty witness, and such party shall annex to any such motion the notice of deposition with proof of service thereof, together with a copy of any responses and objections. . . . .

[13]Tax Court Rule 91 provides in pertinent part:

proceedings in the Tax Court present different considerations with respect to a stay.

Moreover, other Tax Court Judges have in fact granted stays or continuances or have removed cases from the calendar because of the pendency of the ongoing criminal tax shelter investigation. *See e.g., Crawford Property v. Commissioner*, Docket No. 2052-01; *Diversified Group Inc., et al. v. Commissioner*, Docket No. 2051-01); *Diversified Capital Services v. Commissioner*, Docket Nos. 2053-01, 13330-01, 13331-01; *Meruelo v. Commissioner*, Docket No. 624-04; *Starlike Properties v. Commissioner*, Docket No. 2484-04; *Goddard v. Commissioner*, Docket No. 1144-05; *Goddard v. Commissioner*, Docket No. 1145-05; *Greenburg v. Commissioner*, Docket No. 1143-05; *Pointe Du Hoc v. Commissioner*, Docket No. 006041-05.

Without a stay in this case, the United States will be forced to make a "Hobson's choice" where it must decide either to protect the criminal case by not making important evidence available to its attorneys and the Court in this civil case, or protect the civil case by prematurely exposing the evidence to be used in the criminal trial. No matter what choice it makes, one or both of the Government's cases will be unfairly prejudiced.

If the Government chooses to protect the criminal case, both its civil case and its criminal case will be unfairly prejudiced because the Government's civil attorneys will be forced to take

---

> a) **Stipulations Required. (1) General.** The parties are required to stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters not privileged which are relevant to the pending case, regardless of whether such matters involve fact or opinion or the application of law to fact. Included in matters required to be stipulated are all facts, all documents and papers or contents or aspects thereof, and all evidence which fairly should not be in dispute . . . .

and defend civil depositions – to the extent individuals will not invoke the Fifth Amendment– while they lack information that the prosecutors are temporarily unable to share with them about documents, facts, witnesses and the criminal defendants. Moreover, to the extent the civil attorneys for the Government have gathered information and documents, using that information and those documents to cross-examine witnesses will potentially preview cross-examination by the prosecutors in the criminal case and thereby enable those witnesses to tailor their testimony by either side at the criminal trial. A Government choice to protect the civil case would come at great cost to the criminal trial and pending investigations. The fact that the Tax Court's denial of the stay in Tucker is forcing such a choice on the government in that case should not force a similar choice to be made in this case.[14]

Finally, because the trial in the criminal case is scheduled for September 11, 2006, suspending proceedings in this case until after the criminal proceedings are resolved is not an unreasonable delay in the proceedings in this case. Therefore the third part of the *St. Paul Fire* three-part test is satisfied.

## CONCLUSION

The Tucker/Epsolon transactions are part of the *Stein* indictment and the issue of the legitimacy of the Tucker's transaction will be litigated in the criminal trial. To permit the civil case to go forward with discovery and /or trial prior to the conclusion of the Stein trial would prejudice the criminal trial, and would prejudice the ability of the United States to fairly develop their defense in the civil case pending before this Court. As the Senate Subcommittee Report,

---

[14]As of the drafting of this memorandum, the United States is considering what options it may have with respect to the Tax Court's denial of the stay in that case.

the KPMG deferred prosecution documents, and the superseding indictment demonstrate, the KPMG illegal tax shelter conspiracy generated billions of dollars in phony tax losses and involved a large number of individuals, many of whom are professionals, including lawyers and accountants. The illegal tax shelter criminal proceedings are enormously important with respect to the effective administration of the Internal Revenue laws, and this case is just one facet of the overall conspiracy. Thus, as a result of grand jury secrecy, Fifth Amendment considerations, and the danger that events in this case could compromise the criminal prosecution, proceedings in this case should be suspended until after the criminal case has been resolved. As a practical

matter, discovery will not be feasible until after that trial, which is set to begin on September 11, 2006, and assuming conviction, after any sentencing proceeding has ended. Based on the foregoing, defendant respectfully moves that the instant case be stayed until resolution of the pending criminal case.

Respectfully submitted,

January 13, 2006
Date

s/ David R. House
DAVID R. HOUSE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 616-3366

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section
Of Counsel

Attorneys for Defendant