communications in question were not privileged. For example, the defendant DAVID GREENBERG, with the knowledge and approval of the defendant RICHARD ROSENTHAL, attempted to conceal his activities in this manner by purporting to have KPMG clients engage a law firm (the "Orange County Law Firm") to provide legal advice, which law firm would then purport to engage KPMG to work under the direction of the Orange County Law Firm. Under *United States v. Kovel*, communications by non-lawyer professionals such as accountants are protected under the attorney-client privilege when the accountant is in fact working under the direction of an attorney. Numerous *Kovel* arrangements purportedly established by GREENBERG and the Orange County Law Firm were sham arrangements because the clients did not directly engage the law firm, in many instances never even spoke to anyone at the Orange County Law Firm, and GREENBERG's work was done outside of the purported lawyer-client privilege. The purpose of this fraudulent conduct was to enable the client, with the assistance of GREENBERG and the Orange County Law Firm, to conceal the fraudulent tax shelter from the IRS by attempting to cloak all of the work for the shelter in the attorney-client privilege. The defendants GREENBERG and ROSENTHAL set up such a phony *Kovel* relationship with the Orange County Law Firm in an attempt to hide ROSENTHAL's fraudulent tax shelter transaction from the IRS.

<u>Obstruction of IRS and Senate Investigations</u>

59. In or about October 2001 the IRS initiated an examination of KPMG

for its failure to register the transactions with the IRS. As part of this examination, in early 2002 the IRS issued 25 summonses to KPMG calling for information relating to numerous tax shelters with which KPMG may have been involved. In addition, the IRS summonses required KPMG to designate a knowledgeable person to testify under oath at the IRS. KPMG designated the defendant JEFFREY EISCHEID, who at the time was the Partner-in-Charge of KPMG's Personal Financial Planning group, to testify. EISCHEID's testimony was false, misleading, and evasive. Among other things, EISCHEID falsely denied that KPMG's fees were based on anticipated tax benefits and misrepresented KPMG's role in devising, marketing, and implementing tax shelters. Indeed, after one day of testimony, another KPMG partner who attended the testimony reported in an email to the defendant RICHARD ROSENTHAL that KPMG's Office of General Counsel and outside counsel "determined that the best strategy was 'the less said the better,'" and that EISCHEID "felt that he had no choice but to be 'forgetful.' And so the record will reflect repeated 'I don't knows', 'I don't recalls,' and 'I was out of the loops' — the rope-a-dope/Enron defense."

60. IRS summonses called for production of documents relating to SOS tax shelters, among other things. The defendants RICHARD SMITH and STEVEN GREMMINGER were among the KPMG personnel directing KPMG's response to the IRS summonses and SMITH and GREMMINGER were aware of KPMG's involvement in marketing and implementing SOS transactions. Nevertheless, none of the SOS tax

shelters marketed or implemented by KPMG, or in which KPMG personnel participated, were disclosed to the IRS and on a number of occasions, SMITH, GREMMINGER and others caused KPMG falsely to claim to the IRS that the production of documents and information relating to the summonses was substantially complete.

61. In addition, when the IRS in May 2003 specifically inquired about KPMG's failure to produce SOS information, the defendants JEFFREY EISCHEID and STEVEN GREMMINGER intentionally caused KPMG's representatives to falsely respond that KPMG was not involved in SOS, but may have prepared a couple of tax returns containing SOS losses.

62. In January 2003, a Subcommittee of the United States Senate issued a subpoena to KPMG calling for documents and information relating to its tax shelter activities, including a specific request for documents relating to tax shelters used by KPMG partners to evade their own taxes. The subpoena specifically named the defendant DAVID GREENBERG as well as certain KPMG partners who, in fact, had used SOS transactions to evade their own taxes, including the defendant RICHARD ROSENTHAL. The defendants RICHARD SMITH and STEVEN GREMMINGER were among the KPMG personnel supervising and directing KPMG's response to the Senate investigation. In addition, SMITH and GREMMINGER were aware of ROSENTHAL's and other KPMG partners' use of GREENBERG shelters to offset those partners' own income or gain, and were aware of related documents responsive to the

Senate subpoena. However, the defendants SMITH and GREMMINGER and their co-conspirators caused KPMG's representatives falsely to respond to the subpoena as follows: "to the best of its knowledge and belief, after reasonable inquiry to date, the firm has not yet identified any documents that are responsive to this request."

63. In or about November 2003, the defendants RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, LARRY DELAP, and MARK WATSON, certain co-conspirators, and others testified before the Senate Subcommittee investigating tax shelter activities of KPMG and others. The defendants EISCHEID, WIESNER, and DELAP testified together in panel format. During this testimony, among other things, EISCHEID falsely denied that KPMG's fee was a percentage of the tax loss to be generated by the shelters. In addition, when asked by a Senator whether FLIP, OPIS and BLIPS were "designed and marketed primarily as tax reduction strategies," EISCHEID falsely stated "Senator, I would not agree with that characterization." In addition, among other false and misleading testimony presented at the hearing, SMITH gave evasive testimony regarding KPMG's involvement in designing, marketing, and implementing tax shelters. LARSON also provided false and misleading testimony by, among other things, falsely denying that BLIPS was designed so that investors would exit on day 60 of the transaction regardless of the purported 7-year structure of the purported loan, and falsely denying that FLIP was designed primarily for tax deductions.

RITCHIE's Obstruction of IRS Audit of the Beverly Hills Businessman

64. In 1999, the Beverly Hills Businessman participated in a BLIPS transaction that generated $300 million of phony tax losses, a portion of which was attached to various publicly-traded stocks. The Beverly Hills Businessman sold these stocks to trigger the losses. The Beverly Hills Businessman triggered and claimed a $225 million BLIPS-related loss on 1999 tax returns, and claimed the remaining BLIPS loss on 2000 tax returns. In or about early 2002, the IRS's Los Angeles office commenced a civil audit of the Beverly Hills Businessman and certain entities controlled by him with respect to the 1999 tax year.

65. During the course of, and in connection with, the IRS audit, defendant GREGG RITCHIE, who represented the Beverly Hills Businessman and the entities in connection with the audit, made a number of false and misleading statements to the IRS Revenue Agent conducting the audit in order to avoid disclosing to the IRS that the $225 million loss claimed by the Beverly Hills Businessman and related entities for 1999 was attributable to a BLIPS tax shelter transaction sold to the Beverly Hills Businessman by KPMG. Those false and misleading statements included that the alleged $225 million "loss" incurred by the Beverly Hills Businessman and ultimately claimed on tax returns was attributable to regular business activities of the Beverly Hills Businessman's companies. In addition to making false and misleading statements, RITCHIE (a) provided the IRS Revenue Agent with a false and misleading document

that purported to represent the organizational structure of the Beverly Hills Businessman's companies but which, in truth and fact, omitted a description of or reference to the entities through which the Beverly Hills Businessman participated in BLIPS and created the phony $225 million loss for the 1999 tax year, and (b) failed to provide the IRS Agent with the BLIPS power point, notwithstanding the fact that RITCHIE had been provided the power point by KPMG and used it to provide the Beverly Hills Businessman with an understanding of BLIPS.

66. After realizing during the audit that the IRS Agent conducting the audit had not uncovered the true nature of the $225 million loss, GREGG RITCHIE sought to expand the audit to cover the year 2000, and sought to have the IRS enter into a settlement, or "closing", agreement, which agreement would finally determine the Beverly Hills Businessman's tax liabilities for the 1999 and 2000 tax years. In order to create a false sense of urgency with respect to the execution of that agreement, GREGG RITCHIE falsely represented to the IRS that the closing agreement had to be finalized by April 15, 2002 because the Beverly Hills Businessman had to comply with certain IRS return filing deadlines.

67. On or about April 23, 2002, GREGG RITCHIE realized that the closing agreement relating to the IRS's audit of the Beverly Hills Businessman would not be completed prior to the expiration of the April 23, 2002 deadline set by the IRS for taxpayers to disclose to the IRS's Office of Tax Shelter Analysis in Washington, D.C.

their participation in tax shelters likes BLIPS, which disclosures would allow tax shelter participants to avoid certain civil (but not criminal) penalties. In order to comply with the disclosure filing deadline without alerting the Los Angeles IRS Revenue Agent about the filing, GREGG RITCHIE prepared and caused to be sent to the Office of Tax Shelter Analysis, in Washington, D.C., a disclosure form with respect to the Beverly Hills Businessman's 1999 BLIPS transaction. In that disclosure, RITCHIE falsely represented that he had provided a copy of the disclosure form to the Los Angeles IRS Revenue Agent who was conducting the audit of the Beverly Hills Businessman. In truth and fact, as RITCHIE well knew, he never provided the disclosure form to the Los Angeles IRS Revenue Agent the Los Angeles IRS Revenue Agent did not learn of the disclosure filing until after the execution of the closing agreement in or about May 2002.

**Evasion of Defendants' Taxes**

68. As noted above, the Larson/Pfaff entities collected at least $140 million in fees relating to FLIP, OPIS, and BLIPS. Between July and September 1999, the defendants JOHN LARSON and ROBERT PFAFF engaged in a BLIPS transaction through Bank E and claimed on tax returns approximately $24 million in purported losses as a result. LARSON and PFAFF used these fraudulent losses to evade their own taxes and taxes relating to an entity they owned and controlled ("Larson/Pfaff entity 1"). The defendants LARSON, PFAFF, and DAVID AMIR MAKOV engaged in a set of two BLIPS transactions from March through May 2000 through Bank C that purported to

generate a total of $75 million of losses. LARSON, PFAFF, and MAKOV generated these losses using a variety of entities and trusts controlled by them, and used them to evade individual income taxes and taxes relating to entities they owned and controlled ("Larson/Pfaff entity 2" and "Larson/Pfaff entity 3"). The defendants LARSON, PFAFF, and MAKOV exited the BLIPS transactions approximately 67 days after commencing the transaction; they did not remain in for later stages or seven years, and did not exit the transaction based on the performance of the nominal investment component of BLIPS.

69. In 1999, the defendant GREGG RITCHIE engaged in a BLIPS transaction that purported to generate tax losses of approximately $10 million. RITCHIE exited BLIPS at the earliest opportunity and before year-end 1999. RITCHIE's BLIPS transaction was conducted concurrent with the $300 million BLIPS transaction conducted by the Beverly Hills Businessman. The Beverly Hills Businessman also exited BLIPS at the earliest opportunity. However, the Beverly Hills Businessman triggered approximately $225 million in tax losses in 1999, attaching a substantial portion of the remaining losses to stocks and triggering them in 2000. Both RITCHIE and the Beverly Hills Businessman attached a portion of the phony BLIPS losses to a number of publicly traded stocks that had already suffered large losses during the year, in order to mislead the IRS into believing that the losses resulted from those stocks' poor performance, rather than from the fraudulent tax shelters. RITCHIE prepared and caused to be

prepared tax returns for himself and the Beverly Hills Businessman that reported the BLIPS losses as if they had resulted from the sale of these various stocks. In addition, although the Larson/Pfaff entities purchased these stocks on behalf of RITCHIE and the Beverly Hills Businessman on or about December 6, 1999, RITCHIE falsely reported that these stocks had been purchased on "various" dates to further conceal the BLIPS shelter and to mislead the IRS into thinking that the losses resulted from the poor performance of these stocks during the year.

70. The defendant RICHARD ROSENTHAL conducted an SOS transaction in 1999. ROSENTHAL used approximately $248,000 in tax losses from this transaction to evade 1999 taxes, and approximately $248,000 in tax losses from this transaction to evade 2000 taxes.

71. The defendant DAVID GREENBERG received approximately $1.6 million in income from KPMG in 1999, 2000, and 2001. On his tax returns for those years, he claimed losses of approximately $1.6 million with the notation "nominee," and therefore fraudulently understated his taxable income and paid virtually no tax on the money he received from KPMG. GREENBERG reported this money as income on the tax returns for an entity controlled by GREENBERG and a co-conspirator not named as a defendant herein ("CC 11"), but that entity conducted tax shelter transactions to generate phony losses that offset virtually all of that income. GREENBERG only reported on his individual income tax returns a total of $185,000 in income from this entity.

## Statutory Allegations

72. From at least in or about 1996 through at least in or about 2005, JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), and 7206(2).

## Objects of the Conspiracy

73. It was a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY,

DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, willfully and knowingly would and did defraud the United States of America and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

74. It was further a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by tax shelter clients and others, in violation of Title 26, United States Code, Section 7201.

75. It was further a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY

DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, wilfully and knowingly would and did make and subscribe and cause others to make and subscribe United States individual, corporation, and partnership income tax returns, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and that the defendants and their co-conspirators did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(l).

76. It was further a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, wilfully and knowingly would and did aid and assist in, and procure, counsel,

and advise the preparation and presentation under, the internal revenue laws, of certain United States individual, corporation, and partnership income tax returns which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

## Means and Methods of the Conspiracy

77. Among the means and methods by which JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, would and did carry out the conspiracy were the following:

a. They would and did concoct tax shelter transactions and false and fraudulent factual scenarios to support them so that wealthy United States citizens would pay certain of the conspirators and other participants in the transactions approximately 5 to 7% of income or gain instead of paying federal and state taxes on that income or gain.

b. They would and did prepare false and fraudulent documents to

deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and opinion letters.

c. They would and did conceal the contents of tax shelter sales presentations in order to prevent the IRS from discovering the true facts regarding those shelter transactions.

d. They would and did prepare and provide to their clients false and fraudulent representations that the clients were required to make in order to obtain opinion letters that purported to justify using the phony tax shelter losses to offset income or gain. At times, the conspirators presented to their clients these false and fraudulent client representations after the all-in costs of approximately 5 to 7% of the desired tax loss were collected from the tax shelter clients.

e. They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated the phony tax losses and therefore substantially understated the tax due and owing by the shelter clients.

f. They would and did (i) fail to report on certain tax returns the losses and the gain or income they sheltered and thus fraudulently understate gross amounts of income and gain; and (ii) disguise the shelter losses on certain tax returns in a manner intended to deceive the IRS.

g. They would and did take various steps to prevent the creation and

retention of documents that might reveal to the IRS the true facts regarding the fraudulent tax shelters as well as certain conspirators' role in designing, marketing, and implementing them, including but not limited to concealing from the IRS that the opinion letters provided by KPMG, the RUBLE Law Firm, and other firms were not independent and were instead prepared by entities involved in the design, marketing, and implementation of the tax shelters.

h. They would and did take various additional steps to conceal from the IRS the existence of the shelters, their true facts, and certain conspirators' role in designing, marketing, and implementing the shelters, including, but not limited to, failing to register the shelters, using sham attorney-client privilege claims, and concealing documents and providing false and misleading information in response to IRS and Senate investigations.

**Overt Acts**

78. In furtherance of the conspiracy and to effect the illegal objects thereof, JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-

conspirators not named as defendants herein KPMG and Dominick DeGiorgio, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about January 30, 1997, defendants JEFFREY EISCHEID and JOHN LARSON advised a FLIP client and his return preparer to create a grantor trust for the purposes of concealing on the client's tax return the FLIP tax loss to be generated and the client's gain from other sources.

b. On or about July 18, 1997, the defendant ROBERT PFAFF prepared a memorandum to the defendants JOHN LANNING and JEFFREY STEIN discussing how KPMG and the Larson/Pfaff Entities should jointly devise, market, and implement tax shelter transactions and how their fees should be divided.

c. On or about August 16, 1997, the defendant JOHN LANNING sent an email to the defendants JEFFREY STEIN, JEFFREY EISCHEID, JOHN LARSON, ROBERT PFAFF, GREGG RITCHIE, and others regarding a meeting focusing on successfully completing LARSON and PFAFF engagements, continuing to grow and expand the "Tax Advantaged Transactions" practice that LARSON and PFAFF had been overseeing, and endeavoring to forge an ongoing and successful relationship with the "Pfaff/Larson firm."

d. In or about September 1997, the defendant GREGG RITCHIE on

behalf of KPMG and the defendant JOHN LARSON on behalf of the Larson/Pfaff Entities signed an "operating agreement" regarding joint marketing and implementation of FLIP transactions.

e. On or about December 15, 1997, the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," told the defendant RANDY BICKHAM, who in turn told the defendant GREGG RITCHIE that RUBLE's managing partner had approved his working with KPMG on a joint basis to develop and market tax products and jointly to share in the fees.

f. On or about March 14, 1998, the defendant JEFFREY STEIN sent an email to the defendant JOHN LANNING and others recommending, in substance and in part, that revenue credit for OPIS transactions be divided among KPMG practice groups in a particular manner based on the similarities between FLIP and OPIS.

g. On or about May 26, 1998, the defendant GREGG RITCHIE advised the defendant JEFFREY STEIN and others that KPMG should not register OPIS because to do so would put KPMG at a severe competitive disadvantage in marketing tax shelters.

h. On or about June 8, 1998, the defendant GREGG RITCHIE advised the KPMG team marketing OPIS not to leave the OPIS PowerPoint presentation "with clients or targets under any circumstances" because doing so "will

DESTROY any chance the client may have to avoid the step transaction doctrine."

i. On or about September 10, 1998, the defendant JEFFREY EISCHEID sent an email to defendant JOHN LANNING and others proposing an "alliance" with a competitor of the Larson/Pfaff Entities to implement OPIS transactions and noting that "we have very little time to work with if we are going to execute trades such that our clients can generate the desired benefits in calendar 1998."

j. On or about December 3, 1998, the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," prepared a memorandum to the defendant RANDY BICKHAM and another co-conspirator not named as a defendant herein proposing structuring BLIPS with a fixed-rate loan for purposes of avoiding a rule that would block the generation of BLIPS phony tax losses.

k. On or about December 15, 1998, the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," sent an email to his management stating that he had worked closely with KPMG in developing tax products and had agreed to issue "concurring" "more likely than not" opinion letters for those products in return for a fee from KPMG of $50,000 per deal for 1997, and a fee for 1998 based on deal size.

l. On or about January 22, 1999, the defendant JEFFREY EISCHEID instructed KPMG partners that each partner should decide for himself or herself

whether to attempt to conceal losses from the IRS using a grantor trust.

m. On or about April 30, 1999 and May 1, 1999, the defendants JEFFREY EISCHEID, MARK WATSON, JOHN LARSON, DAVID AMIR MAKOV, RANDY BICKHAM, CAROL WARLEY, DAVID RIVKIN, and CARL HASTING, and certain co-conspirators met in Dallas, Texas for a BLIPS task force meeting.

n. On or about May 9, 1999, the defendant MARK WATSON sent an email to the defendants JEFFREY EISCHEID, PHILIP WIESNER, LARRY DELAP, and RANDY BICKHAM proposing false representations to be included in the BLIPS opinion letter.

o. On or about May 10, 1999, the defendant MARK WATSON sent an email to the defendants RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, LARRY DELAP, and RANDY BICKHAM proposing a false representation to be included in the BLIPS opinion letter.

p. On or about May 10, 1999, the defendant JEFFREY STEIN sent an email to others in which he recommended that KPMG market and implement BLIPS.

q. On or about May 18, 1999, the defendant LARRY DELAP sent an email stating that marketing of BLIPS was approved.

r. On or about August 4, 1999, the defendant PHILIP WIESNER

announced that BLIPS was approved for marketing by KPMG personnel.

s. On or about August 5, 1999, the defendant RANDY BICKHAM sent an email to the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," in the Southern District of New York stating that he and the attorney had received a "get out of jail free card" as a result of obtaining permission from Washington National Tax to proceed with BLIPS.

t. On or about August 30, 1999, the defendant RANDY BICKHAM sent the defendant GREGG RITCHIE a BLIPS powerpoint presentation for the Beverly Hills Businessman.

u. In or about September or October 1999, Domenick DeGiorgio, a co-conspirator not named as a defendant herein, met at the offices of Bank B in the Southern District of New York with the defendant ROBERT PFAFF, and on another occasion, with JOHN LARSON and DAVID AMIR MAKOV and others.

v. In or about 1999, in the Southern District of New York and elsewhere, Banks A, B and C, prepared and caused to be prepared transactional documents relating to BLIPS tax shelter transactions.

w. On or about September 24, 1999, a co-conspirator not named as a defendant herein ("KPMG Partner 1") instructed the Innovative Strategies group that because banks were unwilling to execute as many BLIPS deals as had been sold to clients, the Innovative Strategies group should consult with DAVID

GREENBERG regarding a tax shelter transaction that BLIPS clients could use instead of BLIPS to shelter their income and gain.

x. On or about September 24, 1999, the defendant RICHARD ROSENTHAL advised defendant DAVID GREENBERG that defendant MARK WATSON would contact GREENBERG to arrange tax shelter transactions for clients to whom KPMG had offered BLIPS, but for whom KPMG could not arrange BLIPS transactions.

y. On or about September 27, 1999, the defendant DAVID AMIR MAKOV prepared a "loan premium rationale" designed to falsely make it appear that there were legitimate business and economic purposes for structuring the BLIPS purported loan in the manner it was structured.

z. On or about October 1, 1999, the defendant LARRY DELAP approved the sale of OPIS transactions to clients who were promised BLIPS but for whom KPMG could not arrange BLIPS transactions.

aa. In or about October 1999, the defendant DAVID AMIR MAKOV requested a treasury official of Bank B in the Southern District of New York to execute a swap transaction involving a BLIPS "loan" by employing two separate trade tickets rather than a single swap transaction ticket.

bb. In or about mid-October 1999, a co-conspirator not named as a defendant herein, caused KPMG professionals to be deployed to the New York,

New York offices of Bank B to aid in processing various BLIPS transactions in order to allow the transactions to be initiated and terminated by the end of the calendar year.

cc. On or about October 18, 1999, the defendant RICHARD ROSENTHAL instructed a co-conspirator not named as a defendant herein ("KPMG Partner 2") to send no further emails regarding a tax shelter client who had been pitched BLIPS, but then had been sold an SOS tax shelter transaction by DAVID GREENBERG ("DAVID GREENBERG Client 1"), resulting in a fee triple the fee that would have resulted from BLIPS.

dd. On or about December 1999, the defendant CARL HASTING sent an email to the defendant RICHARD ROSENTHAL reporting $437,500 revenue from a BLIPS transaction arranged for the husband of a KPMG partner and assigning to the KPMG partner "Teamwork Revenue" credit for this transaction.

ee. On or about November 30, 1999, the defendant CAROL WARLEY advised a BLIPS client to divide the phony tax shelter losses among 10 stocks that have been losers.

ff. On or about December 3, 1999, the defendant CARL HASTING sent an email to the defendant JEFFREY EISCHEID in which he itemized SOS transactions and $700,000 in fees due to KPMG. EISCHEID wrote "just a word of caution . . . DPP has mandated that we receive no value added fees from the

client and no payment from [CC 10]. At $350 per hour, your $700,000 is 2,000 hours."

gg. On or about December 8, 1999, the defendant MARK WATSON advised others involved in marketing and implementing BLIPS that a document on which the client selected how much of the BLIPS loss should be ordinary and how much should be capital should not be kept in the file because "if the IRS were to discover such a document it could look very bad for the client."

hh. On or about January 9, 2000, the defendant CARL HASTING sent an email to the defendant RICHARD ROSENTHAL reporting $470,000 revenue from two SOS transactions arranged by HASTING and assigning to ROSENTHAL "Teamwork Revenue" credit for these transactions.

ii. On or about March 7, 2000, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, LARRY DELAP, and STEVEN GREMMINGER, and others met in the Southern District of New York to discuss the risks of civil penalties and criminal investigation associated with completing the implementation of 1999 OPIS and BLIPS transactions.

jj. On or about March 21, 2000, a co-conspirator not named as a defendant herein advised others involved in marketing BLIPS that they should "NOT put a copy of" an email in their BLIPS file because "it is a roadmap for the taxing authorities to all the other listed transactions."

kk. In or about March 2000, the defendant STEVEN GREMMINGER called KPMG's relationship partner at Law Firm 2 about the Law Firm 2 Memo and stated that Law Firm 2 was interfering with a KPMG tax transaction and that senior tax partners at KPMG were irate. BLIPS was the KPMG tax transaction referred to by GREMMINGER.

ll. On or about March 29, 2000, the defendant DAVID GREENBERG issued to defendant RICHARD ROSENTHAL an opinion letter relating to ROSENTHAL's SOS tax shelter transaction. GREENBERG issued the opinion letter with the name of a nominee as the purported author in order to conceal GREENBERG's involvement in implementing the transaction, and with CC 11 as the purported addressee in order falsely to make it appear that the opinion letter was covered by the attorney-client privilege.

mm. In or about March and April 2000, in the Southern District of New York, the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," prepared and caused to be prepared dozens of BLIPS opinion letters.

nn. On or about November 9, 2000, defendant DAVID GREENBERG sent an email to CC 11 instructing CC 11 to establish entities and bank accounts to be used to execute SOS transactions for five KPMG partners and one KPMG former partner.

oo. In or about 1998, 1999, and 2000, the defendant RAYMOND J.

RUBLE, also known as "R.J. Ruble," caused dozens of invoices and opinion letters relating to fraudulent tax shelter transactions to be sent by overnight carrier from the RUBLE Law Firm in New York, New York to KPMG's Atlanta office.

pp. In or about 1998, 1999, and 2000, in the Southern District of New York and elsewhere, certain conspirators, including KPMG personnel and clients, and others involved in FLIP and OPIS tax shelter transactions prepared, signed and filed tax returns that falsely and fraudulently claimed over $4.2 billion in phony tax losses generated by FLIP and OPIS transactions.

qq. In or about 2000 and 2001, in the Southern District of New York and elsewhere, certain conspirators, including KPMG personnel and clients, and others involved in BLIPS tax shelter transactions prepared, signed and filed tax returns that falsely and fraudulently claimed over $5.1 billion in phony tax losses generated by BLIPS transactions.

rr. In or about 1999, 2000, and 2001, in the Southern District of New York and elsewhere, certain conspirators, including KPMG personnel and clients, and others involved in SOS tax shelter transactions prepared, signed and filed tax returns that falsely and fraudulently claimed over $1.9 billion in phony tax losses generated by SOS.

ss. In or about March 2001, defendants JEFFREY EISCHEID and STEVEN GREMMINGER attempted to procure an additional law firm to author

a favorable opinion letter for a BLIPS client who had previously demanded that KPMG return all of his fees to him.

tt. On or about February 12 and 27, 2002, the defendant JEFFREY EISCHEID provided false and misleading testimony under oath to the IRS.

uu. On or about October 2, 2002, the defendant RICHARD SMITH sent a letter to the IRS in the Southern District of New York falsely claiming that "KPMG has at this time virtually completed its compliance with the summonses" although as SMITH well knew, KPMG had produced no documents or information regarding its involvement in marketing and implementing SOS transactions.

vv. On or about February 19, 2003, the defendants RICHARD SMITH and STEVEN GREMMINGER and others caused KPMG's outside counsel to falsely represent to the Senate that "after reasonable inquiry to date, the firm has not yet identified any documents" relating to shelter transactions used by KPMG partners to shelter their own income or gains, although SMITH and GREMMINGER well knew that KPMG had various documents responsive to this subpoena request.

ww. On or about November 18, 2003, the defendant JEFFREY EISCHEID provided false and misleading testimony under oath to a Subcommittee of the United States Senate.

xx. On or about November 18, 2003, the defendant RICHARD SMITH provided evasive testimony under oath to a Subcommittee of the United States Senate.

yy. On or about November 20, 2003, the defendant JOHN LARSON provided false and misleading testimony under oath to a Subcommittee of the United States Senate.

zz. On or about January 22, 2004, a BLIPS client ("CAROL WARLEY Client 2") provided false and misleading testimony under oath to the IRS.

(Title 18, United States Code, Section 371.)

**COUNTS TWO THROUGH FORTY**
**(Tax Evasion)**

The Grand Jury further charges:

79. The allegations set forth in paragraphs 1-71 are repeated and realleged as if fully set forth herein.

80. From on or about January 1 of each of the calendar years set forth below, through at least on or about the filing dates set forth below for each said calendar year, in the Southern District of New York and elsewhere, JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID

RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, along with their co-conspirators, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by the tax shelter clients and by certain defendants and entities controlled by defendants set forth below to the United States of America for the calendar years set forth below, by committing and causing to be committed the following acts, among others:

a. preparing and executing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and opinion letters;

b. creating entities to be used in executing tax shelter transactions;

c. executing financial transactions to implement the fraudulent tax shelters;

d. preparing and filing false and fraudulent tax returns; and

e. taking various steps to conceal from the IRS the existence of the shelters, their true facts, and certain conspirators' role in designing, marketing, and implementing the shelters, including, but not limited to, failing to register the shelters, using sham attorney-client privilege claims, and concealing documents and providing false and misleading information in response to IRS and Senate investigations.

| Count | Client/Defendant in Entity Controlled by Defendant | Tax Return | Approx. Amount of Fraudulent Tax Shelter Loss | Approx. Date of Filing |
|---|---|---|---|---|
| 2 | Beverly Hills Businessman | 1999 1040 | $120 million | 08/23/2000 |
| 3 | Beverly Hills Businessman | 2000 1040 | $41 million | 10/15/2001 |
| 4 | GREGG RITCHIE | 1999 1040 | $2.7 million | 10/14/2000 |
| 5 | GREGG RITCHIE | 2000 1040 | $2.3 million | 10/01/2001 |
| 6 | RICHARD ROSENTHAL | 1999 1040 | $248,000 | 10/15/2000 |
| 7 | RICHARD ROSENTHAL | 2000 1040 | $248,000 | 10/15/2001 |
| 8 | CAROL WARLEY Client 1 | 1999 1040 | $136 million | 04/15/2000 |
| 9 | CAROL WARLEY Client 1 | 2000 1040 | $74 million | 10/09/2001 |
| 10 | CAROL WARLEY Client 1 | 2001 1040 | $76 million | 10/15/2001 |
| 11 | CAROL WARLEY Client 2 | 1999 1040 | $36 million | 04/15/2000 |
| 12 | CAROL WARLEY Client 3 | 1999 1040 | $10 million | 04/15/2000 |
| 13 | CAROL WARLEY Client 4 | 1999 1040 | $6 million | 04/15/2000 |
| 14 | JOHN LARSON Client 1 | 1999 1040 | $10 million | 05/10/2000 |
| 15 | JOHN LARSON Client 1 | 2000 1040 | $47 million | 04/15/2001 |

| Count | Client, Hedge Fund, or Entity Controlled by Defendant | Tax Returns [illegible] | [illegible] Amount of Fraudulent Shelter Loss | Approximate Date of Filing |
|---|---|---|---|---|
| 16 | JOHN LARSON<br>Client 1 Trust | 1999 1041 | $20 million | 05/10/2000 |
| 17 | JOHN LARSON<br>Client 1 Trust | 2000 1041 | $47 million | 04/15/2001 |
| 18 | Hedge Fund<br>Manager 1 | 1999 1040 | $52 million | 08/01/2000 |
| 19 | DAVID RIVKIN<br>Client 1 | 1999 1040 | $25 million | 04/15/2000 |
| 20 | DAVID RIVKIN<br>Client 2 | 1999 1040 | $59 million | 04/15/2000 |
| 21 | DAVID RIVKIN<br>Client 3 | 1999 1040 | $20 million | 04/15/2000 |
| 22 | DAVID RIVKIN<br>Client 4 | 2000 1040 | $30 million | 10/15/2001 |
| 23 | DAVID RIVKIN<br>Client 5 | 1999 1040 | $9 million | 10/19/2000 |
| 24 | DAVID RIVKIN<br>Client 5 | 2000 1040 | $17 million | 06/18/2001 |
| 25 | CARL HASTING<br>Client 1 | 1999 1040 | $36 million | 04/15/2000 |
| 26 | CARL HASTING<br>Client 2 | 1999 1040 | $50 million | 10/15/2000 |
| 27 | CARL HASTING<br>Client 3 | 1999 1040 | $7 million | 09/19/2000 |
| 28 | KPMG Partner 2 | 2000 1040 | $590,000 | 10/10/2001 |
| 29 | Venture Capital Fund<br>Manager 1 | 1999 1040 | $68 million | 10/16/2000 |

| Count | Client/Defendant or Entity Controlled by Defendant | Tax Return(s) | Approximate Amount of Fraudulent Shelter Loss | Approximate Date of Filing |
|---|---|---|---|---|
| 30 | Other Client 1 | 1999 1040 | $81 million | 04/15/2000 |
| 31 | Other Client 2 | 1999 1040 | $8 million | 04/15/2000 |
| 32 | JOHN LARSON | 1999 1040 | $8 million | 10/13/2000 |
| 33 | ROBERT PFAFF | 1999 1040 | $8 million | 10/15/2000 |
| 34 | Larson/Pfaff entity 1 | 1999 1040 | $8 million | 06/19/2000 |
| 35 | Larson/Pfaff entity 2 | 1999 1120 | $25 million | 02/21/2001 |
| 36 | Larson/Pfaff entity 2 | 2000 1120 | $25 million | 12/03/2001 |
| 37 | Larson/Pfaff entity 3 | 2000 1120 | $25 million | 09/27/2001 |
| 38 | DAVID GREENBERG Client 1 | 1999 1040 | $19 million | 10/15/2000 |
| 39 | DAVID GREENBERG Client 2 | 1999 1040 | $1.4 million | 10/15/2000 |
| 40 | DAVID GREENBERG Client 3 | 2000 1120 | $119 million | 09/30/2001 |

(Title 26, United States Code, Section 7201, Title 18, United States Code, Section 2.)

**COUNTS FORTY-ONE THROUGH FORTY-FOUR**
**(Evasion of RUBLE's Income Taxes)**

The Grand Jury further charges:

81. The allegations set forth in paragraphs in 52-53 are repeated and realleged as if fully set forth herein.

82. For the tax years 1997-2001, RUBLE knowingly omitted from his U.S. Individual Income Tax Returns over $1,482,000 in income in the form of side payments paid to him by the CC-10-related entities and by the LARSON and PFAFF nominee entities.

83. From on or about January 1 of each of the calendar years set forth below, through at least on or about the filing dates set forth below for each said calendar year, in the Southern District of New York and elsewhere, the defendants listed below, unlawfully, wilfully, and knowingly, did attempt to evade and defeat a substantial part of the income taxes due and owing by RUBLE to the United States of America for the calendar years 1998-2001 by various means, including, among others (a) opening and causing to be opened in New York, New York a bank account in the name of a trust controlled by RUBLE; (b) depositing and causing to be deposited in this trust bank account in New York, New York and another bank account certain side payments he received from tax shelter promoters; (c) falsely informing the RUBLE Law Firm that he had no outside income; (d) causing the issuance by the RUBLE Law Firm of IRS Forms K-1 that under-reported RUBLE's income for the calendar years 1998-2001; and (e) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, false and fraudulent U. S. Individual Income Tax Returns, Forms 1040, for the calendar years 1998-2001, which returns falsely omitted income in the amounts set forth below, which falsities caused RAYMOND J. RUBLE to

substantially understate his taxable income and tax due and owing each year, as set forth below:

| Count | Defendants | Tax Year | Filing Date | Approx. Omitted Income | Additional Tax Due and Owing |
|---|---|---|---|---|---|
| 41 | RAYMOND J. RUBLE, JOHN LARSON, ROBERT PFAFF | 1998 | 10/15/99 | $350,000 | $148,089 |
| 42 | RAYMOND J. RUBLE | 1999 | 09/30/00 | $175,000 | $71,379 |
| 43 | RAYMOND J. RUBLE, JOHN LARSON, ROBERT PFAFF | 2000 | 10/15/01 | $250,000 | $107,299 |
| 44 | RAYMOND J. RUBLE | 2001 | 10/15/02 | $500,000 | $201,365 |

(Title 26, United States Code, Section 7201, Title 18, United States Code, Section 2.)

**COUNTS FORTY-FIVE AND FORTY-SIX**
**(Obstruction of the IRS)**

The Grand Jury further charges:

84. The allegations set forth in paragraphs 1-71 are repeated and realleged as if fully set forth herein.

85. On or about the dates set forth below, in the Southern District of New York and elsewhere, the defendants listed below unlawfully, wilfully, and knowingly did corruptly obstruct and impede and endeavor to obstruct and impede the due administration of the Internal Revenue laws by committing or causing to be committed the acts set forth below:

| Count | Approx. Date | Defendants | Description |
|---|---|---|---|
| 45 | 10/02/2002 | RICHARD SMITH, STEVEN GREMMINGER | False statement to the IRS in the SDNY that "KPMG has at this time virtually completed its compliance with the summonses" |
| 46 | 05/28/2003 | JEFFREY EISCHEID, STEVEN GREMMINGER | Telephone call by KPMG representative to IRS representatives in the SDNY and Washington, D.C. falsely claiming that KPMG did not promote or market SOS, but KPMG prepared at least 2 tax returns relating to SOS. |

(Title 26, United States Code, Section 7212, Title 18, United States Code, Section 2.)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

JEFFREY STEIN,
JOHN LANNING,
RICHARD SMITH,
JEFFREY EISCHEID,
PHILIP WIESNER,
JOHN LARSON,
ROBERT PFAFF,
DAVID AMIR MAKOV,
LARRY DELAP,
STEVEN GREMMINGER,
RAYMOND J. RUBLE,
also known as "R.J. Ruble,"
GREGG RITCHIE,
RANDY BICKHAM,
MARK WATSON,
CAROL WARLEY,
DAVID RIVKIN,
CARL HASTING,
RICHARD ROSENTHAL, and
DAVID GREENBERG,

Defendants.

SUPERSEDING INDICTMENT

S1 05 Cr. 888 (LAK)

18 U.S.C. § 371, 26 U.S.C. §§ 7201, 7212,
18 U.S.C. § 2

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

[signature]
Foreperson.