# EXHIBIT A

**Memorandum of Law in Support of Defendants' Joint Motion to Strike References to the "SOS" Strategies in the Indictment**

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **05 Cr. 888 (LAK) (ECF)** |
| **JEFFREY STEIN *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO STRIKE REFERENCES TO THE "SOS" STRATEGIES IN THE INDICTMENT**

# TABLE OF CONTENTS

Page


I. THE SOS COUNTS DO NOT ALLEGE A CLEAR VIOLATION OF THE TAX LAW ..... 3

A. A Criminal Tax Indictment Must Allege A Clear Violation of the Tax Laws. ..... 3

B. The Allegations of the Indictment ..... 4

C. Insufficiency of the Allegations Concerning SOS. ..... 6

1. "Investment" vs. "Tax Shelter." ..... 8

2. Non-Tax Purposes For Specific Steps In The SOS Transactions. ..... 8

D. The Fact That A Transaction Was Motivated By A Desire To Obtain Tax Benefits Does Not Mean That Those Benefits Are Inherently Invalid. ..... 9

E. The Indictment Cannot Be Sustained on the Basis that the Transaction Lacked Economic Substance. ..... 11

1. The Indictment Contains No Allegation that the SOS Transactions Lacked Economic Substance. ..... 11

2. Even if the Indictment Had Alleged that the SOS Transactions Lacked Economic Substance, It Must Still be Dismissed Under Pirro ..... 13

F. The Allegations Are Legally Insufficient and Should Be Stricken. ..... 15

II. DEFENDANTS' CONCLUSIONS REGARDING THE SOS TRANSACTION WERE CORRECT. ..... 17

A. The Basis Question: The Investor's Basis in the Partnership is Equal to His Basis in the Long Option and is not Reduced by the Assumption by the Partnership of the Obligation under the Short Option. ..... 18

1. General Principles. ..... 19

2. The Obligation Under the Short Option did not Constitute a Liability for Partnership Tax Purposes. ..... 20

B. The Partnership, and the Contribution to and Assumption by the Partnership of the Options, Must be Given Effect for Tax Purposes. ..... 24

1. Under the Statute, Congress Treats Every Unincorporated Organization as a Partnership if it Carries on "Any Business, Financial Operation or Venture. ........ 25

2. Tax Purpose is Legally Irrelevant Here. ........ 27

3. The Contribution of the Long Option to, and the Assumption of the Obligation Under the Short Option by, the Partnership had Economic Consequence. That is All That is Necessary........ 27

4. The Fact that an Investor Chose an Advantageous Structure for His Transaction Does not Change the Result. ........ 28

III. REGARDLESS OF WHAT THE FEDERAL INCOME TAX TREATMENT OF SHORT OPTION INVESTMENT MAY BE, THE ADVICE DEFENDANTS GAVE REGARDING SUCH TREATMENT WAS A REASONABLE INTERPRETATION OF THE LAW AT THAT TIME. CONSEQUENTLY, IT CANNOT BE THE SUBJECT OF CRIMINAL PROSECUTION BECAUSE DEFENDANTS LACKED THE REQUISITE CRIMINAL INTENT........ 29

A. Defendants' Opinions were Based on a Reasonable Interpretation of the Technical Requirements of the Statute and Regulations. ........ 31

B. Defendants' Opinions Also Reflected a Reasonable Interpretation of "Economic Substance" and Other Applicable Judicial Doctrines. ........ 33

IV. CONCLUSION........ 42

# TABLE OF AUTHORITIES

Page

**CASES**

American Home Products Corp. v. United States,
601 F.2d 540 (Ct. Cl. 1979) ........ 28

Atlantic Coast Line R. Co. v. Phillips,
332 U.S. 168 (1947) ........ 7, 16

Biggs v. Commissioner,
69 T.C. 905 (1978), aff'd, 632 F.2d 1171 (5th Cir. 1980) ........ 28

Black & Decker Corp. v. United States,
340 F. Supp. 2d 621 (D. Md. 2004)........ 13

Campbell County State Bank, Inc. v. Commissioner,
37 T.C. 430 (1961), acq., 1966-2 C.B. 3,
rev'd on other grounds, 311 F.2d 374 (8th Cir. 1963) ........ 26

Chisolm v. Commissioner,
79 F.2d 14 (2d Cir. 1935)........ 12, 29

In re CM Holdings,
301 F.3d 96 (3d Cir. 2002)........ 35

Collins v. Commissioner,
857 F.2d 1383 (9th Cir. 1988)........ 14

Coltec Indus., Inc. v. United States,
62 Fed. Cl. 716 (2004)........ 10, 14

Commissioner v. Culbertson,
337 U.S. 733 (1949) ........ 12, 26

Commissioner v. Newman,
159 F.2d 848 (2d Cir. 1947)........ 16

Compaq Computer Corp. v. Commissioner,
277 F.3d 778 (5th Cir. 2001)........ 10, 34

Cortec Industries, Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991)........ 1, 8

Denver & Rio Grande W.R.R. Co. v. United States,
205 Ct. Cl. 597, 505 F.2d 1266 (1974) .......... 23

Deputy v. du Pont,
308 U.S. 488 (1940) .......... 22, 24

Esmark, Inc. v. Commissioner,
90 T.C. 171 (1988) .......... 9

Exxon Mobil Corp. v. Commissioner,
114 T.C. 293 (2000) .......... 23

Frank Lyon Co. v. United States,
435 U.S. 561 (1978) .......... 7

Gregory v. Helvering,
293 U.S. 465 (1935) .......... 10, 16

Harrison Property Management Co. v. United States,
475 F.2d 623 (Ct. Cl. 1973) .......... 26

Helmer v. Commissioner,
34 T.C.M. (CCH) 727 (1975) .......... 22, 24

Helvering v. Gregory,
69 F.2d 809 (2d Cir.), aff'd, 293 U.S. 465 (1934) .......... 16

IES Industries Inc. v. United States,
253 F.3d 350 (8th Cir. 2001) .......... 10, 11

Jacobson v. Commissioner,
915 F.2d 832 (2d Cir. 1990) .......... 6, 12

Knetsch v. United States,
364 U.S. 361 (1960) .......... 35

Magneson v. Commissioner,
753 F.2d 1490 (9th Cir. 1985) .......... 28

Moline Props., Inc. v. Commissioner,
319 U.S. 436 (1943) .......... 25, 26

Northern Indiana Public Service Co. v. Commissioner,
115 F.3d 506 (7th Cir. 1997) .......... 10, 34

Prichard v. 164 Ludlow Corp.,
390 F. Supp. 2d 408 (S.D.N.Y. 2005) .......... 8

Russell v. United States,
369 U.S. 749 (1962) .......... 5

Salina Partnership LP v. Commissioner,
80 T.C.M. (CCH) 686 (2000).......... 10, 21

Stark v. Commissioner,
86 T.C. 243 (1986) .......... 20

TIFD III-E Inc. v. United States,
342 F. Supp. 2d 94 (D. Conn. 2004) .......... 14

United Parcel Service of America, Inc. v. Commissioner,
254 F.3d 1014 (11th Cir. 2001)..........10, 28, 35

United States v. Atkins,
869 F. 2d 135 (2d Cir. 1989).......... 2, 13

United States v. Critzer,
498 F.2d 1160 (4th Cir. 1974).......... 30, 36

United States v. Guess,
95 AFTR.2d ¶ 2005-1677 (S.D. Cal. 2004).......... 6

United States v. Ingredient Tech. Corp.,
698 F.2d 88 (2d Cir. 1983).......... 13

United States v. Pirro,
96 F. Supp. 2d 279 (S.D.N.Y. 1999) .......... 3

United States v. Pirro,
212 F.3d 86 (2d Cir. 2000).......... 2, 3, 4, 5, 11, 30

United States v. Regan,
937 F.2d 823 (2d Cir. 1991).......... 12

United States v. Stahl,
616 F.2d 30 (2d Cir. 1980).......... 7

Winn Dixie Inc. v. Commissioner,
254 F.3d 1313 (11th Cir. 2001).......... 34

**STATUTES AND RULES**

26 U.S.C. § 704(e) ........ 33

26 U.S.C. § 722 ........ 19

26 U.S.C. § 733(1) ........ 19

26 U.S.C. § 752 ........ 19

26 U.S.C. § 761 ........ 25

26 U.S.C. § 6662(d)(2)(c)(iii)(II) ........ 8

26 U.S.C. § 7701(a)(2) ........ 25

H.R. Rep. No. 108-755 (2004) ........ 15

S. Rep. No. 109-54 (2005) ........ 15

**REGULATIONS**

68 Fed. Reg. 37,434 (June 24, 2003) ........ 21, 31

Prop. Treas. Reg. § 1.752-1(a)(1) ........ 21

Temp. Treas. Reg. § 1.752-1T(g) ........ 21

Temp. Treas. Reg. § 1.752-6T(a) ........ 31

Treas. Reg. § 1.752-3 ........ 19

**TREASURY DECISIONS**

T.D. 8237, 1989-1 C.B. 180 ........ 21

T.D. 8380, 1992-1 C.B. 218 ........ 21

**MISCELLANEOUS**

Chief Counsel Notice 2003-020 (June 25, 2003) ........ 32

McKee, Nelson & Whitmire, Federal Taxation of Parterships and Partners, ¶ 3.02 [3][a] (3d ed. 1996) ........ 12, 33

Rev. Rul. 88-77, 1988-2 C.B. 128 ........ 20

**ARTICLES**

Brannan, Partership Interest Basis Issues, 440 PLI/Tax 721 (1999) ........ 31

Cuff, Allocating Partnership Liabilities, 70 Taxes 303 (May 1992) ........ 31

Ginsburg, Making Tax Law Through The Judicial Process, ABA Journal (Mar. 1984) ........ 18

Hariton, Sorting Out the Tangle of Economic Substance, 52 Tax Law. 235 (Winter 1999) ........ 35

Nelson, The Limits of Literalism: The Effect of Substance Over Form, Clear Reflection and Business Considerations on the Proper Interpretation of Subchapter K, 73 Taxes 641 (Dec. 1995) ........ 12, 34

Stratton, IRS Defends Action Against KPMG Professionals, Tax Notes Today (Sept. 20, 2005) ........ 30

Tandon, IRS, Treasury Shared Views of Shelter Lawyers, IRS Document Says, Tax Notes Today (Oct. 14, 2005) ........ 23

Tandon, First Son-of-Boss Case Goes to Trial, Tax Notes Today (Sept. 12, 2005) ........ 8

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **05 Cr. 888 (LAK) (ECF)** |
| **JEFFREY STEIN *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO STRIKE REFERENCES TO THE "SOS" STRATEGIES IN THE INDICTMENT

Defendants, by undersigned counsel, respectfully submit this Memorandum of Law in support of Defendants' Joint Motion for an Order pursuant to Fed. R. Crim. P. 7(d) striking all allegations in the Indictment[1] relating to the so-called "Short Option Strategies" ("SOS")-type transactions, including but not limited to relevant portions of Paragraphs 28, 32, 33, 47-51, 52, 70, 78cc, 78hh, 78ll, 78nn, and 78rr.

The prosecution against Defendants concerns, in part, advice some of the Defendants provided to various clients regarding the tax consequences of structured investments in options on foreign currency. The Indictment refers to these transactions as the "short option strategy" ("SOS").[2] The government contends that SOS is a "fraudulent tax shelter," Ind. at ¶¶ 25, 28;

---

1 All references to the Indictment refer to the Superseding Indictment herein.

2 The government nowhere in the indictment explains what it means by "SOS." While it is alleged that nine of the Defendants were involved with SOS-type strategies, it is not alleged that they were based on a template in the way that the FLIPS, BLIP and OPIS opinions allegedly were, and in fact the Indictment suggests there were at least eleven "types" of SOS strategies used by KPMG, and yet another by Defendant David Greenberg. A general summary of what Defendants surmise the government may believe are the principal elements of one type of such transaction is set forth in Appendix A. The Court can consider can consider extrinsic evidence describing transactions on which an indictment is based where such a description will assist the Court in comprehending the basis for the motion to strike/dismiss. *See* United States v. Atkins, 661 F. Supp. 491, 493-94 (SDNY 1987) (Judge

that opinion letters that Defendants issued to their clients describing the tax consequences of SOS transactions were also "false and fraudulent," Ind. at ¶¶ 27, 48, 49, 77(b); and that the purpose of these opinions was to enable the client to file "false and fraudulent" tax returns containing "false and fraudulent" losses and to "fraudulently conceal [ ] from the IRS those shelters." Ind. at ¶¶ 25, 77(e).

Despite this abundance of epithets, the allegations in the Indictment against Defendants based on the SOS transactions must be dismissed for three reasons. First, accepting all of the allegations of the Indictment as true for purposes of this pretrial motion, there is nothing in the allegations concerning the SOS transactions that state that those transactions violated any clear requirement of the tax law. Accordingly, pursuant to United States v. Pirro, 212 F.3d 86 (2d Cir. 2000), because the Indictment fails to allege that any of Defendants committed any criminal tax violation with respect to the SOS transactions, those allegations of the Indictment must be stricken.

Second, the tax treatment of the transactions at issue was not a fraudulent, or even incorrect, application of the tax law as it existed at that time; and Defendants were correct in concluding in the opinion letters that the tax consequences reported by the taxpayers in those transactions more likely than not would be sustained if challenged by the Internal Revenue Service ("IRS"). Indeed, it is one of the great shameful ironies of this prosecution that the tax consequences that the government asserts now are criminally fraudulent are the necessary result of positions the government asserted successfully against other taxpayers when that was to its advantage. The only difference between then and now is that, with respect to the transactions

---

Weinfeld, in ruling on a motion to dismiss, considered the defendant's affidavit describing the transactions in ruling, but only because "otherwise, the basis of their motion would be incomprehensible").

presently at issue, it is to the government's disadvantage for taxpayers to follow those self-same positions.

Third, even if Defendants' analysis in those opinion letters was incorrect, it is impossible, in light of the significant authority in both statute and case law supporting that analysis, to conclude that Defendants' possessed the intent to violate the law necessary to support conviction. To the contrary, these opinions reflected a reasonable belief as to the tax consequences of the transactions that was well-grounded in existing authority. Therefore, the SOS counts against Defendants should be stricken.

## I. THE SOS COUNTS DO NOT ALLEGE A CLEAR VIOLATION OF THE TAX LAW.

### A. A Criminal Tax Indictment Must Allege A Clear Violation of the Tax Laws.

In United States v. Pirro, 212 F.3d 86 (2d Cir. 2000), the Second Circuit affirmed an Order of the District Court, 96 F. Supp 2d 279 (S.D.N.Y. 1999) (Barrington Parker, J.), which had granted a pretrial motion to strike certain allegations of an Indictment in a tax evasion case. Specifically, the defendant in Pirro moved to strike[3] allegations in a count of the Indictment charging the willful filing of a false corporate tax return that were predicated on the government's theory that the defendant had violated the tax law by failing to disclose his "ownership interest" in the corporation. The District Court accepted the truth of the allegations of the Indictment but nevertheless also held that the failure of the Indictment to allege a clear violation of the tax law raises an issue of law, not of fact, to be decided by the Court. 96 F. Supp. 2d at 282-83. Following this principle, the District Court in Pirro granted the pretrial

[3] The Pirro decisions describe the remedy sought as either a motion to strike, 96 F. Supp. 2d at 285, or as a motion to dismiss a portion of a count. 212 F.3d at 88. This distinction appears to be one of semantics, not of substance. We have characterized this motion as being one to "strike" allegations that are legally insufficient; it could equally be characterized as a motion to "dismiss" those allegations from the Indictment.

motion to strike the allegations from the indictment and on the government's interlocutory appeal the Second Circuit affirmed, holding that the issue of whether or not an "ownership interest" in a corporation must be disclosed on a corporate tax return, as opposed to an interest as a shareholder, was "debatable." 212 F.3d at 88. The Second Circuit went on to hold that criminal tax liability cannot be predicated upon an alleged violation of an unclear aspect of the tax law. 212 F.3d at 90-91 (citing United States v. Regan, 937 F.2d 823, 827 (2d Cir. 1991); United States v. Harris, 942 F.2d 1125, 1131 (7th Cir. 1991); United States v. Mallas, 762 F.2d 361, 363 (4th Cir. 1985)). Accordingly, since the Second Circuit concluded that the indictment contained no clear allegation that Pirro had committed a criminal violation of the tax law in this respect, the Court held that the allegations of the Indictment charging that Pirro had willfully filed a false corporate tax return by failing to disclose his "ownership interest" in the corporation had to be stricken. 212 F.3d at 91.

Pirro compels the conclusion that the allegations of the Indictment here relating to the SOS transactions must be stricken. There is nothing in the allegations concerning the SOS transactions that state that those transactions violated any clear requirement of the tax law. Accordingly, the Indictment fails to allege that any of Defendants committed any criminal tax violation with respect to the SOS transactions, and under Pirro, those allegations of the Indictment must be stricken.

**B. The Allegations of the Indictment.**

This motion calls the Court's attention to the allegations of the Indictment concerning the SOS transactions (Ind. ¶¶ 47-51)[4]. At the outset, it is striking that the Indictment barely even

[4] By focusing on the allegations of the Indictment concerning the SOS transactions, Defendants by no means concede that there was anything about any of the other transactions described in the Indictment on which criminal tax liability can be based. We expect the evidence at trial to establish that no criminal tax violations were committed in connection with any of these transactions. However, we also recognize that at this stage the sole issue before the

contains any description of what the SOS transactions allegedly were. All that the Indictment says is that the SOS transactions had something to do with "entering into virtually offsetting foreign currency option positions," which were "sometimes" transferred to a partnership, from which the taxpayer ultimately withdrew and claimed tax losses (Ind. ¶¶ 47). There is nothing inherent in the Indictment's description of the SOS transactions that would support a conclusion that the transactions were in violation of any clear provision of the tax law.

Moreover, the Indictment lumps together at least eleven different types of transactions, all of which are placed under the general heading of "SOS" (Ind. ¶ 47). The Indictment does not say which of the particular transactions all categorized as "SOS" are at issue in this case; nor does the Indictment explain what if any differences there are in these various subcategories of SOS transactions; nor does the Indictment explain whether or not any of these differences has any bearing on the proper tax treatment of the transactions. The Indictment's fundamental failure even to describe what the SOS transactions were in itself runs afoul of the constitutional requirement that an Indictment give a defendant fair notice of the crime charged by stating "some facts specific enough to describe a particular criminal act." Pirro, 212 F.3d at 93. See also Russell v. United States, 369 U.S. 749, 760-61, 82 S. Ct. 1038, 8 L.Ed.2d 240 (1962).

An even more fundamental deficiency than the failure of the Indictment to describe the SOS transactions with reasonable particularity is the failure of the Indictment to allege any facts that would support a conclusion that the SOS transactions violated some clear provision of the tax law and therefore can properly be the basis for criminal tax liability. Specifically, there is no allegation that the SOS transactions did not comply with the technical requirements of the statute

---

Court is the legal sufficiency of the allegations of the Indictment, assuming them to be true. The allegations concerning the SOS transactions are, on the face of the Indictment, glaringly insufficient to support a charge of criminal tax liability.

and regulations, nor that they were shams or otherwise lacked economic consequences. Indeed, the Indictment fails even to allege that there was not a reasonable opportunity to earn a profit in the SOS transactions without regard to tax benefits. As is discussed in more detail below, the absence of any such allegations in the Indictment that the SOS transactions lacked economic substance or for any other reason would not be sustained as a civil matter is absolutely fatal to any contention by the government that criminal tax liability can be predicated upon the SOS transactions.[5] Jacobson v. Commissioner, 915 F.2d 832, 838-39 (2d Cir. 1990). Even in the context of a civil motion for a preliminary injunction with respect to alleged fraudulent tax shelters, one court has held that the government could not establish the probability of success on the merits where there had been no determination or adjudication that the transactions violated any provision of the Internal Revenue Code. United States v. Guess, 95 AFTR.2d ¶ 2005-1677 (S.D. Ca. 2004). The situation in the context of a criminal prosecution can be no different, particularly since the government's burden is so much greater.

**C. Insufficiency of the Allegations Concerning SOS.**

While the Indictment offers up various epithets such as "phony" and "fraudulent" to describe the tax benefits derived from the SOS transactions, such conclusory rhetoric is, as Pirro makes clear, no substitute for specific allegations that the transactions violated some clear provision of the tax law. Specific factual allegations are missing from the Indictment, and the Indictment never actually says anything as to why the tax benefits derived from the SOS transactions were not entirely proper under the tax law (as in fact they were, as fully set forth below, *infra* at II). The most that the Indictment can offer are the allegations in Paragraph 49(a)-

[5] There is authority (particularly in the 9th Circuit where Defendant Greenberg resided and where all acts alleged regarding him appear to have occurred) for the proposition that in the context of a transaction such as the SOS transactions, the 'economic substance' doctrine does not apply at all. The Court need not resolve that issue on this motion because of the complete failure of the Indictment even to allege anything at all on the issue and because the doctrine is not the type of clear rule of law which can be the predicate for a criminal conviction.

(d), which allege that "SOS opinion letters, and other associated documents" were "false and fraudulent" in certain ways, which can be summarized as follows:

(1) It is alleged that the SOS opinions "falsely and misleadingly describe SOS as an investment, when in truth and in fact, it was a tax shelter designed and marketed to generate tax losses in order to eliminate income taxes for wealthy clients[6]. . . ." (Ind. ¶ 49(a)); and

(2) It is alleged that the SOS opinions falsely stated that there were non-tax reasons for carrying out specific steps of the SOS transactions, when, in fact, the motivation for taking those steps in the manner that they were was to generate tax benefits in the transactions (Indictment ¶ 49(b)-(d)).

Again, the fatal defect in all of these allegations is the utter failure of the Indictment to allege that, *taken as a whole*, the SOS transactions violated any clear requirement of the tax laws.[7] The fact that the transactions were carried out in a particular way in order to take advantage of beneficial tax treatment is irrelevant, so long as the transactions were otherwise in compliance with the tax law. Frank Lyon Co. v. United States, 435 U.S. 561, 580, 98 S. Ct. 1291, 55 L.Ed.2d 550 (1978) ("The fact that favorable tax consequences were taken into account by [the taxpayer] on entering into the transaction is no reason for disallowing those consequences."); Atlantic Coast Line R. Co. v. Phillips, 332 U.S. 168, 172-73, 67 S. Ct. 1584 (1947) (Frankfurter, J.) (taxpayers may order "their affairs so as to minimize taxes. . . because 'nobody owes any public duty to pay more than the law demands: taxes are enforced exactions,

---

[6] Allegations such as this about "wealthy clients" run throughout the Indictment, and are more akin to something one would expect to find in a stump speech by a politician running for office than in an indictment charging specific violations of clear provisions of the tax law. Such allegations are improper. Cf. United States v. Stahl, 616 F.2d 30, 33 (2d Cir. 1980) (reversible error to permit prosecutor to make appeals to class prejudice by referring repeatedly to the wealth of the defendant).

[7] The Indictment does not make any claim that the opinion letters concerning the SOS transactions were false in that they allegedly misstated any specific rule of tax law contained in the Internal Revenue Code, or any case law or regulations there under.

not voluntary contributions.'") (quoting Commissioner v. Newman, 159 F.2d 848, 851 (2d Cir. 1947)).

### 1. "Investment" vs. "Tax Shelter."

The first alleged false statement in the SOS opinions—that the opinions[8] described the SOS transactions as "investments" rather than "tax shelters"—borders on being frivolous. There is nothing inconsistent between characterizing a transaction as an "investment" as opposed to a "tax shelter." On the contrary, the Internal Revenue Code (the "Code") itself defines a "tax shelter" as "any *investment* plan or package" that has a significant purpose of avoiding Federal income tax. 26 U.S.C. § 6662(d)(2)(C)(iii)(II) (emphasis added). The allegation in the Indictment that the SOS opinions were "fraudulent" because they characterized the transactions as "investments" is utterly baseless and cannot possibly support a claim of criminal tax liability and certainly does not impact the "more likely than not" conclusion.

### 2. Non-Tax Purposes For Specific Steps In The SOS Transactions.

The other alleged false statements contained in the SOS opinions related to the existence of non-tax purposes for carrying out specific steps in the SOS transactions. The Indictment does not allege that there was no non-tax purpose for engaging in the transactions as a whole (such as

[8] Since the Indictment itself makes reference to and relies upon the opinion letters, the Court can make reference to those letters in order to place the allegations of the Indictment in context so that the Court can assess the legal sufficiency of the Indictment. Cf. Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (in ruling on a motion to dismiss a civil complaint as legally insufficient under Fed. R. Civ. P. 12(b), which applies a standard effectively the same as a motion to dismiss an Indictment under Fed. R. Crim. P. 12(b), a Court can, without converting a motion to dismiss into a motion for summary judgment, refer to any documents referred to and relied upon in the pleadings); Prichard v. 164 Ludlow Corp., 390 F. Supp. 2d 408, 409 (S.D.N.Y. 2005) (same). We request that the Government provide the Court with copies of the SOS opinions authored by all Defendants referred to in the Indictment, so that the Court may consider such documents in ruling on the legal sufficiency of the Indictment.

the possibility of earning an overall pre-tax profit), merely that there were no non-tax reasons[9] for engaging in the transactions by conducting various specific steps in the form in which the transactions were carried out.[10] These allegations are insufficient to state any criminal violation of the tax law.

The Indictment's attempt to "deconstruct" the SOS transactions effectively turns upside down the well-known "step transaction" doctrine applicable in tax cases. The "step transaction" doctrine directs courts to determine the tax consequences of a transaction by evaluating the overall economic effect of the transaction, and not by isolating individual pieces or "steps" in the transaction. See, e.g., Esmark, Inc. v. Commissioner, 90 T.C. 171, 195-98 (1988). The Indictment here does just the opposite. The Indictment alleges that there were no non-tax reasons for taking individual steps in the transaction, but contains no allegation that on an integrated basis, the transaction had no economic effects. Absent such an allegation, there is no basis under any theory to claim that the SOS transactions violated the tax law. To the contrary, as fully discussed below, the form in which a transaction is carried out, even if motivated by a desire to obtain a tax benefit, far from evidencing a crime, is clearly irrelevant if the overall transaction has the requisite economic consequences. Esmark, 90 T.C. at 197.

### D. The Fact That A Transaction Was Motivated By A Desire To Obtain Tax Benefits Does Not Mean That Those Benefits Are Inherently Invalid.

The thrust of the Indictment's allegations about the SOS transactions is that the tax benefits generated by the transactions were allegedly "phony" because the taxpayers were

---

[9] In fact, in Jade Trading LLC v. United States, No. 03-2164T, a civil case involving a SOS-type transaction, the government conceded that each of the option transactions at issue there could have generated a profit. *See* Tandon, "First Son-of-Boss Case Goes to Trial," Tax Notes Today (Sep. 12, 2005).

[10] A reading of the actual opinions will not only assist the Court in assessing the sufficiency of the indictment but will also make clear that the Indictment references from the SOS opinions are out of context and when the opinions are read in their entirety, they do not support the allegations of the indictment.

motivated by a desire to obtain those tax benefits when they entered into the transactions. However, if the transactions were in compliance with the requirements of the tax law—and the Indictment contains no allegation that the SOS transactions failed to comply with any clear requirement of the tax law—then the tax law permits the taxpayers to claim the tax benefits, regardless of such a motivation. Northern Indiana Public Service Co. v. Commissioner, 115 F.3d 506, 511 (7th Cir. 1997); Salina Partnership LP v. Commissioner, 80 T.C.M (CCH) 686, 694 (2000). "There may be no tax-independent reason for a taxpayer to choose between" different ways of conducting a transaction, but if the transaction complies with the tax law then the taxpayer is entitled to claim any tax benefits flowing from the transaction in spite of the fact that the taxpayer chose to conduct the transaction in the manner that was most beneficial under the tax laws. United Parcel Service of America, Inc. v. Commissioner, 254 F.3d 1014, 1019 (11th Cir. 2001). See also Compaq Computer Corp. v. Commissioner, 277 F.3d 778, 786 (5th Cir. 2001) ("Even assuming that Compaq sought primarily to get otherwise unavailable tax benefits in order to offset unrelated tax liabilities and unrelated capital gains, this need not invalidate the transaction."); IES Industries Inc. v. United States, 253 F.3d 350, 355 (8th Cir. 2001) ("A taxpayer's subjective intent to avoid taxes will not by itself determine whether there was a business purpose to a transaction."); Coltec Indus., Inc. v. United States, 62 Fed. Cl. 716, 738 (2004) (a prominent recent civil case involving what the government unsuccessfully asserted was also an abusive tax shelter: "The existence of tax avoidance motives does not preclude a transaction from meeting the requirements of [26 U.S.C. § 752], as the oft-quoted dictum of Gregory v. Helvering, 293 U.S. 465, 469, 55 S. Ct. 266, 79 L.Ed. 596 (1935), makes clear…"). In other words, the fact that the transaction may have been structured for tax purposes does not render it impermissible.

### E. The Indictment Cannot Be Sustained on the Basis that the Transaction Lacked Economic Substance.

#### 1. The Indictment Contains No Allegation that the SOS Transactions Lacked Economic Substance.

The Indictment contains no allegation that the SOS transactions violated any particular provision of the tax laws.[11] Nor does it contain any allegation that the transactions did not take place, were backdated or otherwise falsified. Finally, it also does not contain any allegation that the SOS transactions, taken as a whole, lacked economic substance or a business purpose.

Whatever the government's position on economic substance, it is incontrovertible that there are various, conflicting definitions of the requirement—or lack thereof—of economic substance in tax cases. See IES Industries, 253 F.3d at 354-55 (discussing different subjective and objective tests for business purpose and economic substance); Gilman v. Commissioner, 933 F.2d 143, 148 (2d Cir. 1991) (noting that the definition of economic substance is a "flexible" one). Because of the sparseness of the allegations in the Indictment as to what the SOS transactions involved, and the utter lack of any allegation as why the SOS transactions supposedly violated the tax laws, it is impossible to say at this point how these different definitions of economic substance could apply, if at all. The point for purposes of this discussion, however, is not which definition is correct but that the Indictment fails to allege that the SOS transactions lacked economic substance under *any* definition. This lack of clarity in the tax law is alone a sufficient reason to disqualify the transactions from being a proper basis for an assertion of criminal tax liability. Pirro, 212 F.3d at 88 (collecting cases).

---

[11] As explained, infra at I.E.2., even if the government had alleged a lack of economic substance in a fashion that made clear what it believed the formulation of that doctrine to be, the Indictment would still have to be dismissed because the economic substance doctrine is simply not well-enough defined to be the basis for a criminal prosecution. It is, both as to its constituent elements and as to whether and when it should be applied, an eminently debatable and constantly debated doctrine. It is a poster child for the type of unclear aspect of tax law that the court in Pirro concluded cannot be a predicate for criminal conviction.

For example, the Second Circuit has often looked to the issue of whether or not a transaction presented a reasonable possibility of earning an economic profit, in excess of fees and transaction costs and without regard to tax benefits, as a touchstone in assessing economic substance. Gilman v. Commissioner, 933 F.2d at 146; Jacobson, 915 F.2d at 838-39.[12] The Indictment does not allege that the SOS transactions did not objectively present a reasonable opportunity to earn such a profit.

Similarly, there is also authority for the proposition that where a partnership has been established and it carries on business activities, including investment activities, and the partners share profits and losses, the contribution of assets to the partnership, a component of the SOS transactions, *see* Ind. ¶ 47, in itself constitutes a sufficient economic effect to satisfy the economic substance and business purpose doctrines. Commissioner v. Culbertson, 337 U.S. 733, 746-47, 69 S. Ct. 1210 (1949). See also Chisolm v. Commissioner, 79 F.2d 14, 15 (2d Cir. 1935) (L. Hand, J.). See McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners, ¶3.02[3][a] (3d ed. 1996); Nelson, "The Limits of Literalism: The Effect of Substance Over Form, Clear Reflection and Business Purpose Considerations on the Proper Interpretation of Subchapter K," 73 Taxes 641 (Dec. 1995) ("if a putative partnership conducts a real enterprise in which the putative partners share capital ownership, it is recognized regardless of the fact that its formation or use is tax-motivated and even if there was no business or economic purpose for

---

[12] Defendants note, however, that it is not self-evident that Second Circuit case law would govern on this issue. It appears from the Indictment that opinion letters were written for taxpayers who engaged in SOS transactions in numerous jurisdictions. Since this is a criminal case, intent is the central issue, Regan, 937 F.2d at 827, and the central issue here is whether or not Defendants intended to violate the tax laws when they wrote the opinions. Different jurisdictions have articulated different standards for whether and to what degree economic substance may be necessary—if at all—and the relevant jurisdiction would be the one applicable to the taxpayer who received the opinion letter. Obviously, in a jurisdiction where there is no articulated requirement for economic substance, this would necessarily impact the analysis of the validity of the transaction. This is yet another ambiguity in this case supporting the conclusion that the Indictment fails to allege that the SOS transactions violated any clear requirement of the tax laws.

admitting one or more partners.”). Again, the Indictment contains no allegations that would enable a Court to determine whether or not the SOS transactions had economic consequences sufficient to satisfy these requirements of the tax law.

In short, the most that the Indictment says is that the SOS transactions were tax motivated, but not that they lacked economic substance, however defined, or that they violated any clear requirement of the tax law. These allegations are insufficient. See Black & Decker Corp. v. United States, 340 F. Supp. 2d 621, 623 (D. Md. 2004) (in an admittedly tax-motivated transaction involving a transfer of contingent liabilities to a separate entity in order to obtain an increased basis in the stock of that entity and hence a capital loss upon the sale of the stock of that entity, the tax benefits of the transaction were upheld because “the court may not ignore a transaction that has economic substance, even if the motive for the transaction is to avoid taxes”).

**2. Even if the Indictment Had Alleged that the SOS Transactions Lacked Economic Substance, It Must Still be Dismissed Under Pirro.**

Even if the government had alleged a lack of economic substance in a fashion that made clear what it believed the formulation of that doctrine to be, the Indictment would still have to be dismissed. The reason is that absent allegations similar to the facts involved in such cases as United States v. Atkins, 869 F.2d 135 (2d Cir. 1989) or United States v. Ingredient Tech. Corp., 698 F.2d 88 (2d Cir. 1983), to the effect that there was a sham in fact because the transactions had been falsified or, in light of side agreements negating them, should be considered not to have occurred, the economic substance doctrine is simply not well-enough defined to be the basis for a criminal prosecution. It is, both as to its constituent elements and as to whether and when it should be applied, an eminently debatable and constantly debated doctrine. It is a poster child

for the type of unclear aspect of tax law that the court in Pirro concluded cannot be a predicate for criminal conviction.

The ambiguity and uncertainty regarding the elements and scope of the economic substance doctrine should be readily apparent from the authorities discussed at pp.11-13, supra. As noted there, even in this Circuit, it has been described as "flexible." Gilman v. Commissioner, supra. And the cases applying it have been described as "not perfectly explicit on this subject." TIFD III-E Inc. v. U. S., 342 F. Supp. 2d 94, at 109 (D. Conn. 2004). A "flexible" doctrine with respect to which the case law has been "not perfectly explicit" is the antithesis of one that sets forth clear rules. Even more, components of the doctrine vary from court to court. In fact, at least one court has opined, in the context of reviewing what the government called an "abusive tax shelter" with many similarities to SOS, that it would be unconstitutional to impose such a non-statutory requirement as economic substance if the transaction otherwise complies with the Internal Revenue Code. Coltec Indus., Inc. v. United States, 62 Fed. Cl. 716, 756 (2004). That is, it held that, as a matter of law, the doctrine was invalid. And of those cases in which it is applied, as one court has observed:

> The cases are glutted with [economic substance] tests. Many such tests proliferate because they give the comforting illusion of consistency and precision. They often obscure rather than clarify.

Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988).

Even the government has recognized this ambiguity and inconsistency, both the executive branch and the legislative branch. For example, the IRS, in discussing the application of the economic substance doctrine as applied to another "abusive tax shelter" known as "contingent deferred swaps," had this to say:

> The various United States Courts differ on whether the economic substance analysis requires the application of a two-prong test or is a facts and

> circumstances analysis regarding whether the transaction had 'practical economic effect' taking into account both subjective and objective aspects of the transaction. ... Moreover, among the United States Courts of Appeal that apply a two-prong test, there is a disagreement as to whether the test is disjunctive or conjunctive…. Courts have used different measures to determine whether a transaction has objective economic substance…. Certain courts have been willing to recognize the economic substance of a transaction when, in lieu of a reasonable possibility of profit, the taxpayer establishes that the transaction altered the economic relationships of the parties.[13]

And a Conference Committee of the U. S. Congress, when considering legislation to create a statutory definition of the economic substance doctrine, had this to say about it:

> There is a lack of uniformity regarding the proper application of the economic substance doctrine. Some courts apply a conjunctive test that requires the taxpayer to establish the presence of both economic substance ... and business purpose ... in order for the transaction to survive judicial scrutiny. A narrower approach used by some courts is to conclude that either a business purpose or economic substance is sufficient to respect the transaction. A third approach regards economic substance and business purpose as "simply more precise factors to consider" in determining whether a transaction has any practical economic effects other than the creation of tax benefits.

H.R. Rep. 108-755 at 664-665 (2004) (footnotes omitted).

In light of this, unless the government specifically alleges that the transactions at issue in SOS did not occur or, because of side agreements or other arrangements negating them, should not be considered to have occurred -- which it has not done and cannot do -- the government's charges regarding SOS must be dismissed.

**F. The Allegations Are Legally Insufficient and Should Be Stricken.**

Instead of making any allegation that the SOS transactions violated any specific provision of the tax law, or even that the transaction laced "economic substance," however that slippery

---

13 IRS Industry Specialization Program Coordinated Issue Paper on Notional Principal Contracts (Jan. 6, 2005). This report set forth a number of arguments for attacking transactions known as contingent deferred swap ("CDS"). A Senate report, which characterizes CDS as an abusive tax shelter, states that Locke, Liddell & Sapp, the law firm whose managing partner at the time was Harriet Miers, currently Counsel to the President of the United States, issued opinions in support of this shelter. Permanent Subcommittee on Investigations of the United States Senate, "The Role of Professional Firms in the U.S. Tax Shelter Industry," S. Rep. No. 109-54, at 85 (2005).

doctrine may be defined, the Indictment focuses almost entirely on what the government believes are Defendants' bad motives -- a desire to reduce taxes. What it overlooks, however, is one of the most basic rules of tax law, namely,

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.

Gregory v. Helvering, 293 U.S. 465, 469, 55 S. Ct. 266, 268 (1935).

No jurist articulated this principle more eloquently than Judge Learned Hand:

> Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.

Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir.), aff'd, 293 U.S. 465 (1934). Judge Hand was even more forceful writing in dissent in Commissioner v. Newman, 159 F.2d 848, 850-51 (2d Cir. 1947) (cited with approval by the Supreme Court in Atlantic Coast Line R. Co., 332 U.S. at 173, 67 S. Ct. at 1587):

> Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich and poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant.

To be sure, a taxpayer's right to minimize taxes is dependent upon doing so by means that the law permits. Helvering, 69 F.2d at 810 ("Therefore, if what was done here, was what was intended by [the relevant provisions of the tax law], it is of no consequence that it was all an elaborate scheme to get rid of income taxes, as it certainly was."). However, the Indictment here neither alleges that the SOS transactions violated any specific provision of the Internal Revenue Code nor any legal requirement of the tax laws. The mere fact that the taxpayers' entry into the

SOS transactions may have been tax motivated is of no moment.

Therefore, the allegations of the Indictment do not support the conclusion that the SOS transactions violated any provision of the tax laws and under Pirro, those allegations must be stricken.[14]

## II. DEFENDANTS' CONCLUSIONS REGARDING THE SOS TRANSACTION WERE CORRECT.

The insufficiency of the indictment is all the more clear when considered in light of the substantive law regarding the merits of the so-called SOS transactions. A review of that law reflects that the tax treatment of the transactions at issue was not a fraudulent, or even incorrect, application of the tax law as it existed at that time. Indeed, Defendants were correct in concluding in the opinion letters that the tax consequences reported by the taxpayers in these transactions more likely than not would be sustained if challenged by the IRS.

The SOS transactions at issue in the Indictment—to the extent they are described[15]—present two principal tax issues. The first is what should the investor's basis in the partnership be as a result of his contribution thereto of the long option and the partnership's assumption of responsibility under the short option. The government's apparent wish is that the investor's basis should only be a net amount equal to the price paid for the long option reduced by the premium received from the sale of the short option. In point of fact, however, nothing in the Code or regulations as they existed during the years at issue supports this position. Indeed, that position

---

14 The allegations relating to the SOS transactions appear in Paragraphs 28, 32, 33, 47-51, 52, 70, 78cc, 78hh, 78ll, 78nn, and 78rr of Count One of the Indictment. However, we believe that certain of the substantive tax evasion counts, Counts 2-40, are also predicated on the SOS transactions. However, this is not specified in the Indictment and the government has refused to provide any Bill of Particulars. The Court should direct the government to specify which of the tax evasion counts are predicated on the SOS transactions, and those counts should also be struck.

15 Although, as discussed earlier, the government nowhere in the Indictment describes what it means by "SOS" and, in fact, refers to eleven different types of such transactions, a general summary of what Defendants surmise the government may believe are the principal elements of one type of such transaction is set forth in Appendix A.

is flatly contradicted by the authority that existed at the time, most particularly by rulings vigorously and successfully sought by the government when advantageous to it in cases against other taxpayers. In short, and as further described below, the tax planning that the government finds criminally objectionable here simply follows the path paved by the government itself.[16]

The second principal tax issue is whether the existence of the partnership, and the investor's status as a partner thereof, should be respected. The government presumably wishes to avoid having to recognize the partnership and the investor's status as a partner because of the basis issue identified above. However, the government fails here also because, in addition to other reasons that are specific to each taxpayer and will not be discussed for purposes of this motion, it ignores the fact that the contribution by the investor of his options to the partnership had economic consequences to both the investor and the other partners by virtue of the diversification, i.e. the partnership held other, different assets as well.

### A. The Basis Question: The Investor's Basis in the Partnership is Equal to His Basis in the Long Option and is not Reduced by the Assumption by the Partnership of the Obligation under the Short Option.

Defendants were absolutely correct in concluding that an investor's basis in the partnership interest obtained upon the contribution of the long option to the partnership and the assumption by the partnership of the obligation under the short option was the amount paid for the long option. There was no offset for the obligation assumed by the partnership to perform under the short option. The government knows this, and knows it full well. That is undoubtedly why the Indictment makes no reference to this point. Under the applicable case law and IRS

---

[16] As one prominent tax law professor (and spouse of Justice Ginsburg) has observed, "[e]very stick crafted to beat on the head of a taxpayer will metamorphose sooner or later into a large green snake and bite the Commissioner on the hind part." Martin D. Ginsburg, "Making Tax Law Through the Judicial Process," A.B.A. J., Mar. 1984, at 76.

authority, an investor's basis in his partnership interest was as the opinions referenced in the Indictment concluded, namely, the amount paid for the long option.

**1. General Principles.**

Upon contributing an asset to a partnership, the taxpayer's basis in his partnership interest equals his basis in the property contributed. 26 U.S.C. § 722. In addition, if the contributed property is subject to liabilities, or if the partnership otherwise assumes some of the taxpayer's liabilities, the taxpayer's basis in his partnership interest is reduced by the amount of such liabilities assumed by the partnership. 26 U.S.C. §§ 733(1), 752(b). Finally, a taxpayer includes in his basis his share of the partnership's liabilities, including his share of his own liabilities that the partnership assumed.[17]

The definition of what is a liability for partnership tax purposes is important for the option investments at issue here. There would be significantly different consequences upon sale or redemption of the partnership interest, depending upon whether the obligation to perform under the short obligation is, or is not, treated as a liability for partnership tax purposes. Upon such sale or redemption the taxpayer would be treated as having received not just the amount paid directly to him by the buyer (or the property distributed by the partnership in redemption), but also relief from his share of partnership liabilities. That would increase the proceeds the taxpayer would be considered to have received upon such sale or redemption, and would decrease the loss realized upon such sale or decrease the basis in the property received upon such redemption.[18] It is for this reason that a key tax question – perhaps the key tax question – with

[17] The rules regarding how a partner determines his share of partnership liabilities are quite complicated, but can be summarized generally as looking to who will bear the burden of those liabilities if the partnership cannot pay. If nobody bears the burden because the liabilities are non-recourse, the liabilities are shared according to a partner's interest in partnership profits. Treas. Reg. § 1.752-3.

[18] For example, assume a taxpayer contributed a long option with a basis of $100 to a partnership and had the partnership assume a contingent obligation with an estimated cost of $80 but that is not treated as a liability for

respect to the tax treatment of an investment in such options is whether the obligation to perform under the short option constitutes a liability under Code Section 752 for partnership tax purposes.

### 2. The Obligation Under the Short Option did not Constitute a Liability for Partnership Tax Purposes.

The Code and regulations in effect during the years that are at issue under the Indictment provided detailed rules for the allocation of partnership liabilities. As astonishing as it may seem given its importance for partnership tax purposes, however, neither the Code nor the regulations provided detailed rules indicating what constituted a "liability." The closest thing to a definition that existed was a revenue ruling issued by the Internal Revenue Service in 1988. Rev. Rul. 88-77, 1988-2 C.B. 128.[19] The Ruling provided that an obligation was considered a partnership liability only if it created or increased the basis to the partnership of a partnership asset, if it gave rise to an immediate deduction to the partnership, or if it gave rise to an expense that was neither deductible nor chargeable to capital account. The obligation under the short option did none of these things. It did not create or increase basis to the partnership of a partnership asset, it did not give rise to an immediate deduction and it did not give rise to an expense that was neither deductible nor chargeable to capital account. At about the same time that it issued the Revenue

---

partnership tax purposes, in exchange for a 99% partnership interest. The taxpayer's basis in his interest would be $100, because it would include the basis of the property contributed, but would not be reduced by the amount of the contingent obligation. If the partnership distributed property worth $20 to the taxpayer in liquidation of his interest, he would take this property with a basis of $100 and could sell it for a loss.

Suppose, however, that instead of a contingent obligation, the partnership assumed a fixed liability of the taxpayer to pay $80. The taxpayer's basis of $100 would be reduced by $80 to reflect the assumption of the fixed liability, and then increased by $79.20, reflecting the taxpayer's 99% share of the $80 liability, for a resulting basis of $99.20. Thus, the taxpayer's basis in his interest would be virtually unchanged from the prior example involving the contingent obligation. However, if the partnership distributed property worth $20 to the taxpayer in liquidation of his interest, he would take the property with a basis of only $20, because his $99.20 basis would be reduced by a deemed distribution of cash in the amount of $79.20 from the partnership, representing the relief of this liability. Thus, he would not recognize a loss on the sale of the property.

[19] Revenue rulings are not substantive authority. See Stark v. Commissioner, 86 T.C. 243, 250-51 (1986) ("Absent special circumstances a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation …. [R]evenue rulings typically do not constitute substantive authority for a position.") (citations omitted).

Ruling, the government also issued a temporary regulation providing a similar definition of liability in Temp. Treas. Reg. § 1.752-1T(g).[20] However, for reasons best known to itself, the government omitted this definition of liability from the final regulations that were promulgated in 1991.[21] The definition did not reappear until 2003, when Prop. Treas. Reg. § 1.752-1(a)(1) included a definition that closely resembled the 1988 definition.

Thus, with respect to a question that cuts to the core of partnership tax treatment, there was no statutory or regulatory guidance during the years at issue under the Indictment as to whether the short option obligation was a Section 752 liability. See Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434 (June 24, 2003) ("There is no statutory or regulatory definition of liabilities for purposes of § 752."); Salina Partnership L.P. v. Commissioner, 80 T.C.M. (CCH) 686, 697 (2000) ("Resolution of this issue is complicated by the lack of a definition of 'liabilities' within subchapter K or the underlying regulations.").

However, there was case law on this question, and that case law established that the obligation to perform under the short option did not constitute a liability. In addition, the results in those cases were those the government had sought and constituted victories for it, at least as against the taxpayers that were involved in those cases. It is only when these results can be applied to the advantage of a taxpayer, and to the disadvantage of the government, as is the situation here, that the government tries to assert – on pain of criminal penalties – a contrary conclusion.

[20] T.D. 8237, 1989-1 C.B. 180 (defining "liability" for purposes of Code Section 752 as an obligation, to the extent that incurring or holding such obligation gives rise to (1) the creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings); (2) a deduction that is taken into account in computing the taxable income of the obligor; or (3) an expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital).

[21] See T.D. 8380, 1992-1 C.B. 218 (containing no definition of the term "liability" for purposes of Code Section 752).

First, the government successfully argued before the Supreme Court in Deputy v. du Pont, 308 U.S. 488, 497, 60 S. Ct. 363, 368 (1940), that contingent obligations under a short sale of stock did not constitute indebtedness for tax purposes. The issue there was whether or not the payments that the taxpayer had to make to the entity from which it had borrowed the stock to compensate it for its foregone income were deductible as interest expense. The Court concluded that the obligation under such a short sale did not constitute indebtedness for federal income tax purposes and that, therefore, such payments did not constitute interest expense. In other words, even though the taxpayer had an obligation to perform under the transaction, that obligation did not give rise to a liability for federal income tax purposes.

In another case even more on point, the government successfully persuaded the court that an obligation to perform under a “short” type of transaction did not give rise to a liability for partnership tax purposes. In Helmer v. Commissioner, 34 T.C.M. (CCH) 727, 731 (1975), a partnership owned real property, sold an option to a corporation that gave the corporation the right to purchase the property at a future date for an agreed price, and distributed the cash received to the partners. Since the partners’ bases in their partnership interests were otherwise very low, this distribution would trigger gain to them as a distribution of money in excess of basis unless the obligation under the option constituted a partnership liability that was includable in their bases under Code Section 752. The IRS argued, however, and the Tax Court agreed, that the partnership’s receipt of the option premium did not cause the partnership to incur a liability that would affect the partners’ bases: the option agreement did not give rise to any liability to repay the option premium if the agreement terminated, nor did it obligate the partnership to perform any services in the future. Because the taxpayer’s obligation to deliver the property to

the corporation was contingent upon the corporation's decision whether to exercise the option, the court refused to take this obligation into account.[22]

In short, under decided judicial authority, the obligation of a taxpayer to perform under the short option did not constitute a liability under Code Section 752 for partnership tax purposes. More than that, the government understood this, as an internal briefing memorandum prepared for the IRS Chief Counsel in 1995 in connection with a proposed revenue ruling that considered whether an obligation to perform under a short sale of securities constituted a liability made clear. Tandon, "IRS, Treasury Shared Views of Shelter Lawyers, IRS Document Says," Tax Notes Today (Oct. 14, 2005). Apparently in response to a request from the Chief Counsel that the IRS also consider whether options gave rise to liabilities, the memorandum cited Helmer and then admitted, "we agree that existing authority prevents treating options as creating liabilities," and recommended further consideration of the issue. Thus, the IRS clearly understood that it had no basis for treating an obligation under a short option as a partnership liability without first either amending the regulations or seeking an amendment to the Code. But, the government did not, in fact, amend the regulations until 2003, when it promulgated Temp. Treas. Reg. § 1.752-6T(a). And even though, in promulgating that regulation, Treasury admitted that it was creating a new definition of "liability" that departed from the position the government had argued for in Helmer, Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434, it made the regulation retroactive to 1999.

In sum, under the law that existed during the time at issue in the Indictment, the law clearly provided – and the government clearly understood – that the obligation to perform under

---

22 This holding is consistent with the long-established principle that a contingent obligation cannot be included in a buyer's basis until paid. See, e.g., Denver & Rio Grande W.R.R. Co. v. United States, 205 Ct. Cl. 597, 505 F.2d 1266, 1269-70 (1974) (Defendant's summary judgment granted on grounds contingent obligation cannot be included in basis); Exxon Mobil Corp. v. Commissioner, 114 T.C. 293, 313-4 (2000) ("all-events" test barring recognition of contingent obligations applies to Section 1012 determination of cost basis in asset).

the short option did not constitute a liability for partnership tax purposes. The SOS transactions that the government asserts are criminally objectionable simply follow the path paved by the government itself in Deputy v. Du Pont, 308 U.S. 488, 60 S. Ct. 363 (1940) (a short position—i.e., an obligation to deliver securities in the future – is not an indebtedness) and Helmer v. Commissioner, 34 T.C.M. (CCH) 727, 731 (1975) (the obligation to deliver property pursuant to a call option does not constitute a fixed liability or indebtedness for purposes of the Code Section 752 partnership tax rules). Therefore, a partner's basis in his partnership interest upon contribution of the long option and the short option to the partnership was not reduced by the short option obligation.

**B. The Partnership, and the Contribution to and Assumption by the Partnership of the Options, Must be Given Effect for Tax Purposes.**

The second principal tax issue is whether or not the partnership to which the investor contributed his options and which assumed the investor's obligation to perform under the short option should be given effect for federal income tax purposes.

The Indictment labels the transactions involved with respect to the short option strategy as fraudulent or false at every opportunity, asserting that the transactions were not an investment; that they would not have been entered into independently; that there was no purpose to diversify; that there were no substantial non-tax business reasons for the transaction. What the Indictment does not say, however, is that the transactions did not take place. It cannot say that because such an allegation would not be true. As a result, what the government's position comes down to is that the partnership, and the contribution of the long option thereto and an assumption of the obligation under the short option thereby, cannot be given effect for federal income tax purposes. This is key to its position because if a partnership does not exist, then the basis and other consequences resulting from such contribution and later disposition or redemption of the

associated partnership interest do not arise. The Indictment, however, does not assert that the partnerships did not exist. The government's case against Defendants is holed on the shoals on that deficiency.

### 1. Under the Statute, Congress Treats Every Unincorporated Organization as a Partnership if it Carries on "Any Business, Financial Operation or Venture.

In Code Section 761, Congress defines in broad, clear and unambiguous terms when an entity qualifies as a partnership for federal tax purposes. It defines "partnership" in these expansive terms:

> For purposes of this title, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation or venture is carried on and which is not, within the meaning of this title, a corporation or a trust or estate …. (Emphasis added).

26 U.S.C. § 761. This broad definition is not intended to be limited to certain narrow situations, as it mirrors a similarly broad definition found in Code Section 7701(a)(2):

> The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such syndicate, group, pool, joint venture, or organization. (Emphasis added).

Further, the Supreme Court has established in Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439, 63 S. Ct. 1132, 1134 (1943), a disjunctive rule that an entity will be respected for tax purposes if its purpose (at the time of formation) is the equivalent of business activity or the entity carries on business after its formation. There, an individual formed a corporation that owned property and carried on only a minimal amount of activity. Later, he urged that the entity should be disregarded; but the Supreme Court resisted, recognized the entity, and laid down this rule:

> Whether the purpose be to gain an advantage under the law … or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. (Emphasis added).

Moline, 319 U.S. at 438-39, 63 S. Ct. at 1134. See also Harrison Prop. Mgmt. Co. v. United States, 475 F.2d 623, 626-627 (Ct. Cl. 1973) (in applying Moline, the business purpose question is not whether the venture could have been operated successfully in some other structure; the question is whether a purpose existed to engage in the equivalent of business activity); and Campbell County State Bank, Inc. v. Commissioner, 37 T.C. 430, 441-42 (1961), acq., 1966-2 C.B. 3, rev'd on other grounds, 311 F.2d 374 (8th Cir. 1963) (applying Moline to partnerships). Furthermore, for partnership tax purposes business activity includes investment activity. See 26 U.S.C. § 761 (which includes financial operation among the list of activities; see also the permission under Code Section 761 for investment partnerships to elect out of partnership treatment.)

Six years later, the Supreme Court recognized that a partnership can exist even when an interest therein had been acquired through gift. Commissioner v. Culbertson, 337 U.S. 733, 69 S. Ct. 1210 (1949). As the leading partnership taxation treatise explained, "[F]or present purposes, Culbertson stands for the proposition (later codified) that if the putative partners actually share the ownership of capital interests in an unincorporated business enterprise, the requisite business purpose exists and they will be recognized for tax purposes as partners." William S. McKee, et al., Federal Taxation of Partnerships and Partners § 1.05(3)(a) (3d ed. 1997). Justice Frankfurter, in his concurring opinion in Culbertson, 337 U.S. at 754, 69 S. Ct. 1220, put it simply:

> In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of [the partnership tax provisions]. But if they are in the same

> business boat, although they may have varying rewards and varied responsibilities, they do not cease to be in it when the tax collector appears.

In short, Moline, Culbertson, and Code Section 761 together show that the existence of an entity legally constituted under State law must be recognized where the investors actually pool resources for joint benefit.

**2. Tax Purpose is Legally Irrelevant Here.**

No one disputes that one of the potential benefits for investors undertaking the short option investment approach was tax deduction. However, as discussed at pp. 9-10, supra, the presence or absence of a tax motivation is not relevant to the correct treatment of a transaction under the tax law and for good reason. As discussed above, the law recognizes that citizens are entitled to follow the law—including the tax law—even when it works to their advantage.

**3. The Contribution of the Long Option to, and the Assumption of the Obligation Under the Short Option by, the Partnership had Economic Consequence. That is All That is Necessary.**

The government's position seems to be that the contribution to, and assumption by, the partnership of the long and short options are not to be given tax effect because the taxpayer did not have a proper motive. Thus, the Indictment claims that Defendants falsely claimed that the option positions were contributed to diversify the investment, the offsetting option positions were entered into for substantial non-tax business reasons, and so forth. All of these allegations go to what the motive was for making the contribution. The allegations miss the mark by a wide margin, however, because they do not allege that such contribution and assumption lacked genuine economic consequences. In order to give effect to the partnership and to such contributions and assumptions, that is all that is necessary.

The fact that such contributions and assumptions had economic consequences is undeniable. It is an inevitable and necessary result of contributing those options to a partnership

that held other investments. The government does not allege in the Indictment that such contributions did not result in diversification. Instead, it simply alleges that the purpose of the contributions was not diversification but or some other non-tax reason, rather, something else, presumably tax minimization. However, the fundamental lesson of the Supreme Court's opinions in Moline and Culbertson is that, if a contribution actually occurs and affects the economic position of the parties, it cannot be dismissed as a sham simply because the contribution was tax-motivated.

Accordingly, given the undeniable effects of the SOS investors' contributions to the partnership on their potential economic return, the contributions should be respected even if the investors lacked any business purpose for making them.

#### 4. The Fact that an Investor Chose an Advantageous Structure for His Transaction Does not Change the Result.

A taxpayer is free to choose the structure in which he or she will do business. A taxpayer, having a choice between two equally direct ways of achieving the same result, is free to choose the method which entails the most tax advantages to him. Magneson v. Commissioner, 753 F.2d 1490, 1497 (9th Cir. 1985); Biggs v. Commissioner, 69 T.C. 905, 913 (1978), aff'd, 632 F.2d 1171 (5th Cir. 1980). See also American Home Prods. Corp. v. United States, 601 F.2d 540, 548 (Ct. Cl. 1979) ("It is fundamental that once a taxpayer properly enters a bona fide transaction the mere fact that the transaction legally reduces taxes is irrelevant. A taxpayer has the option to select a transaction which will legally minimize taxes.") As the Eleventh Circuit recognized in United Parcel Serv. of Am., Inc., 254 F.3d at 1019:

> The Code treats lots of categories of economically similar behavior differently. For instance, two ways to infuse capital into a corporation, borrowing and sale of equity, have different tax consequences; interest is usually deductible and distributions to equity holders are not. There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business,

> but it does not mean that the taxpayer lacks a "business purpose." To conclude otherwise would prohibit tax-planning.

Under this Indictment, the taxpayers to whom Defendants gave advice entered into foreign currency option contracts. These option contracts were contributed to a partnership. The government does not allege, nor could it, that such a contribution was devoid of economic consequences and did not effect a pooling and sharing of profits and losses among partners with respect to different investments.[23] Thus, such contributions had business significance and cannot be ignored.

## III. REGARDLESS OF WHAT THE FEDERAL INCOME TAX TREATMENT OF SHORT OPTION INVESTMENT MAY BE, THE ADVICE DEFENDANTS GAVE REGARDING SUCH TREATMENT WAS A REASONABLE INTERPRETATION OF THE LAW AT THAT TIME. CONSEQUENTLY, IT CANNOT BE THE SUBJECT OF CRIMINAL PROSECUTION BECAUSE DEFENDANTS LACKED THE REQUISITE CRIMINAL INTENT.

In its Indictment, the government avoids the threshold question of whether the short option transactions with respect to which Defendants provided tax advice were improper. This avoidance is not inadvertent; it is willful and intentional. The reason is that there has not been a single case – not a single one – that has held that the losses arising from a sale of a partnership interest in a partnership or from the sale of property received in redemption of such an interest with respect to such transactions are not allowed. As a result, because the government cannot point to a single case in which a court has held that such deductions were disallowed, it has framed its case solely in terms of whether Defendants made a false statement, or were otherwise involved in the evasion of tax the nature of which is never defined in connection with these

---

[23] In Chisholm v. Commissioner, 79 F.2d 14, 15 (2d Cir. 1935) Judge Hand, interpreting his holding in Gregory, supra, held that a partnership formed as part of a pre-arranged plan to dispose of stock in a company to avoid tax must be recognized because, although the partnership was formed "confessedly to escape taxation," it was undeniably a "genuine pool of joint capital, managed jointly."

transactions. As set forth in Section I, supra, the allegations of the Indictment are woefully inadequate to state any criminal violation in connection with the SOS transactions.

However, the ultimate question in any criminal tax case is whether Defendants reasonably believed the deductions claimed by the taxpayers were at, a minimum, sustainable at a "more likely than not" level. If Defendants reasonably believed that the deductions were not frivolous, then they cannot have had the criminal intent required to be guilty of the offenses with which they have been charged. As the Second Circuit observed in Pirro, "where the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." 212 F.3d at 91, quoting Mallas, 762 F.2d at 363, quoting United States v. Critzer, 498 F.2d 1160, 1162 (4th Cir. 1974). That conclusion is even more strongly compelled when the opinions reflected a reasonable interpretation of the law.

It was reasonable for Defendants to believe that these deductions were proper. First, it was reasonable to believe that the transactions satisfied the technical requirements of the statute, regulations and other legal authorities in effect during the years at issue. Second, it was reasonable to believe that they satisfied the relevant judicial doctrines applicable to tax-motivated transactions as they existed at that time. Indeed, a high ranking government official has apparently conceded this when he commented to the ABA Section of Taxation that there has been no conclusion by the government that SOS (or the other structured transactions identified in the Indictment) are criminally fraudulent tax shelters per se. Stratton, "IRS Defends Action Against KPMG Professionals," Tax Notes Today (Sept. 20, 2005).[24]

---

[24] Mr. John Klotsche, the government official who was quoted in the Tax Notes Today article as saying that SOS was not criminally fraudulent per se, was at the time of his comments Senior Advisor to the Commissioner of Internal Revenue.

**A. Defendants' Opinions were Based on a Reasonable Interpretation of the Technical Requirements of the Statute and Regulations.**

As discussed above, solid authority supported Defendants' opinions regarding what an investor's basis in his partnership interest would be upon contribution of the long option to the partnership and the assumption of the obligation under the short option by the partnership. Even if wrong, it should be apparent from the weight of the authorities discussed there that such a conclusion was, in any event, a reasonable interpretation of the law.

This is also clear from commentary that existed at that time. Commentary from the 1990s does not evidence an understanding of "liability" for this purpose that is at odds with Defendants' opinions. Instead, it tends to focus on the absence of clear authority on this subject, and expresses a frustration with Treasury's failure to define "liability" in the regulations. See, e.g., Cuff, "Allocating Partnership Liabilities," 70 Taxes 303, 305 (May 1992) ("Naively, one would suppose that the Final Regulations would … define what they are talking about, namely, "liabilities"); Brannan, "Partnership Interest Basis Issues," 440 PLI/Tax 721 (1999) (noting that, "[s]urprisingly, the term "liability" is not defined in the Section 752 regulations and there are relatively few cases and rulings on the issue," but then identifying Helmer as one of the "key authorities" in this area). In short, Defendants' interpretation of the law was consistent with the prevailing view.

To be sure, several years after the SOS transactions took place, Treasury, in 2003, promulgated a temporary regulation that provided by fiat that the obligation to perform under the short option would be treated as a liability that reduced an investor's basis in its partnership interest when it was assumed by the partnership. Temp. Treas. Reg. § 1.752-6T(a). In promulgating this regulation in 2003 – after the transactions at issue in the Indictment – Treasury, however, admitted that it was creating a new definition of "liability" and, in the

process, was departing from the principle it established in Helmer. Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434. Indeed, the government was aware that Helmer prevented it from treating short option obligations as liabilities at least as early as 1995, but did nothing to change this treatment for eight years. Tandon, "IRS, Treasury Shared Views of Shelter Lawyers, IRS Document Says," Tax Notes Today (Oct. 14, 2005). And, in order to apply the temporary regulation to civil proceedings involving the years at issue in the Indictment, it made the regulation retroactive effective to 1999.

In other words, Treasury, intent on disallowing the tax benefits of SOS, had to create a new rule to treat such an obligation as a liability because there was no authority under existing law that clearly supported its position. Indeed, in a 2003 memorandum setting forth various legal arguments for attacking the SOS transaction undertaken in prior years, the only authority the IRS cited to support treating the short option obligation as a partnership liability that reduced the taxpayer's basis was its own retroactive, temporary regulation. Chief Counsel Notice 2003-020 (June 25, 2003). That is bootstrapping of the worst sort; and whatever may be the government's ability to do so in civil proceedings, it is shameful for it to attempt to do so in a criminal prosecution.

The government's need to promulgate the temporary regulation, its need to make it retroactive, and its admission that the regulation was contrary to then-existing authority conclusively demonstrate that it was reasonable for Defendants to believe when the transactions occurred that it was more likely than not that the reported tax consequences of the SOS transactions would be sustained by a court if challenged by the IRS. In point of fact, there was no authority in effect at the time that clearly required an investor to reduce his basis in the partnership by the short option obligation.

**B. Defendants' Opinions Also Reflected a Reasonable Interpretation of "Economic Substance" and Other Applicable Judicial Doctrines.**

In the Indictment, the government avoids the question of whether it was reasonable to believe that SOS satisfied the technical requirements of the law. Instead, it has simply and wrongly labeled SOS "false and fraudulent." The government's position appears to be not only that the transactions should fail as a civil matter regardless of their technical merits because they supposedly lacked any non-tax business purpose, but also that the transactions were criminal despite their technical soundness. Earlier in this brief, Defendants have urged that, because of debatable nature of the economic substance doctrine—both as to its contours and as to when it should be applied—the government cannot base its prosecution on a claim of lack of economic substance absent allegations showing that the transactions were shams in fact. If the Indictment is, nevertheless, sustained against that ground, the SOS charges in the Indictment must still be dismissed because even if the government could successfully establish that the SOS investors lacked a substantial non-tax business purpose for contributing the option contracts to the partnership, it was reasonable for Defendants to believe that the contributions to the partnership would be given effect.

That is clear from Code Section 704(e). It plainly states that "a person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor." 26 U.S.C. § 704(e). During the years before the SOS transactions occurred, there was substantial discussion in professional journals about the scope of this provision, and prominent commentators concluded that it disposed of the need to show a business purpose for the formation of a partnership. McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners at ¶ 3.02[3][a] (3d ed., 1996) (noting that this provision "virtually requires an arrangement among co-owners to be recognized as a

partnership, regardless of other motives for the arrangement");[25] Nelson, "The Limits of Literalism: The Effect of Substance Over Form, Clear Reflection and Business Purpose Considerations on the Proper Interpretation of Subchapter K," 73 Taxes 641 (Dec. 1995) (noting that in enacting Code Section 704(e), "Congress thus determined that if a putative partnership conducts a real enterprise in which the putative partners share capital ownership, it is recognized regardless of the fact that its formation or use is tax-motivated and even if there was no business or economic purpose for admitting one or more partners").

In addition, although some courts have evaluated a transaction's economic substance by analyzing its profit potential, courts have been hesitant to require a specific quantum of profit in order to uphold a transaction. Compaq Computer Co. v. Commissioner, 277 F.3d 778 (5th Cir. 2001) (reversing Tax Court decision that transaction lacked economic substance where pretax profit was insignificant in relation to the large tax benefits obtained); Northern Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506 (7th Cir. 1997) (respecting existence of a subsidiary created to engage in back-to-back loans to avoid withholding taxes because the subsidiary earned a 1% "spread" on the loans and therefore earned a real profit from its activities). Even where courts have focused on profit potential, the question generally has been whether any profit was possible, not whether a profit was in fact realized. Winn Dixie Inc. v. Commissioner, 254 F.3d 1313 (11th Cir. 2001) (holding transaction was a sham—civilly—where projections showed it could never be profitable on a pre-tax basis).

Finally, some courts have concluded that the economic substance test does not come down to profit potential at all, but simply considers whether a transaction has any practical economic effects other than the creation of tax losses. This test has alternately been phrased in

---

25 Messrs. McKee and Nelson are both former Tax Legislative Counsel at the U.S. Department of the Treasury.

terms of whether the transaction "affected the taxpayer's financial position in any way," In re CM Holdings, 301 F.3d 96, 103 (3d Cir. 2002), or whether it "appreciably affect[ed] the taxpayer's beneficial interest except to reduce his tax." Knetsch v. United States, 364 U.S. 361, 366, 81 S. Ct. 132, 135 (1960). The distinction between transactions that have economic substance and those that are shams is whether they have any meaningful economic effects other than the creation of tax losses. United Parcel Serv. v. Commissioner, 254 F.3d 1014, 1018 (11th Cir. 2001); see generally Hariton, "Sorting Out the Tangle of Economic Substance," 52 Tax Law 235 (Winter 1999) ("the economic substance doctrine is not just a smell test, because it … permits taxpayers to retain even the most egregious tax benefits if they arise from transactions with meaningful economic consequences"). Contributions to the partnership clearly had such consequences.

## IV. CONCLUSION

This case ultimately turns upon Defendants' intent. Even if the government could convince a court to find that the SOS transactions should not be sustained as a civil matter, it is impossible for the government to prove that Defendants had the requisite intent to be guilty of any criminal offense in connection with their participation in these transactions. First, the Indictment fails to allege a violation of a clear rule of law. Pirro establishes such an allegation is necessary because, otherwise, Defendants cannot be found to have had the requisite intent to violate it. And, as also urged in this brief, to the extent the government's case depends on an assertion not that the SOS transactions did not occur but that they lacked economic substance, no such allegation of a violation of a clear rule of law can be made because the economic substance doctrine is anything but clear.

Second, even if this Court does not grant Defendant's Motion to Dismiss on this basis, the Indictment must still be dismissed because the applicable tax law compels the conclusion that

the opinions at issue were correct or that, at the very least, it was reasonable for Defendants to believe that the SOS transactions more likely than not would be sustained if challenged by the IRS.

The government's Indictment makes much of certain alleged false statements in the opinion letters. But, in doing so, it misses the point. Those statements do not change the fact that the short option did not constitute a liability for partnership tax purposes. Nor do they change the fact that the options existed and that their contribution to the partnerships had economic consequences. Nor do they change the fact that the options themselves offered the potential for profit. Those are the core issues involved in determining whether the deductions would be sustained. Ample authority indicated that they should. Moreover, even if such deductions were not sustained, that authority shows that it was reasonable for Defendants to believe that they would.

Finally, as the government itself has admitted, it has not determined that the SOS transactions were criminally fraudulent tax shelters per se. Therefore, the Indictment should be dismissed and the pithy wisdom of Learned Hand affirmed. The government's frustration with SOS as an alleged tax shelter should be resolved in Congress through the legislative process, not by the judiciary through the criminal process. At the very least, as the Fourth Circuit observed in Critzer: "the appropriate vehicle to decide this pioneering interpretation of tax liability is the civil procedure of administrative assessment, with judicial review in the Tax Court, or payment and a suit for refund in a district court, at the election of the taxpayer; not the prosecution with attendant potential loss of freedom . . . ." 498 F.2d at 1164.

Respectfully submitted,

__________/s/___________________
John N. Nassikas III, D.C. Bar No. 387167
(admitted *pro hac vice)*
Joseph R. Price, D.C. Bar No. 459599
(admitted *pro hac vice*)
Joseph A. Rieser, Jr., D.C. Bar No. 225318
**ARENT FOX PLLC**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
T: (202) 857-6014/ F: (202) 857-6395
*Attorneys for David Greenberg*

__________/s/___________________
Stuart E. Abrams (SA-6957)
M. Breeze McMennamin
David S. Hammer
**FRANKEL & ABRAMS**
230 Park Avenue
New York, NY 10169
(212) 661-5000
&
Jack S. Hoffinger (JH-1114)
Susan Hoffinger (SH-2101)
**HOFFINGER STERN & ROSS, LLP**
150 East 58th Street
New York, NY 10155
T: (212) 421-4000
*Attorneys for R.J. Ruble*

__________/s/___________________
Michael J. Madigan (*pro hac vice*)
Robert H. Hotz, Jr. (RH 4456)
Christopher T. Schulten (CS 7320)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
590 Madison Avenue
New York, New York 10022
T: (212) 872-1000
*Attorneys for John Lanning*

__________/s/___________________
Stanley S. Arkin (SA1373)
Joseph V. DiBlasi (JD5914)
Elizabeth A. Fitzwater (EF6633)
**ARKIN KAPLAN LLP**
590 Madison Avenue, 35th Floor
New York, New York 10022
T: (212) 333-0200/ F: (212) 333-2350
*Attorneys for Jeffrey Eischeid*

__________/s/___________________
James R. DeVita (JRD-5659)
**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, New York 10104
T: (212) 541-2000
&
John A. Townsend, Esq.
**TOWNSEND & JONES LLP**
5615 Kirby Drive, Suite 830
Houston, TX 77005
T: (713) 521-9977/ F: (713) 893-2509
*Attorneys for Carol Warley*

__________/s/___________________
Ronald E. DePetris
Marion Bachrach
Dana Moskowitz
**DePETRIS & BACHRACH, LLP**
240 Madison Avenue
New York, New York 10016
T: (212) 557-7747
*Attorneys for Philip Wiesner*

__________/s/___________________
John F. Kaley (JK:3598)
**DOAR RIECK KALEY & MACK**
217 Broadway, Suite 707
New York, New York 10007
T: (212) 619-3730
*Attorneys for Steven Gremminger*

__________/s/___________________
George D. Niespolo
Stephen H. Sutro
**DUANE MORRIS LLP**
One Market, Spear Tower, 20th Floor
San Francisco, California 94105
T: (415) 371-2200
*Attorneys for Randy Bickham*

__________/s/___________________
Michael S. Kim (MK-0308)
Leif T. Simonson (LS-5915)
**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
T: (212) 488.1200
*Attorneys for Mark Watson*

__________/s/___________________
Robert S. Fink (RSF-7924)
Caroline Rule (CR-6503)
**KOSTELANETZ & FINK, LLP**
530 Fifth Avenue
New York, New York 10036
T: (212) 808-8100
*Attorneys for Richard Smith*

__________/s/___________________
David C. Scheper
**OVERLAND BORENSTEIN SCHEPER & KIM LLP**
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071-3144
T: (213) 613-4670/ F: (213) 613-4656
*Attorneys for Robert Pfaff*

__________/s/___________________
E. Lawrence Barcella, Jr. (EB-9908)
Deborah Salzberg (DS-3422)
**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
75 East 55th Street
New York, New York 10022
T: (212) 318-6000/ F: (212) 319-4090
*Attorneys for Larry Delap*

__________/s/___________________
David Spears
**RICHARDS SPEARS KIBBE & ORBE LLP**
One World Financial Center
New York, New York 10281
T: (212) 530-1800
&
Craig A. Margolis
**VINSON & ELKINS LLP**
The Willard Office Building
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004-1008
T: (202) 639-6540
*Attorneys for Jeffrey Stein*

# APPENDIX A: SUMMARY OF SOS TRANSACTION

So-called SOS transactions involve an investment by a taxpayer (often through a partnership or a limited liability company treated as a partnership for federal income tax purposes) in foreign currency options. The investor would purchase a "put" option on a fixed amount of foreign currency. The put option would permit the investor to sell the currency for an agreed price, or provide for a fixed payout, if the currency declined in value to a certain level relative to the dollar by a specified date (the "Expiration Date"). This option would often be described as a "long option" because the investor had purchased it. The investor would also sell a "put" option on the same amount of foreign currency, which would require the investor to buy a fixed amount of currency for an agreed price, or make a fixed payment, if the currency further declined to a slightly lower level relative to the dollar by the Expiration Date. This option was often described as a "short option" because the investor had an obligation under it.

The investor would pay a premium for the long option and would be paid a lesser amount for the short option. Often, both option contracts were "Digital European" style, meaning they could only be exercised on the Expiration Date. And both would have the same Expiration Date. The options by their terms would settle shortly after the Expiration Date and often could be settled in cash. In addition, they often could be settled prior to the Expiration Date based on market conditions at that time. Further, the transferability of the options was not restricted, and, although they were not publicly traded, a market existed in the sense that there were investors who would buy or sell such options, so that they generally could be sold at any time.

An investor could make money under the options in two circumstances. First, if the value of the foreign currency declined relative to the dollar to the price at which the long option

could be exercised – and no further – the investor could exercise the option to sell the foreign currency to the counterparty or receive the fixed payout, as the case may be, and realize a substantial gain. If, however, the value of the foreign currency declined a bit further, to the price at which the investor's obligation under the short option was triggered, the investor would be required to buy currency or to pay a set amount to the counterparty. This would reduce his overall gain, but still leave him with a handsome profit.

If the exchange rate did not reach either of these thresholds, both of the options would expire unexercised. Because the premium paid under the long option was higher than the premium received under the short option, this resulted in a net loss.

After purchasing these two options, the investor would contribute the long option to a partnership that had other investors and investments. At the same time, the partnership would assume his obligation under the short option.

Sometime later, depending on the investor's decision, the investor might dispose of his interest in the partnership for its then-value, either by selling it to someone else or as a result of its redemption by the partnership. This would ultimately result in a gain or loss equal to the difference between the tax basis in the partnership interest and its net value.

LDR/166519.1