# EXHIBIT B

**Memorandum in Support of Motion for Relief in Connection with Rule 16 Discovery**

David Spears (DS-2720)
Richards Spears Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281
Telephone: 212-530-1800
Fax: 212-530-1801

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 05 Cr. 888 (LAK) (ALL) (ECF) |
| JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, RAYMOND J. RUBLE (also known as "R. J. RUBLE"), and MARK WATSON, Defendants. | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF**
**IN CONNECTION WITH RULE 16 DISCOVERY**

Defendant Jeffrey Stein respectfully submits this memorandum in support of his Motion For Relief In Connection With Rule 16 Discovery.

**BACKGROUND**

On September 6, 2005, the Court ordered the government to "complete discovery by October 5, [2005]." (9/6/05 Transcript of Hearing at 19.) Thereafter, defendants received nothing resembling discovery until October 5, at 5:37 PM, when the government provided an identical letter to counsel for each defendant, six pages in length and attaching Exhibits A

through F.[1] Among other things, the government's October 5 letter directed defense counsel to (1) a document center in Maspeth, New York for inspection and copying of hard documents being produced by the government, and (2) a vendor in Fayetteville, North Carolina to purchase hard drives loaded with electronic files containing documents. After having expended significant time attempting to follow up on the government's October 5 discovery letter and actually obtain production of the materials described in the letter, we are convinced that (1) the government has not honored the Court's September 6 Order regarding discovery, and (2) the Court must enter a further order directed to the government if defendants are to have meaningful discovery as required by Rule 16 of the Federal Rules of Criminal Procedures. Our reasons are set forth below.

## FACTS

### A. "Hard" Documents At The Document Center In Maspeth, New York

On October 12, 2005, counsel for one of the defendants traveled to the business in question to begin review of the documents and spoke with a man named Bruno Edlin, who is apparently a representative of the document center.[2] Mr. Edlin stated that there were no documents available for review at that time. He directed counsel's attention to approximately 20 pallets piled high with boxes and shrink-wrapped. Mr. Edlin said he has approximately 1300

[1] A copy of the government's letter is attached to the Declaration Of David Spears In Support Of Motion For Relief In Connection With Rule 16 Discovery, dated October 14, 2005, ("Spears Decl.") as Exhibit 1. The government's October 5 letter resulted in several letters to the Court. On October 6, counsel for Mr. Stein delivered a letter to the Court noting significant issues regarding the government's production of Rule 16 discovery and requesting a conference with the Court (attached as Exhibit 2 to the Spears Decl.). On October 7, counsel for defendant Mark Watson delivered to the Court a letter seeking certain relief regarding the discovery provided by the government (attached as Exhibit 3 to the Spears Decl.). Also on October 7, the government delivered a letter to the Court responding to the letter of Mr. Stein's counsel (attached as Exhibit 4 to the Spears Decl.). On October 13, counsel for defendant John Larson, who has also served as counsel for Presidio Advisory Services, sent a letter to the Court regarding Presidio's prior production of information to the government and certain allegations made by the government in its October 7 letter (attached as Exhibit 5 to the Spears Decl.).

[2] The government's October 5 letter gave the name of the document center as "JAG". Mr. Stein presented a card showing that he works for a business called Red Rose Document Solutions.

boxes now, but the government has told him to expect a total of around 1500 boxes. He intends to arrange the boxes by number, which will apparently correspond to an index to be provided by the government. These boxes are in a warehouse which also contains approximately 20 large and noisy copying machines on one side. Mr. Edlin said he intends to set up tables in the warehouse for counsel to review documents. Mr. Edlin said it would take approximately five weeks to copy all the documents, and the cost would be $.10 per page.[3] Mr. Edlin noted that making more than one set of copies could reduce the per page cost; but he added that there would be no reduction in the per page cost if the other party ordering a set is the government, because the cost to the government is "nominal."

Counsel was directed by Mr. Edlin to a Joseph Meisner to talk about scanning the documents into electronic format. Mr. Meisner's card said he works for a business called First Choice Copy. Mr. Meisner told counsel it would be possible to scan the documents into an electronic format with optical character recognition ("OCR"), which would make them word-searchable. Mr. Meisner said it would take about three months to scan the documents and would cost $.20 per page. For 2.7 million pages, that would come to $540,000.

**B. Electronic Files At The Vendor In North Carolina**

The facts we have gathered regarding the electronic files being made available for purchase on hard drives are even more disturbing. The hard drives contain approximately 800 gigabytes ("GB") of data. This is an enormous amount of data, more than could be handled by the IT system at a large law firm. The data contained on the two hard drives includes the following: (1) 19 databases with associated images, (2) two email databases of some form with

[3] As counsel for Mr. Stein informed the Court in his October 6 letter (Spears Decl. Ex. 2), another representative of the document center has reported that each of the 1500 boxes will contain 1800 pages, on average, for a total of 2.7 million pages. At a cost of $.10 per page, the total cost for making one set of copies would be approximately $270,000.

attachments, and (3) other documents in formats such as Word, PDF, Excel, etc.

Working with IT experts, who have spoken with the vendor in North Carolina, we have developed an estimate that the 19 databases represent about 600 GB. Industry standards rely on an estimate of approximately 16,500 image files (pages) per GB, so 600 GB would represent about 9.9 million pages. Some of the images in the databases have searchable text files and some do not.

The two email databases and the "other documents" referred to above are called "native" documents or files, which means they are not in image format and are not word-searchable.[4] We have developed an estimate that the native files represent about 200 GB. For these native files, industry standards rely on an estimate of 65,000 pages per GB, so 200 GB would represent approximately 13 million pages.

We are advised by our IT experts that the only possible way to handle this volume of electronic data is to give the hard drives to a specialty vendor which has an extraordinary capacity for handling electronic data and can set up a secure website, accessible only to subscribers, that has all the data on it for access by the subscribers. A vendor of this type charges by the month for storage of the data and maintenance of the website. Depending on the number of subscribers, the cost can be up to $95 per month per GB, which for 800 GB would come to approximately $76,000 per month for the duration of the case. Other costs include set-up, training, and monthly user fees. In addition, there would be considerable expense associated with the conversion of non-searchable documents to OCR format so as to make them searchable. We have received cost estimates from vendors for this task that range from approximately

[4] Some of the documents may be in a format that would permit them to be searched individually on a document-by-document basis.

$467,000 to approximately $1.6 million.[5]

## ARGUMENT

The defendants in this case cannot bear such ruinous expense in order to be entitled to defend themselves at trial, nor can the government legitimately impose such hardship on defendants in this criminal case or any other.

It must be noted at the outset that the KPMG defendants have been deprived of the advance indemnification by KPMG for legal fees and expenses that would ordinarily have been their due in this proceeding. All of the KPMG defendants are charged with crimes they are alleged to have committed in the performance of their regular duties and responsibilities at KPMG, with no question of breach of fiduciary duty to KPMG. To the knowledge of Mr. Stein, who was a partner at KPMG for many years and rose to the position of Deputy Chairman, KPMG has never refused to provide advance indemnification to a partner or former partner in such circumstances. Yet all of the KPMG defendants have been "cut off" by KPMG and left to cover their defenses with their own assets, which vary greatly among defendants but are in no case sufficient to bear the expense associated with the government's perverse approach to discovery.

There can be no doubt as to how this state of affairs came about. The so-called "Thompson memo" – a memorandum issued by then–Deputy Attorney General Larry Thompson to all United States Attorneys on January 20, 2003, setting out "Principles of Federal Prosecution of Business Organizations" (attached as Exhibit 6 to the Spears Decl.) – virtually requires that an entity such as KPMG refuse advance indemnification to its employees and former employees in order to avoid indictment itself. The memo sets out nine factors for consideration by the

[5] For the hard documents in Maspeth, we have received estimates from the same vendors for scanning and converting to OCR format ranging from approximately $315,000 to approximately $666,000.

government in deciding whether to charge the entity with a crime or not. The sixth factor is "the [entity's] remedial actions, including any efforts to...discipline or terminate wrongdoers...." (Spears Decl. Ex. 6, at 3.) A subsequent "Comment" on this factor in the memo states:

> Another factor to be weighed by the prosecutor is whether the [entity] appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees...through the advancing of legal fees...may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

(Id. at 5.) There can be no doubt that an entity such as KPMG, which the government took so close to the edge of indictment as to require entry into a deferred prosecution, could not have avoided indictment without a repudiation of the advance indemnification that would otherwise have been forthcoming to the KPMG defendants. The coercion by the government, and the resulting effect on the defendants' ability to mount an effective defense, are palpable.

Especially under such circumstances, the government's approach to discovery in this case – placing a burden of expense of millions of dollars on the defendants just in disbursements, before attorneys' fees – reflects such a level of unfairness that it makes the goal of every criminal proceeding, a fair trial, an impossibility. The government has dangled before the defendants millions of pages of discovery, which are presumptively related to the defendants' defenses, but in a form that makes those documents completely inaccessible without the expenditure of millions of dollars. It bears noting that in response to defendants' express request, the government has produced no Brady material. Thus, it is incumbent upon defendants to ferret out such evidence themselves from the millions of pages "provided" by the government. Without relief from the Court, defendants will be unable to even attempt to review the government's proffered discovery because they cannot afford the massive expense associated with the manner

in which the government has elected to make that discovery available.

We refer the Court to the letter from counsel for Mr. Larson dated October 13 (Spears Decl. Ex. 5). Counsel states that when he produced documents to the government, the government asked that they be produced electronically and in a specific format. Presumably the government did the same with all of the entities from which it subpoenaed documents, and presumably the government has been able to search electronically the various productions made to it and avail itself of the information contained therein. Defendants must have the same ability, and without inordinate expense.

Mr. Stein requests the following relief from the Court to remedy the unfairness created by the Government in connection with discovery:

(1) The government should, at its own expense, promptly have all of the electronic files being made available to defendants on hard drives converted to an OCR format that is fully word-searchable.

(2) The government should, at its own expense, promptly have all documents currently located at the document center in Maspeth, New York converted to electronic files in an OCR format that is fully word-searchable.

(3) The government should, at its own expense, promptly arrange for a third-party vendor to load all of the electronic files referred to in (1) and (2) above onto secure servers which can be accessed by defense counsel on an ongoing basis for the pendency of this proceeding.

Respectfully submitted,

RICHARDS SPEARS KIBBE & ORBE LLP

By: /s/ David Spears
David Spears (DS-2720)

One World Financial Center
New York, New York 10281
(212) 530-1800

Attorneys for Defendant Jeffrey Stein

- Of Counsel -

Craig Margolis, Esq.
Vinson & Elkins LLP
1455 Pennsylvania Avenue, Suite 600
Washington, DC 20004-1008