# In the United States Court of Federal Claims

No. 05-999T
(Filed: October 10, 2007)

```
**************************************
EPSOLON LIMITED, by and through        *
SLIGO (2000) COMPANY, INC.,            *
Tax Matters Partner,                   *   Tax Refund Suit; TEFRA; Cross-Motions
                                       *   for (Partial) Summary Judgment; 26 U.S.C.
              Plaintiff,               *   § 6501(a); 26 U.S.C. § 6229(a), (d); 26
                                       *   U.S.C. § 7609(e)(2); RCFC 56;
v.                                     *   Rhone-Poulenc; Andantech; AD Global;
                                       *   Grapevine; Powell.
THE UNITED STATES,                     *
                                       *
              Defendant.               *
**************************************
```

A. Duane Webber and George M. Clarke, III, Baker & McKenzie, LLP, Washington, DC, for plaintiff.

David R. House, Tax Division, Court of Federal Claims Section, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

      Before the court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion" or "Pl.'s Mot.") and Cross-Motion of the United States for Partial Summary Judgment, or in the Alternative, Motion Under Rule 56(f) ("Defendant's Cross-Motion" or "Def.'s Cross-Mot."). The issue presented is whether the Internal Revenue Service ("IRS") failed to timely issue a Notice of Federal Partnership Administrative Adjustment ("FPAA"), thus rendering certain partnership items final and barring the IRS from proceeding against the partnership and the partners for additional taxes owed with respect to these items. For the reasons set forth below, the court grants Defendant's Cross-Motion and denies Plaintiff's Motion.

## I. BACKGROUND

      The instant case stems from tax shelter transactions that KPMG, LLP ("KPMG"), a professional firm that provides audit, tax, and advisory services, with the assistance of the law

firm of Brown & Wood, LLP ("Brown & Wood"),[1] promoted and sold to its clients.  These transactions have been investigated by the IRS and have been the basis of much litigation.  Thus, after providing the factual background of the case <u>sub judice</u>, it is also necessary to set forth a brief summary of related cases and events in order to provide context and clarity to the parties' respective motions.

## A.  The United States Court of Federal Claims Litigation

### 1.  Factual Background[2]

---

[1]  The law firms of Brown & Wood and Sidley & Austin, LLP merged in May 2001, to become Sidley Austin Brown & Wood, LLP ("SABW"), and subsequently, on January 1, 2006, SABW became known as Sidley Austin.  <u>See</u> <u>United States v. KPMG, LLP</u>, 316 F. Supp. 2d 30, 39 (D.D.C. 2004) ("<u>KPMG DC II</u>"); Sidley Austin Home Page, http://www.sidley.com/about/about.asp (last visited October 1, 2007).  Brown & Wood prepared opinion letters for KPMG's clients regarding the transactions that became the subject of an IRS investigation.  <u>See</u> Plaintiff's Exhibit ("Pl.'s Ex.") J at 3-6 (copies of Brown & Wood letters to clients stating that the firm would serve as counsel to the client for certain investment transactions that involved "the acquisition of an interest in a foreign corporation through an S corporation and . . . various digital foreign currency option trades . . . .").

[2]  The facts recited by the parties unless otherwise noted and are derived mainly from the Complaint ("Compl."); Plaintiff's Motion; Defendant's Cross-Motion; Plaintiff's Response and Reply to Cross-Motion of the United States for Partial Summary Judgment, or, in the Alternative, Motion Under Rule 56(f), Epsolon's Motion for 56(f) Relief and Leave to Conduct Discovery, and Brief in Support Thereof ("Plaintiff's Response and Reply" or "Pl.'s Resp. & Reply"); Reply of the United States to Plaintiff's Response and Reply to Cross-Motion of the United States for Partial Summary Judgment, and Alternative Rule 56(f) Motion ("Def.'s Reply"); Plaintiff's Proposed Findings of Fact ("Pl.'s PFUF"); Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s PFUF"); Defendant's Proposed Findings of Uncontroverted Fact ("Def.'s PFUF"); Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to Def.'s PFUF"); Plaintiff's Reply to Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF"); Plaintiff's Supplemental Proposed Findings of Uncontroverted Fact ("Pl.'s Supp. PFUF"); Defendant's Response to Plaintiff's Supplemental Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s Supp. PFUF"); plaintiff's exhibits; defendant's exhibits ("Def.'s Ex. __"); and the transcript of the May 21, 2007 oral argument held on the parties' cross-motions ("Tr.").

Because the parties did not paginate the exhibits that accompanied their briefs, the court will refer to the exhibits with the page numbers assigned by the court's electronic case management system.

On April 10, 2002, Epsolon Limited ("plaintiff" or "Epsolon"), a partnership, by and through its tax matters partner Sligo (2000) Company, Inc. ("Sligo"),[3] filed its United States Return of Partnership Income, Form 1065, for the tax year ending December 31, 2001 ("Partnership Return").[4]  Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF ¶ 1; see also Pl.'s Ex. A (a copy of the Partnership Return).  One of the supporting tax schedules filed with the Partnership Return, Schedule K-1, reflects that Sligo, an S Corporation, is essentially the sole owner of Epsolon.  Pl.'s Ex. A at 13.  KPMG prepared the Partnership Return, which claimed a loss of $13,890,954 for Epsolon.  Id. at 2.  The Partnership Return was sent via return receipt requested, and bears an April 15, 2002 received date by the IRS.  Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF ¶¶ 2-3; see also Pl.'s Ex. B (a copy of the return receipt for the Partnership Return); Tr. 8-9 (stating that the Partnership Return was deemed filed April 15, 2002).

Also on April 10, 2002, Keith Tucker, managing member of Epsolon,[5] and his wife, Laura B. Tucker (collectively "the Tuckers"), jointly filed Form 1040, United States Individual Income Tax Return, for the tax year ending December 31, 2001 ("Individual Return").[6]  Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF ¶ 6; see also Pl.'s Ex. D (a copy of the Individual Return).  The Individual Return claimed $13,742,247 in losses from "partnerships, S corporations, trusts, etc."  Pl.'s Ex. D at 3.  The Tuckers submitted Schedule E, Supplemental Income and Loss, with their Individual Return, which reflects an identical amount of loss ($13,742,247) resulting from their "[t]otal partnership and S corporation income."  Id. at 12.  The Individual Return and supporting documents were mailed to the IRS on or before April 15, 2002, and were deemed filed on that date.  Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF ¶¶ 6-8; see also Pl.'s Ex. E (a copy of the return receipt for the Individual Return).

On June 17, 2005, the IRS issued an FPAA for tax year 2001 to Epsolon, and sent it to Robert H. Albaral of the law firm Baker & McKenzie, LLP ("Baker & McKenzie"), who had

---

[3]  In Defendant's Cross-Motion, the government notes that while it references "partnership" and other entities in this case, it does not concede that a viable partnership or the alleged entities existed.  Def.'s Cross-Mot. 3 n.4.  While defendant disagrees that Epsolon and Sligo were valid entities, defendant states that it is possible that the parties' motions can be decided on the issue of whether the FPAA was timely issued without determining the validity of the entities.  Def.'s Resp. to Pl.'s PFUF ¶ 1.

[4]  The Partnership Return reflects that Epsolon's principal corporate office is located in Dublin, Ireland.  Pl.'s Ex. A at 2; Compl. ¶ 3.  Sligo provided a Newark, Delaware address.  Pl.'s Ex. A at 3; Compl. ¶ 4.

[5]  Mr. Tucker is the ultimate economic owner of ninety-nine percent of Epsolon through Mr. Tucker's wholly owned S corporation, Sligo.  See Pl.'s Resp. to Def.'s PFUF ¶ 1.

[6]  Defendant agrees that the Individual Return was filed on or about April 10, 2002, but disagrees that the return was accurate as filed.

power of attorney to receive Epsolon's tax material.  Pl.'s Reply to Def.'s Resp. to Pl.'s PFUF
¶ 5; Pl.'s Ex. C.  The FPAA was accompanied by Form 4605-A, Examination Changes -
Partnerships, Fiduciaries, Small Business Corporations, and Domestic International Sales
Corporations ("Form 4605-A").  Pl.'s Ex. C at 15-16.  Form 4605-A identified "Epsolon Limited
c/o Sligo (2000) Co. Inc." as the taxpayer and notified Epsolon that the IRS had increased
"[o]ther income" attributable to the partnership by $13,890,954.  Id. at 15.  The FPAA also was
accompanied by an Explanation of Items for Epsolon Limited ("Explanation").  Id. at 17-21.  In
the Explanation, the IRS advised Epsolon "that you have failed to establish the actual existence
of Epsolon Limited, or that Epsolon Limited otherwise constituted a partnership for federal
income tax purposes."  Id. at 17.  Further, the Explanation stated:

> [Epsolon's] alleged foreign currency options transactions lacked any genuine
> business purpose apart from tax reduction.  Epsolon Limited and its transactions
> lacked economic substance and constituted economic shams for federal income tax
> purposes. . . .

> . . . Sligo (2000) LLC and Sligo (2000) Company, Inc., as well as the options
> transactions in which they engaged, lacked any genuine business purpose apart from
> tax reduction.

> . . . .

> . . . [C]losure of the loss legs of any Epsolon Limited foreign currency options
> was purposely delayed until after the effective date of Epsolon Limited's purported
> election to be treated as a partnership for U.S. income tax purposes, and that any
> losses from those positions were economically incurred and substantially locked in
> prior to the effective date of the election, when Epsolon Limited was purportedly a
> controlled foreign corporation (CFC) of Sligo (2000) Company, Inc. . . .  [A]ny
> losses from foreign currency options positions of Epsolon Limited are deemed to
> have been recognized by Epsolon Limited CFC prior to its election to be treated as
> a partnership for United States tax purposes.  Accordingly, the partners in Epsolon
> Limited are not entitled to claim losses therefrom.

> . . . .

> The losses claimed by Epsolon Limited and its partners are . . . disallowed
> because it has not been established that the losses, or any portion thereof, were
> actually sustained, or constituted real economic losses.

Id. at 17-19.

On September 15, 2005, plaintiff, by and through its tax matters partner Sligo, filed a
Complaint in the United States Court of Federal Claims ("Court of Federal Claims") pursuant to

section 6226 of the Internal Revenue Code,[7] seeking a readjustment of partnership items.[8] Compl. ¶ 1.  Plaintiff challenges the June 17, 2005 FPAA on two grounds.  First, plaintiff argues that the FPAA is untimely.  Id. ¶ 2.  Second, plaintiff disputes the proposed adjustments in the FPAA, arguing that the Commissioner of the IRS ("Commissioner") inaccurately determined an increase in income in the amount of $13,890,954 and penalties under section 6662.[9]  Id.  On March 22, 2006, the IRS assessed the tax associated with this partnership proceeding on the Tuckers.  Pl.'s Ex. T; Pl.'s Supp. PFUF ¶ 15; Def.'s Resp. to Pl.'s Supp. PFUF ¶ 15.

## 2.  Procedural Background

In response to plaintiff's Complaint, on January 13, 2006, defendant filed a Motion to Stay the Proceedings ("Motion to Stay").  Defendant contended that because the government was prosecuting a tax shelter conspiracy in the United States District Court for the Southern District

---

[7]  All statutory references to "section" or "Code" will be to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, unless otherwise designated.

[8]  Section 6226, in pertinent part, provides:

(a) Petition by tax matters partner. -- Within 90 days after the day on which a notice of final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for readjustment of the partnership items for such taxable year with --

(1) the Tax Court,

(2) the district court of the United States for the district in which the partnerships' principal place of business is located, or

(3) the Court of Federal Claims.

26 U.S.C. § 6226 (2000).

Further, section 6226(e) requires that before or on the day a readjustment petition is filed under section 6226, the partner must deposit with the IRS "the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the final partnership administrative adjustment."  Id. § 6226(e)(1).  Thus, pursuant to section 6226(e)(1), Sligo deposited $6,100,000 with the IRS on September 12, 2005.  Compl. ¶ 7.

[9]  Section 6662 provides for the imposition of accuracy-related penalties on the underpayment of taxes.

of New York ("Southern District of New York") arising from the same or similar transaction(s) to the case sub judice, in which several key witnesses had invoked their Fifth Amendment rights against self-incrimination, discovery could not proceed in the instant case. Specifically, defendant intended to pursue whether plaintiff filed a false or fraudulent return with the intent to evade the payment of taxes. Thus, because discovery in the case sub judice could interfere with, and possibly prejudice, the Southern District of New York criminal case, defendant argued that the stay was appropriate. In its Motion to Stay, defendant represented that the Southern District of New York case would proceed to trial on September 11, 2006. Thus, anticipating that the Southern District of New York proceeding would be resolved expeditiously, the undersigned imposed a stay in the instant case.

On January 3, 2007, defendant informed the court by status report that the trial in the Southern District of New York case had been rescheduled to September 17, 2007, a date that was more than one year after the original trial date. Accordingly, the court held a status conference with the parties on January 22, 2007, to discuss further proceedings in the instant case that would not interfere with the criminal case set for trial in New York. Because the parties agreed that the summary judgment motions on the limitations issues could be decided without seeking discovery from any defendant or witness in the Southern District of New York case, the court directed the parties to complete briefing by June 5, 2007.

### B. The Government's Summons Enforcement Litigation Against KPMG in the United States District Court for the District of Columbia ("DC Litigation")

From January through May 2002, as part of the investigation into KPMG's role in the promotion and participation in transactions the IRS considered to be abusive tax shelters, the IRS served KPMG with several administrative summonses.[10]  United States v. KPMG, LLP, 237 F. Supp. 2d 35, 36 (D.D.C. 2002) ("KPMG DC I"). Because KPMG refused to produce all documents responsive to the summonses, on July 9, 2002, the government brought suit to enforce nine of the summonses in the District Court for the District of Columbia.[11]  See id.  During that proceeding, KPMG asserted, inter alia, taxpayer communication confidentiality and attorney-client privileges under section 7525.[12]  Id. at 37. The District Court for the District of Columbia

---

[10]  The enforcement proceeding in the United States District Court for the District of Columbia ("District Court for the District of Columbia") did not involve the type of transaction allegedly involved in the instant case, the short option strategy ("SOS") type of the Son of BOSS ("Bond and Option Sales Strategy") shelter.

[11]  The government was represented by Stuart D. Gibson of the United States Department of Justice ("DOJ").

[12]  Section 7525, Confidentiality Privileges Relating to Taxpayer Communications, provides:

instructed KPMG to produce its privilege log along with a copy of each document referenced therein to a magistrate judge who would assist the court in determining whether the documents were indeed privileged.[13]  Id. at 48.

On May 4, 2004, the District Court for the District of Columbia, based upon the recommendations of the magistrate judge, granted the government's petition to compel KPMG's compliance with the nine summonses.  KPMG DC II, 316 F. Supp. 2d at 45.  The district court allowed KPMG ten days to identify the participants in the tax shelters identified or suspected to be abusive and to produce all documents previously withheld.  Id.  As to the Brown & Wood opinion letters, the court afforded KPMG two choices.  Id.  Within ten days of the court's order, KPMG could either (1) submit a privilege log explaining why each opinion letter should not be produced, or (2) concede the issue by filing a notice and immediately producing the opinion letters.  Id.  Finally, within that same ten-day period, KPMG was required to produce or certify to the IRS that it had produced "all documents responsive to the eight summonses other than the FLIP/OPIS summons, except for those documents that KPMG continue[d] to withhold on a claim of privilege"; and within thirty days, counsel for the parties were required to confer about documents sought by the remaining eight summonses and file a status report describing the documents at issue or other matters requiring court resolution.  Id. at 46.

On June 3, 2004, KPMG notified the court that some of its clients continued to instruct KPMG to withhold documents from the IRS that were responsive to the remaining eight summonses.  Joint Status Report, United States v. KPMG, LLP, No. 02-M-C00295 (D.D.C. June 3, 2004).  The court directed KPMG to notify its clients who had entered into transactions described in the eight summonses that KPMG was required to produce to the IRS the documents responsive to the summonses.  Agreed Order, United States v. KPMG, LLP, No. 02-M-C00295 (D.D.C. June 8, 2004).  Additionally, the court permitted any client of KPMG who objected to the production of documents an opportunity to intervene by filing the appropriate motion.  Id.  On July 8, 2004, KPMG advised the court that because none of its clients had moved to intervene, KPMG was in the process of producing the relevant documents to the IRS.  Joint Status Report, United States v. KPMG, LLP, No. 02-M-C00295 (D.D.C. July 8, 2004).  On November 9, 2005, the parties represented that no other issues required the court's resolution; thus, on January 13, 2006, the court issued an order closing the case.  Joint Notice, United States

_____

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

26 U.S.C. § 7525(a)(1).

[13]  The Brown & Wood letters referenced in note 1, supra, were among the documents that KPMG asserted were privileged.  KPMG DC II, 316 F. Supp. 2d at 45.

v. KPMG, LLP, No. 02-M-C00295 (D.D.C. Nov. 9, 2005); Joint Status Report, United States v. KPMG, LLP, No. 02-M-C00295 (D.D.C. Jan. 13, 2006).

### C.  Mr. Tucker's John Doe Identity Protection Suit Against KPMG in the United States District Court for the Northern District of Texas ("Texas Litigation")

In September 2000, the IRS issued a bulletin, Notice 2000-44, requiring that organizers and promoters of specific tax shelters, including the SOS shelter allegedly utilized in the instant case, maintain lists of clients and provide those lists to the IRS upon request.  Notice 2000-44, 2000-36 I.R.B. 255 (Sept. 5, 2000).  In April 2002, KPMG received an administrative summons from the IRS, requesting the names of its clients as well as documents relating to transactions identical to or substantially similar to those described in Notice 2000-44 ("Notice 2000-44 Summons").[14]  See Doe v. KPMG, LLP, 325 F. Supp. 2d 746, 748 (N.D. Tex. 2004) ("KPMG Texas").

In August 2003, KPMG notified its clients who had purchased the tax shelters described in the Notice 2000-44 Summons that their names were responsive to the summons, and that KPMG intended to disclose their identities and relevant documents subject to section 7525(a).  Id.; see also KPMG 5th Cir., 398 F.3d at 687 (noting that KPMG also notified the IRS that it would reveal the names and documents responsive to the summons).  KPMG provided the IRS with the requested SOS transaction information, which was substantially similar to the violative transactions described in Notice 2000-44, but omitted the names of the taxpayers from the documents.  KPMG 5th Cir., 398 F.3d at 687.  KPMG then informed its clients that although no information would be revealed prior to September 8, 2003, the firm could not flatly refuse to comply with the summons because the SOS transaction information was responsive to the IRS request.  Id. at 688.

Then, in September 2003, two plaintiffs, "John Doe 1" and "John Doe 2" (collectively "John Does 1 and 2"), filed suit in the United States District Court for the Northern District of Texas ("Northern District of Texas") against KPMG to prevent the disclosure of their identities to the government.  KPMG Texas, 325 F. Supp. 2d at 747-48.  In 2000, John Does 1 and 2 each had purchased one of the SOS shelters from KPMG in order to reduce their federal income tax liabilities for tax years 2000 and 2001.[15]  KPMG 5th Cir., 398 F.3d at 687.  John Does 1 and 2

---

[14]  The IRS did not seek enforcement of the Notice 2000-44 summonses in the DC Litigation "because KPMG had assured the IRS that it had complied in full with the applicable summons."  Doe v. KPMG, LLP, 398 F.3d 686, 687 n.3 (5th Cir. 2005) ("KPMG 5th Cir.").

[15]  It was later revealed that John Doe 1 was Mr. Tucker.  See Pl.'s Resp. to Def.'s PFUF ¶ 1.  Mr. Tucker served as the Chief Executive Officer and Chairman of the Board of Directors of Waddell & Reed Financial, Inc., a financial services firm.  See Declaration of Keith A. Tucker ("Tucker Decl.") ¶ 3.  John Doe 2 was Robert L. Hechler, former President and Chief Operating

asserted that they had retained KPMG's tax consulting services through particular limited liability companies to prepare their respective federal income tax returns, including their individual returns and their S corporation returns, and that their communications were privileged. KPMG Texas, 325 F. Supp. 2d at 748.  Specifically, John Does 1 and 2 argued that their engagement agreements with KPMG provided that a "'confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between KPMG personnel and Client[s] regarding federal tax advice provided pursuant to this engagement.'"  Id. (citation omitted).  John Does 1 and 2 were represented by Mr. Albaral of Baker & McKenzie, Dallas, Texas, and Gregory S. Lynam and Thomas V.M. Linguanti of Baker & McKenzie, Chicago, Illinois.  Id. at 747.

As a result of KPMG's August 2003 disclosure to the IRS that it had information responsive to the Notice 2000-44 Summons, the IRS realized that there were taxpayers yet to be identified who had utilized these allegedly abusive tax shelters.  KPMG 5th Cir., 398 F.3d at 688.  Thus, the IRS was concerned that the statute of limitations might run in the Texas Litigation before the IRS could determine the identities of and assess additional income taxes owed by John Does 1 and 2.  Id.  Accordingly, on March 19, 2004, the IRS requested that John Does 1 and 2 sign a consent agreement extending the statute of limitations while the case was pending.  Id.  Both refused.  Id.  Consequently, on March 25, 2004, the government moved to intervene as a defendant in the Texas Litigation to "protect its interests and the public fisc."  KPMG Texas, 325 F. Supp. 2d at 749.  According to the government, the underreporting for federal income taxes ranged between $2 million and $6 million per year.  Id.  The government, again represented by Mr. Gibson, claimed that, as a result of the underreporting, John Does 1 and 2 received tax benefits of between $4 million and $12 million for tax year 2000.  Id.  The district court allowed the government to intervene on March 25, 2004.  Id.  On April 12, 2004, the Northern District of Texas ruled that John Does 1 and 2 did not possess a privilege claim as to their identities.  Id. at 752.  Thus, the Northern District of Texas denied plaintiffs' request for injunctive relief and unsealed documents related to John Does 1 and 2.[16]  Id. at 755.

---

Officer of Waddell & Reed, Inc., a subsidiary of Waddell & Reed Financial, Inc.  Pl.'s Ex. Q at 2.

[16]  On April 2, 2004, the court had issued "an order equitably tolling the statute of limitations based on [26 U.S.C.] § 6503(a)(1) and other equitable principles."  KPMG Texas, 325 F. Supp. 2d at 749 & n.4 (noting that the order equitably tolled the statute of limitations until the court issued a final judgment on the merits and for sixty days thereafter); see KPMG 5th Cir., 398 F.3d at 688.  John Does 1 and 2 appealed the court's decision to equitably toll the statute of limitations.  KPMG 5th Cir., 398 F.3d at 688.  The United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") reversed the lower court, holding that the "district court [did not have] statutory authority to use equitable tolling to overcome the statute of limitations."  Id. at 690.

### D.  The Government's Summons Enforcement Litigation Against SABW in the United States District Court for the Northern District of Illinois ("Illinois Litigation")

Within the same time frame that KPMG was being investigated, the IRS also was investigating the sale of potentially abusive tax shelters by a former partner at SABW.  United States v. Sidley Austin Brown & Wood, LLP, No. 03-C-9355, 2004 WL 816448, at *1 (N.D. Ill. Apr. 15, 2004) ("SABW I").  On October 14, 2003, the United States District Court for the Northern District of Illinois ("Northern District of Illinois") issued an order permitting the IRS to serve SABW with a "John Doe" summons ("SABW Summons").[17]  See Declaration of John Lindquist ("Lindquist Decl.") ¶ 3;[18] Def.'s Ex. 1.

On October 15, 2003, the IRS served the summons upon SABW, which sought:

> IN THE MATTER OF THE TAX LIABILITIES OF JOHN DOES, United States taxpayers who, during any part of the period January 1, 1996 through October 15, 2003, participated in a transaction which was or later became a 'listed transaction' or other 'potentially abusive tax shelter' organized or sold by the law firm of Sidley Austin Brown & Wood LLP and its predecessor, Brown & Wood LLP.

Def.'s Ex. 2 at 6.  Further, the rider to the summons required SABW to produce:

> the name, address and taxpayer identification number for each United States taxpayer who, during any part of the period January 1, 1996 through October 15, 2003, participated in a transaction which was or later became a 'listed transaction' or other 'potentially abusive tax shelter' organized or sold by the law firm of Sidley Austin Brown & Wood LLP and its predecessor Brown & Wood LLP.

Id. at 8; Def.'s PFUF ¶¶ 3-4; Pl.'s Resp. to Def.'s PFUF ¶¶ 3-4.

By letter dated October 27, 2003, SABW provided the IRS with the identities of some of the participants in the described transactions, but withheld the identities of those clients who had either failed to explicitly consent or had actually objected to the disclosure of their identities pursuant to the SABW Summons.  Def.'s PFUF ¶ 6; Pl.'s Resp. to Def.'s PFUF ¶ 6; see also Def.'s Ex. 3 (a copy of the October 27, 2003 letter from SABW to Mr. Lindquist); Tr. 13-14 (stating that SABW advised the IRS and the DOJ that various unnamed taxpayers had engaged in transactions that were described in the SABW Summons).  Although he was a participant in one

---

[17]  "A 'John Doe' summons is, in essence, a direction to a third party to surrender information concerning taxpayers whose identity is currently unknown to the IRS."  Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 313 n. 4 (citation & quotations omitted).

[18]  John A. Lindquist, III, a trial attorney employed by the DOJ's Tax Division, secured authorization for service of an IRS "John Doe" summons to SABW.  Lindquist Decl. ¶ 1-2.

of the described transactions, Mr. Tucker's identity was not among those revealed by SABW to the IRS in its October 27, 2003 letter.[19]  Def.'s PFUF ¶ 6; Pl.'s Resp. to Def.'s PFUF ¶ 6.

On December 29, 2003, the IRS petitioned the Northern District of Illinois to enforce the SABW Summons.  Def.'s PFUF ¶ 7; Pl.'s Resp. to Def.'s PFUF ¶ 7; Lindquist Decl. ¶ 7; Def.'s Ex. 4;  SABW I, 2004 WL 816448, at *1.  Pursuant to a January 12, 2004 order, the court ordered SABW to provide the government with copies of all letters it received from its clients, with client names redacted.  Def.'s PFUF ¶ 9; Pl.'s Resp. to Def.'s PFUF ¶ 9.  The government received multiple redacted letters from SABW, including two letters dated January 22, 2004, from Mr. Linguanti of Baker & McKenzie, who, as described above, represented John Does 1 and 2 in the Texas Litigation.  Def.'s Ex. 6.  Mr. Linguanti informed SABW that his clients continued to assert attorney-client privilege as to their identities.  Id.; Def.'s PFUF ¶ 10; Pl.'s Resp. to Def.'s PFUF ¶ 10; Lindquist Decl. ¶ 10.

On February 6, 2004, the Northern District of Illinois issued an order permitting anyone who objected to the disclosure of their identity to intervene in the summons enforcement proceeding.  Def.'s PFUF ¶ 11; Pl.'s Resp. to Def.'s PFUF ¶ 11; Lindquist Decl. ¶ 11; Def.'s Ex. 7.  As a result, Baker & McKenzie filed a Motion to Intervene and Motion for Protective Order ("Motion to Intervene") on February 26, 2004, on behalf of two clients identified as "Baker Doe 1" and "Baker Doe 2" (collectively "the Baker Does").[20]  Def.'s PFUF ¶ 12; Pl.'s Resp. to Def.'s PFUF ¶ 12; Lindquist Decl. ¶ 12; Def.'s Ex. 8; Tr. 14.

On March 5, 2004, Mr. Lynam of Baker & McKenzie's Chicago office, in compliance with a March 5, 2004 order, sent to Mr. Lindquist redacted engagement letters between Brown & Wood and the Baker Does.[21]  Pl.'s Supp. PFUF ¶ 2; Def.'s Resp. to Pl.'s Supp. PFUF ¶ 2; Pl.'s Ex. J.  The engagement letters, both dated December 26, 2000, stated that Brown & Wood would:

> [A]ct as special U.S. federal income tax counsel . . . in connection with certain investment transactions in which you have engaged involving the acquisition of an interest in a foreign corporation through an S corporation and your entering into

---

[19]  The parties agree that Mr. Tucker engaged Brown & Wood to perform services, but they disagree as to the nature of those services.  Def.'s PFUF ¶ 5; Pl.'s Resp. to Def.'s PFUF ¶ 5.

[20]  It was later determined that the Baker Does were Mr. Tucker and Mr. Hechler.

[21]  The parties' proposed findings of uncontroverted fact state that the court order was issued on March 4, 2004; however, a copy of the order found on the electronic case management system of the Northern District of Illinois reflects that the order was issued on March 5, 2004.

various digital foreign currency option trades, both in your individual capacity and
through the foreign corporation.

Pl.'s Ex. J at 3, 5.

By letter dated March 9, 2004, government counsel Mr. Gibson advised Armando Gomez
of the Washington, D.C. office of Skadden, Arps, Slate, Meagher & Flom ("Skadden"), KPMG's
counsel in the DC Litigation, that the DOJ was "concerned that KPMG [had] not disclosed all the
tax shelters it was involved in developing and/or promoting, as demanded in the summonses at
issue in this case." Pl.'s Ex. K at 2. The letter further stated that the DOJ had come into
possession of the December 26, 2000 engagement letters, which bore a fax banner reflecting that
the documents were transmitted from KPMG's New York office on February 5, 2001. Id. at 5.
Mr. Gibson requested that Mr. Gomez advise what role, if any, KPMG played in the transactions.
Id.

Between March 9, 2004, and March 30, 2004, Mr. Gibson and personnel at Skadden
discussed KPMG's agreement to cooperate with the IRS by identifying all previous tax shelters
and tax shelter participants. Declaration of Stuart D. Gibson ("Gibson Decl.") ¶ 4. By letter
dated March 31, 2004, Robert S. Bennett of Skadden responded to Mr. Gibson, stating that "[a]s
we have discussed, the John Doe plaintiffs in [the Texas Litigation] may have been the recipients
of the engagement letters referenced in one of your letters to us dated March 9, 2004."[22] Pl.'s Ex.
L at 2. Mr. Bennett also welcomed the government's decision to intervene in the Texas
Litigation because "KPMG has no interest in protecting the John Does' identities."[23] Id. at 3. He
further stated that the "John Doe plaintiffs in that matter may have been the recipients of the
engagement letters" to which Mr. Gibson had referenced. Id.

---

[22] However, Mr. Gibson states that his March 9, 2004 letter confirms his "recollection"
that when he wrote the letter to Mr. Gomez, he was unaware whether the December 26, 2000
engagement letters "had anything to do with" the Baker Does. Gibson Decl. ¶ 4. Mr. Gibson
further declares that Mr. Bennett's March 31, 2004 letter "indicates that [Mr. Bennett] was not
entirely certain that the [December 26, 2000 engagement letters] related to the 'John Doe
plaintiffs' in the injunction case." Id.

[23] As noted previously, the cases in the various federal district courts overlapped as to
timing. Indeed, during an April 1, 2004 hearing, Mr. Gibson advised the District Court for the
District of Columbia that: "[T]here is a hearing in Chicago on a summons enforcement case [in
the Northern District of Illinois] in which [the John Does in the Texas Litigation] are trying to
withhold their names in that case. So they are fighting a multifront war and we hope either today
or some time next week we'll be able to get those names." Pl.'s Supp. PFUF ¶ 5; Pl.'s Ex. M at
21-22. Defendant objects to this statement as irrelevant, and asserts that the summons
enforcement with respect to KPMG is separate and apart from the issue of whether SABW's
response to the summons served on it was finally resolved. Def.'s Resp. to Pl.'s Supp. PFUF ¶ 5.

The government opposed the Motion to Intervene filed by the Baker Does in the Illinois Litigation. United States' Response in Opposition to Intervention, <u>Sidley Austin Brown & Wood, LLP</u>, No. 03-C-9355 (N.D. Ill. Mar. 18, 2004); United States' Supplemental Memorandum in Opposition to Intervention, <u>Sidley Austin Brown & Wood, LLP</u>, No. 03-C-9355 (N.D. Ill. Apr. 13, 2004). However, on April 14, 2004, the Baker Does filed a Motion to Withdraw Motion to Intervene and Motion for Protective Order ("Motion to Withdraw"). Def.'s Ex. 9; Def.'s PFUF ¶ 13.[24] The Motion to Withdraw informed the court that the Baker Does' identities had been disclosed to the government by an individual other than their counsel, SABW, and that with the Baker Does' identities public, there was no point in pursuing protection. Def.'s Ex. 9 at 15. As a result of the disclosure, counsel for the Baker Does instructed counsel for SABW to provide the clients' names to the government if SABW believed that the names were responsive to the SABW Summons. <u>Id.</u> at 15-16; Def.'s PFUF ¶ 14; Pl.'s Resp. to Def.'s PFUF ¶ 14. The Northern District of Illinois granted the Motion to Withdraw on April 15, 2004. Lindquist Decl. ¶ 15; Def.'s PFUF ¶ 9; Pl.'s Resp. to Def.'s PFUF ¶ 9.

Upon withdrawal of the Baker Does' Motion to Intervene, government counsel Mr. Lindquist requested that counsel for SABW disclose the identities of the Baker Does, but SABW counsel responded that he would not comply without a court order or written consent from the Baker Does.[25] Def.'s PFUF ¶ 16. Defendant represents that shortly thereafter, SABW counsel informed Mr. Lindquist that SABW had requested that counsel for the Baker Does provide SABW with written consent to disclose the summoned identities of the Baker Does to the IRS, but the Baker Does refused.[26] Def.'s PFUF ¶ 17; Lindquist Decl. ¶ 17.

---

[24] Plaintiff agrees that on April 14, 2004, Mr. Tucker, through counsel, filed an unopposed Motion to Withdraw Motion to Intervene and Motion for Protective Order. Pl.'s Resp. to Def.'s PFUF ¶ 13. However, plaintiff adds that Mr. Tucker sought to withdraw the Motion to Intervene and Motion for Protective Order because the government possessed the identifying information relating to Mr. Tucker that was requested by the SABW Summons. <u>Id.</u>

[25] Plaintiff asserts that it has no knowledge as to whether such a conversation occurred and, without being able to conduct discovery, cannot verify the correctness of the proposed finding. Pl.'s Resp. to Def.'s PFUF ¶ 16. However, plaintiff argues that this fact is not necessary to resolve the issue presented because it is established that, as of April 14, 2004, defendant possessed the information requested in the summons with respect to Mr. Tucker. <u>Id.</u> Thus, plaintiff contends that if the court is inclined to find that there is a question as to whether defendant possessed such information, the referenced conversation is one matter as to which plaintiff should be permitted to conduct discovery. <u>Id.</u>

[26] Again, plaintiff denies that such a request was made, and asserts that this fact is not necessary to resolve the issue presented because, as of April 14, 2004, defendant possessed the information requested in the SABW Summons with respect to Mr. Tucker. Pl.'s Resp. to Def.'s PFUF ¶ 17. Accordingly, plaintiff asserts that if the court is inclined to find that there is a

Forty-six of SABW's clients, collectively known as "the Does," were granted permission to intervene in the Illinois Litigation on April 15, 2004.[27] SABW I, 2004 WL 816448, at *1, 10. The Does challenged the SABW Summons on the ground that it was ambiguous. United States v. Sidley Austin Brown & Wood, LLP, No. 03-C-9355, 2004 WL 905930, at *1 (N.D. Ill. Apr. 28, 2004) ("SABW II"). On April 28, 2004, the Northern District of Illinois ruled that the SABW Summons did not require SABW "impermissibly to draw legal conclusions regarding unduly vague terms in order to comply with the terms of the summons. The [Does] have failed to meet their heavy burden of showing the summons is unenforceable as written." SABW II, 2004 WL 905930, at *6. Thus, the Northern District of Illinois granted the government's petition to enforce the SABW Summons. Id.; see also Def.'s Ex. 10 (a copy of the judgment granting the government's petition to enforce the "John Doe" summons). On April 30, 2004, the Northern District of Illinois issued an order staying enforcement of the SABW Summons with respect to the intervening Does "for the period during which this proceeding remains pending, including all appeals, including the period until all appeals are disposed of, or until expiration of the period in which all appeals may be taken or a request for rehearing may be made."[28] Lindquist Decl. ¶ 19; Def.'s Ex. 11 at 24-25.

On June 29, 2004, after the expiration of the period for which an appeal of the Northern District of Illinois' April 28, 2004 order could be taken under Rule 26(a) of Federal Rules of Appellate Procedure, SABW, via e-mail, disclosed to government counsel what it represented was the "balance of the names and address[es] of the interveners in the John Doe action." Def.'s PFUF ¶ 20; Pl.'s Resp. to Def.'s PFUF ¶ 20; see also Def.'s Ex. 12 (a copy of the e-mail communication from SABW to Mr. Lindquist providing the balance of the names and addresses of intervenors in the Illinois Litigation). The list produced by SABW included the name "Keith Tucker" under the heading "Diversified - Spread Options." Def.'s PFUF ¶ 21. However, the information produced by SABW did not include Mr. Tucker's social security number, or the

---

question as to whether defendant possessed such information, the referenced request is one matter as to which plaintiff should be permitted to conduct discovery. Id.

[27]   The Northern District of Illinois named the various "Does" who intervened by the firm representing them, and the Baker Does were not among those who intervened. SABW I, 2004 WL 816448, at *1 & n.1.

[28]   Plaintiff agrees that on April 30, 2004, the Northern District of Illinois issued the referenced order; however, plaintiff asserts that such a fact is not necessary to resolve the issue presented. Pl.'s Resp. to Def.'s PFUF ¶ 19. Plaintiff further notes that the Fifth Circuit has found that a similar order issued in connection with this litigation, on which the referenced order was actually based, was invalid and could not operate to extend periods of limitation with respect to the assessment of federal taxes. Pl.'s Resp. to Def.'s PFUF ¶ 19 (citing Doe v. United States, 398 F.3d 686, 690 (5th Cir. 2005), rev'g John Doe 1 v. KPMG, LLP, No. 3:03-CV-2036-H, 2004 U.S. Dist. LEXIS 5592 (N.D. Tex. Apr. 2, 2004)).

names and Employment Identification Numbers for any participating entities including, but not limited to, Sligo and Epsolon.[29]  Id.

Defendant asserts that at the time the list was produced, counsel for SABW, upon inquiry by government counsel, represented that the additional summoned material was not readily available because its New York offices had been destroyed by the September 11, 2001 terrorist attack.  Id. ¶ 22.  But see Pl.'s Resp. to Def.'s PFUF ¶ 22 (stating that plaintiff has no knowledge as to whether such an inquiry occurred and disagreeing that this statement is necessary to resolve the parties' motions).  Upon demand by government counsel, SABW subsequently recovered the names of the taxpayer entities that participated in these transactions.[30]  Def.'s PFUF ¶ 22.  On March 3, 2005, counsel for SABW hand-delivered to government counsel a supplemental production in response to the SABW Summons in which Sidley Austin, for the first time, identified the names of participating entities, including, but not limited to, Sligo and Epsolon.[31]  Def.'s PFUF ¶ 23.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"), summary judgment is appropriate only when there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and is similar in language and effect.[32]  Summary

---

[29]  Plaintiff agrees that the referenced production contained the name Keith Tucker and the other information; however, plaintiff asserts that this fact is not necessary to resolve the issue presented because it is established that, as of April 14, 2004, defendant possessed the information requested in the summons with respect to Mr. Tucker (including his name, address, and social security number).  Pl.'s Resp. to Def.'s PFUF ¶ 21; Pl.'s Resp. & Reply 15-17.

[30]  Plaintiff states that it has no knowledge as to whether such an inquiry and related discussion occurred and, without being able to conduct discovery, cannot verify the correctness of the proposed finding.  Pl.'s Resp. to Def.'s PFUF ¶ 22.  However, plaintiff maintains that this fact is not necessary to resolve the issue presented because, as of April 14, 2004, defendant possessed the information requested in the SABW Summons with respect to Mr. Tucker.  Id.; Pl.'s Resp. & Reply 15-17.  Nevertheless, plaintiff asserts that if the court is inclined to find that there is a question as to whether defendant possessed such information, discovery is necessary.  Pl.'s Resp. to Def.'s PFUF ¶ 22.

[31]  Plaintiff agrees that the referenced production contained the names of Sligo and Epsolon, but argues that defendant already possessed such information.  Pl.'s Resp. to Def.'s PFUF ¶ 23.

[32]  In general, the rules of this court are patterned on the FRCP.  Therefore, precedent under the FRCP is relevant to interpreting the rules of this court, including RCFC 56.  See Jay v.

judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c).

RCFC 56(c) provides that the moving party bears the burden of demonstrating that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994); Meyers v. Asics Corp., 974 F.2d 1304, 1306 (Fed. Cir. 1992).  "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id.

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.  The judge is not required to make findings of fact, but instead, must determine whether there "are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 163 (Fed. Cir. 1985); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence that establishes the existence of an element of its case. Id. at 322.

"'Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment.'" Cross Med. Prods., Inc. v. Medtronic, 424 F.3d 1293, 1302 (Fed. Cir. 2005) (quoting Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998)).  However, if the court rejects one claim, this determination does not mean that "'the other is necessarily justified.'" B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001)

Sec'y of HHS, 998 F.2d 979, 982 (Fed. Cir. 1993); Imperial Van Lines Int'l, Inc. v. United States, 821 F.2d 634, 637 (Fed. Cir. 1987).

(citation omitted); see also Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998). The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition.  See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) ("[T]his court determines for itself whether the standards for summary judgment have been met."), cited in Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1379 (Fed. Cir. 2000).  When considering cross-motions for summary judgment, the court may not grant summary judgment in favor of either party if disputes remain concerning material facts.  Mingus Constructors Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Id.  Denial of both motions is warranted if genuine disputes exist over material facts.  Id.  A fact is material if it will make a difference in the outcome of a case under the governing law.  Anderson, 477 U.S. at 248.

In the present case, both parties believe that there are no material facts in dispute as to the timeline of events.  Def.'s Reply 16; Plaintiff's Supplemental Memorandum ("Pl.'s Supp. Mem.") 2.  The parties have filed extensive proposed findings of fact and cross-motions for summary judgment with supporting briefs and exhibits, and participated in an oral argument on their cross-motions.  The court agrees with the parties that there are no material facts in dispute, and no additional facts are necessary to resolve the issues presented.  Thus, consideration of the parties' cross-motions for summary judgment is appropriate.

## III.  PARTNERSHIPS AND THE RELEVANT STATUTE OF LIMITATIONS PROVISIONS

This case involves the statute of limitations provisions of the Code, the interplay between the limitations periods that apply to partnership proceedings and those that apply to individuals, and whether the applicable limitations period was suspended.

### A.  Partnerships

Partnerships are not subject to federal income taxes, although they must file informational returns.  26 U.S.C. § 701; Kaplan v. United States, 133 F.3d 469, 471 (7th Cir. 1998); Grapevine Imps. Ltd. v. United States, 71 Fed. Cl. 324, 326 (2006).  Instead, under section 702 of the Code, items of partnership income, deductions, credits, and losses are allocated among the individual partners to be reported on their respective returns.  See United States v. Basye, 410 U.S. 441, 448 (1973).  "[I]n response to the special problems posed by the taxation of partnership activities," Kaplan, 133 F.3d at 471, Congress enacted the Uniform Partnership Procedures of the Tax Equity and Fiscal Responsibility Act of 1982, 26 U.S.C. §§ 6221-6234 (2000) ("TEFRA"). TEFRA was enacted to "'improve the auditing and adjustments of income tax items attributable to partnerships.'"  Weiner v. United States, 389 F.3d 152, 154 (5th Cir. 2004) (quoting Alexander v. United States, 44 F.3d 328, 330 (5th Cir. 1995)), cert. denied, 544 U.S. 1050

(2005).  It "created a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level."  In re Crowell, 305 F.3d 474, 478 (6th Cir. 2002).  Pursuant to TEFRA, partnerships are required to file informational returns reflecting the distributive shares of income, gains, deductions, and credits attributable to their partners, while individual partners are required to report their pro rata share of tax on their individual income tax returns.  See 26 U.S.C. § 701; Weiner, 389 F.3d at 154; Kaplan, 133 F.3d at 471.

Under TEFRA, the threshold determination of whether an item is a "partnership item" or a "nonpartnership item" governs the application of the TEFRA procedures.[33]  The treatment of partnership items is determined at the partnership level.  26 U.S.C. §§ 6211(c), 6221, 6230(a)(1). The treatment of nonpartnership items, id. § 6231(a)(4), is resolved at the individual partner level, using, inter alia, the normal deficiency procedures of the Code.  Id. §§ 6212(a), 6230(a)(3); see Crnkovich v. United States, 202 F.3d 1325, 1328 (Fed. Cir. 2000) (per curiam).  If the IRS decides to adjust any partnership items reflected on the partnership's tax return, the IRS must notify the individual partners of the adjustment through an FPAA.  26 U.S.C. §§ 6223(a)(2), (d)(2), 6225(a); Kaplan, 133 F.3d at 471.  Various provisions of the Code define the statute of limitations on assessments made with respect to FPAA adjustments and the tolling of those periods.  See, e.g., 26 U.S.C. §§ 6229, 6501.

For ninety days following the issuance of an FPAA, the tax matters partner has the exclusive right to file a petition for readjustment of the partnership items in the Tax Court, the Court of Federal Claims, or a United States District Court.  Id. § 6226(a); see also Monahan v. Comm'r, 321 F.3d 1063, 1065 (11th Cir. 2003).  After that period expires, other partners are given sixty days to file a petition for readjustment.  26 U.S.C. § 6226(b)(1).  If a partner's tax liability might be affected by the outcome of the litigation of partnership items, that partner may participate in the proceeding.  Id. § 6224(a), (c).  The IRS may assess additional tax liability against individual partners within one year of the conclusion of the partnership's tax determination.  Id. § 6229(d).  The partner may contest the tax liability by paying the assessment and filing a refund action in this court.  Id. § 6226(e).  Further, "[s]ection 6226(c) binds partners to the result obtained by a legal challenge brought by one partner, thereby preventing numerous lawsuits concerning the same factual and legal issues."  Kaplan, 133 F.3d at 471.  If a partner settles his partnership tax liability with the IRS, the partner can no longer participate in the partnership level litigation, and the partner is bound instead by the terms of the settlement agreement.  26 U.S.C. §§ 6224(c)(1), 6228(a)(4).  In addition, partnership items convert to nonpartnership items when the IRS enters into a settlement agreement with the partner with respect to such items.  Id. § 6231(b)(1)(C).

---

[33]  A "partnership item" is "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent . . . such item is more appropriately determined at the partnership level than at the partner level."  26 U.S.C. § 6231(a)(3).

### B.  Statute of Limitations Provisions

Several provisions of the Code that affect the limitations period are implicated in the instant case.  First, section 6501(a) sets forth a general period of limitations of three years within which the IRS must assess taxes.  Id. § 6501(a).  However, the section 6501(a) period is suspended if a party who is served with a summons fails to timely comply with the summons.  Id. § 7609(e)(2).  Specifically, section 7609(e)(2) provides that the section 6501(a) period shall be suspended beginning on the date that is six months after the service of the summons and until compliance with the summons is complete.  Id.  Finally, section 6229(a) provides a statute of limitations period for assessing tax attributable to a partnership item.  Id. § 6229(a).  The court will discuss each of these provisions in greater detail below.

### IV.  DISCUSSION

The three issues before this court are: (1) whether section 6229(a) operates as a possible extension of the section 6501(a) statute of limitations period, Pl.'s Resp. & Reply 17-21, Def.'s Reply 6-8, Pl.'s Supp. Mem. 2; (2) whether the statute of limitations period set forth in section 6501(a) was suspended by section 7609(e)(2) until SABW complied with the SABW Summons, Pl.'s Resp. & Reply 13-17, Def.'s Reply 10-19, Pl.'s Supp. Mem. 2; and (3) whether issuing the June 17, 2005 FPAA suspended the section 6501(a) statute of limitations period, Pl.'s Resp. & Reply 21-24, Def.'s Reply 8-10, Pl.'s Supp. Mem. 2.  The parties agree that the period of limitations on assessment of tax under 26 U.S.C. § 6501 would have expired on April 15, 2005, but for any applicable exceptions.  Tr. 9.  However, defendant cross-moves for partial summary judgment on the ground that the FPAA was issued at a time when the section 6501(a) statute of limitations period for assessing taxes attributable to partnership items was open for Mr. Tucker's 2001 taxable year by reason of the suspension of the statute of limitations in section 7609(e)(2) due to a pending IRS summons.

### A.  Did Section 6229(a) Operate to Extend the Limitations Period Set Forth in Section 6501(a)?

#### 1.  The Code

The parties' first area of disagreement is two-fold: (1) whether the limitations provision of section 6229(a) or section 6501(a) applies, and (2) whether section 6229(a) can extend the statute of limitations set forth in section 6501(a).  Section 6501 sets forth the general statute of limitations for assessing tax on items reported on a tax return.  Section 6501(a) provides:

General rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in

court without assessment for the collection of such tax shall be begun after the expiration of such period.  For purposes of this chapter, the term "return" means the return required to be filed by the taxpayer (and does not include a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit).

26 U.S.C. § 6501(a).

In addition to this general provision, the Code specifically provides a statute of limitations for partnership items.  Section 6229(a), Period of Limitations for Making Assessments, provides in relevant part:

General rule.--Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of--

(1) the date on which the partnership return for such taxable year was filed, or

(2) the last day for filing such return for such year (determined without regard to extensions.

Id. § 6229(a).[34]

## 2.  Case Law Interpreting the Interplay of Sections 6229(a) and 6501(a)

### a.  AD Global Fund, LLC ex. rel. North Hills Holding, Inc. v. United States

In AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States, 67 Fed. Cl. 657 (2005) ("AD Global I"), the Court of Federal Claims ruled that the issuance of an FPAA challenging the reporting of partnership items suspended the three-year statute of limitations on income tax assessments under section 6501(a).  67 Fed. Cl. at 694.  AD Global Fund's 1999 tax year partnership return was deemed filed on April 17, 2000.  Id. at 659.  In May 2003, the IRS issued a Notice of Beginning of Partnership Administrative Proceeding to AD Global Fund.  Id. On October 9, 2003, the IRS issued an FPAA setting forth proposed adjustments and accuracy-related penalties to the partnership items reported on the partnership return.  Id.  On March 8, 2004, AD Global Fund filed a complaint for readjustment of partnership items pursuant to section 6226.  Id.  Subsequently, plaintiff sought summary judgment, arguing that the IRS failed to assess tax attributable to partnership items within the three-year period mandated by section

---

[34]  Although there are exceptions to section 6229(a), such as those found in section 6229(b), which provides for the extension of the limitations period by agreement, and section 6229(c), which sets no statute of limitations in cases of fraud, neither exception applies here.

6229(a). Id. at 660. In response, defendant countered that section 6229(a) sets forth a minimum period for the assessment of tax; thus, it was proper for the IRS to assess tax attributable to partnership items within the section 6501(a) period after the 6229(a) period expired. Id. Further, defendant asserted that the issuance of the FPAA suspended the statute of limitations period set forth in section 6501(a). Id. After a detailed review of case law and legislative history, the Court of Federal Claims denied AD Global Fund's motion, holding that section 6229(a) provided a minimum period for assessments for partnership items that may extend the period set forth in section 6501(a).[35] Id. at 694.

On November 8, 2005, the Court of Federal Claims certified its ruling for interlocutory appeal. AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States, 68 Fed. Cl. 663 (2005). On March 2, 2007, the Federal Circuit affirmed, holding that section 6229(a) "does not provide a separate statute of limitations, but simply creates a minimum period that may extend the regular statute of limitations for partnership items." AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States, No. 06-5046, 2007 WL 624366, at *2 (Fed. Cir. Mar. 2, 2007) ("AD Global II"). The Federal Circuit based its ruling, in part, on the fact that section 6229(a) does not contain mandatory words establishing a time within which assessments must be made. AD Global II, 2007 WL 624366, at *3; see also Crnkovich, 202 F.3d at 1335 n.7; Grapevine, 71 Fed. Cl. at 329-30. Thus, the Federal Circuit reasoned, "[b]ecause § 6229 does not state an end date or otherwise set forth a maximum period, it does not, on its face, create a statute of limitations." AD Global II, 2007 WL 624366, at *3. The Federal Circuit also held that its "interpretation may extend the regular statute of limitations in § 6501(a) for assessments to individual partners . . . ." Id.

### b. **Grapevine Imports Ltd. v. United States**

The Court of Federal Claims in Grapevine concurred with a majority of the analysis set forth in AD Global I regarding the interplay of sections 6229 and 6501; thus, the court adopted AD Global I's holding. 71 Fed. Cl. at 328. Grapevine concerned the April 19, 2000 filing of plaintiff Grapevine Imports, Ltd.'s ("Grapevine") partnership return for tax year 1999, which reflected a net short-term loss of $21,884. Id. at 326. On or before April 15, 2000, the husband and wife partners who formed Grapevine, Joseph J. Tigue and Virginia B. Tigue (collectively "the Tigues"), jointly filed their 1999 individual tax return, which included transactions

---

[35] In arriving at its conclusion, the Court of Federal Claims thoroughly analyzed the case law, as will be discussed below. 67 Fed. Cl. at 663-71. When discussing the case law, the court noted that the cases it relied upon were persuasive, not binding, authority since none had been decided by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") or the United States Supreme Court ("Supreme Court"). Id. at 663. Thus, for additional guidance, the court turned to the plain meaning of section 6229. Id. at 671-76. However, the court concluded that because two readings of section 6229(a) were possible, the "plain meaning [could not] be determined by reference to the text alone." Id. at 676. Thus, in conjunction with case law, the court weighed legislative history to reach its conclusion. Id. at 676-91.

involving the partnership and reflected a total loss of $973,087.  Id.  The Tigues carried this loss forward to future tax years, in addition to a $1,127,481 net operating loss carried forward from 1998.  Id.  On August 17, 2001, the Tigues jointly filed their 2000 individual tax return in which the 1998 net operating loss had the effect of eliminating their taxable income of $730,161.  Id.

On June 19, 2003, the IRS issued a John Doe summons to the Tigues' tax consultants, Jenkens & Gilchrist ("Jenkens"), but because Jenkens refused to comply with the summons, the government filed a summons enforcement action in the Northern District of Illinois.  Id.  On May 14, 2004, the Northern District of Illinois directed Jenkens to comply with the summons within three days, which Jenkens did on May 17, 2004.  Id.  On December 17, 2004, the IRS issued an FPAA to Grapevine's tax matters partner, T-Tech, adjusting the partners' basis in Grapevine by $10,000,000 for the 1999 tax year.  Id.  On March 8, 2005, Joseph Tigue, the sole owner of T-Tech, made deposits of $1,594,205 and $221,170 for tax years 1999 and 2000, respectively, pursuant to section 6226(e), in anticipation of filing a refund action in this court.  Id.  On March 11, 2005, Grapevine and its tax matters partner, T-Tech, filed their complaint in the Court of Federal Claims for readjustment of partnership items under section 6226(a), asking the court either to declare the FPAA invalid or, alternatively, to order the government to reverse the adjustments.  Id.  On October 21, 2005, the Grapevine plaintiffs filed a motion for summary judgment, in which they asserted that the FPAA was untimely pursuant to section 6229(a).  Id.  Defendant cross-moved for summary judgment.  Id.

In deciding the parties' cross-motions, the Court of Federal Claims analyzed the statute, its legislative history, and pertinent case law in arriving at the same conclusion set forth in AD Global I.  Id. at 329-39.  Specifically, the court in Grapevine interpreted the language "shall not expire before" in section 6229 to mean that the "limitations period may expire 'after' three years from the date of the partnership return."  Id. at 329.  Accordingly, the Grapevine court determined that section 6229(a) sets forth a minimum period, "not an independent limitations period exclusive of section 6501," and such a conclusion "flows from statutory language."  Id. (looking to cases such as Crnkovich, 202 F.3d at 1326, Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 534 (2000), and Andantech, LLC v. Commissioner, 331 F.3d 972, 976 (D.C. Cir. 2003), to support its conclusion).

Thus, the court determined that because the Tigues' 2000 joint return was filed on August 17, 2001, the limitations period for assessing tax would have expired naturally on August 17, 2004.  Id. at 339.  However, under section 7609(e), the court determined that the section 6501(a) period was suspended when Jenkens failed to comply with the summons it received within six months.  Id.  Specifically, the court held that under the Code, the section 6501(a) period was suspended from December 19, 2003 (six months after the summons was issued), until May 17, 2004, when Jenkens complied with the summons.  Id.  This suspension, in turn, extended the

section 6501(a) limitations period to January 17, 2005; thus, the court ruled that the FPAA was timely when issued.[36] Id.

### c. Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner

In Rhone-Poulenc, the Tax Court addressed two issues relevant to the instant case: (1) the interplay between sections 6501(a) and 6229(a), and (2) whether the issuance of an FPAA pursuant to section 6229(d) suspends the statute of limitations. 114 T.C. at 534. The case involved a partnership action based on a petition filed pursuant to section 6226. Id. The partnership filed its return for tax year 1990 on either September 15 or 17, 1991, id. at 537, and on September 12, 1997, the IRS issued an FPAA with respect to the partnership for its 1990 tax year. Id. at 536. Similar to the cases described above, the parties disagreed principally over the relationship between sections 6229 and 6501. Id. at 537.

In interpreting the TEFRA partnership provisions, the Tax Court heeded the Supreme Court's admonition that statutes of limitation sought to be applied against the government be strictly construed in favor of the government. Id. at 540 (referring to E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924)). The Tax Court noted that because "[a]ny income tax attributable to partnership items is assessed at the partner level[,] . . . any statute of limitations provisions that limit the time period within which assessment can be made are restrictions on the assessment of a partner's tax." Id. at 539. Thus, as to the first issue, the Rhone-Poulenc court concluded that section 6229 sets forth a minimum period for the assessment of tax attributable to partnership items, separate from the section 6501(a) period, "which is ordinarily the maximum period for the assessment of any tax." Id. at 542. The Tax Court noted that in several prior decisions, it had explained that section 6229 can extend the limitations period provided in section

_____

[36] Pursuant to section 6229(d), the government also asserted that the section 6501(a) period, as it applied to the Tigues, was suspended further by the issuance of the FPAA to Grapevine's partners – an interpretation with which the court agreed. Grapevine, 71 Fed. Cl. at 339-40. Section 6229(d), which will be discussed in further detail below, is also an area of disagreement between the parties in the instant case. Generally, section 6229(d) suspends the running of the section 6501(a) period upon the issuance of an FPAA when a suit is brought pursuant to section 6226 and for one year thereafter.

The court in Grapevine also addressed whether the FPAA was timely as to the Tigues' return for tax year 1999. Id. at 340-43. In asserting that the FPAA was timely, defendant argued that section 6501(e)(1)(A), which relates to the substantial omission of items on a tax return, set forth a six-year assessment limitations period applicable to the Tigues. Id. at 340. However, because the section 6501(e)(1)(A) period is not relevant to the case sub judice, the court will not explore the Grapevine court's analysis here.

6501 with respect to tax attributable to partnership items.[37]  Id. at 542-43.  The court reasoned that "if Congress had intended to create a completely separate statute of limitations for assessments attributable to partnership and affected items, the drafters of section 6229 would have tracked the language of section 6501(a)."  Id. at 545.

### d.  Andantech, LLC v. Commissioner

In Andantech, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), concurred with the reasoning of Rhone-Poulenc, and held that section 6501 provided a general limitations period for assessing and collecting taxes, and that section 6229(a) established a minimum period for assessing income tax pertaining to partnership items. Andantech, 331 F.3d at 976.  The IRS issued FPAAs for Andantech's partnership tax returns for the short tax years ending December 10, 1993, and December 31, 1993, and for the tax year ending December 31, 1994.  Id. at 973.  The Tax Court found that the returns filed for the 1993 tax years were timely assessed by the IRS, and rejected Andantech's claim to $51 million in losses reported on the returns.  Id.

In affirming in part the Tax Court's decision, the D.C. Circuit held that the Tax Court correctly reasoned that section 6229(a) sets forth a minimum period for assessing income tax, "complementing the [period] set in § 6501."  Id. at 976.  The D.C. Circuit's decision reflects its approval of the analysis provided by Rhone-Poulenc:

> There is nothing about the court's reasoning in Rhone-Poulenc, nor in its reliance on that case here that gives us pause.  The language of § 6501 plainly refers to all the assessments made pursuant to the chapter, and specifically notes that § 6229 may be used to extend the period in case of partnership items.  Likewise, the language of § 6229, rather than simply stating a three-year statute of limitations, indicates by the use of the term "shall not expire" that the provision is intended to dictate a minimum period, but not an absolute restriction. . . .  [W]e find the reasoning and analysis first applied by the Tax Court in Rhone-Poulenc, then followed in the present case reasonable, persuasive, and ultimately convincing . . . .

Id. at 977.  Thus, the D.C. Circuit affirmed the Tax Court's determination that the FPAAs issued to Andantech for the 1993 tax years were "properly and timely assessed" by the IRS.  Id. at 977-78.

### 3.  Section 6229(a) Provides a Minimum Statute of Limitations Period

As discussed above, the binding precedent of the Federal Circuit makes clear that section 6229(a) provides a minimum limitations period that can, given the appropriate facts, extend the

---

[37]  The Tax Court noted that, at times, some of its opinions contained dicta to the contrary.  Rhone-Poulenc, 114 T.C. at 543.

statute of limitations set forth in section 6501(a). <u>AD Global II</u>, 2007 WL 624366, at *2; <u>see also</u> <u>Grapevine</u>, 71 Fed. Cl. at 328-39; <u>Andantech</u>, 331 F.3d at 976-77; <u>Rhone Poulenc</u>, 114 T.C. at 542-43. Although it is beyond dispute that section 6229(a) provides a minimum period, the court must determine whether, in the instant case, another Code section suspends the three-year limitations period with respect to the FPAA issued on June 17, 2005, for the tax year 2001.

### B. Did Section 7609(e)(2) Suspend the Section 6501(a) Statute of Limitations?

### 1. The Code

The second disputed issue is whether the SABW Summons suspended the section 6501(a) limitations period pursuant to section 7609(e)(2). Section 7602(a) authorizes the IRS to issue a summons to determine the accuracy of a return. 26 U.S.C. § 7602(a). A "John Doe" summons, such as the SABW Summons, is issued once a court has decided that:

> (1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,
>
> (2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and
>
> (3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

<u>Id.</u> § 7609(f).

Section 7609(e)(2) contains the suspension mechanism for section 6501, by providing in relevant part:

> (e) Suspension of statute of limitations.**--**
>
> (1) Subsection (b) action.--If any person takes any action as provided in subsection (b) and such person is the person with respect to whose liability the summons is issued (or is the agent, nominee, or other person acting under the direction or control of such person), then the running of any period of limitations under section 6501 (relating to the assessment and collection of tax) or under section 6531 (relating to criminal prosecutions) with respect to such person shall be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending.

(2) Suspension after 6 months of service of summons.--In the absence of the resolution of the summoned party's response to the summons, the running of any period of limitations under section 6501 or under section 6531 with respect to any person with respect to whose liability the summons is issued (other than a person taking action as provided in subsection (b)) shall be suspended for the period--
(A) beginning on the date which is 6 months after the service of such summons, and
(B) ending with the final resolution of such response.

Id. § 7609(e).

## 2.  The SABW Summons[38]

    To understand the context of the parties' dispute regarding the SABW Summons, it is first necessary to understand how the issues in the Texas Litigation and Illinois Litigation and the events surrounding those issues are intertwined.  In the Texas Litigation, Mr. Tucker submitted various documents to the court under seal, including his declaration.  Pl.'s Supp. PFUF ¶ 6; Pl.'s Ex. N.  That declaration sets forth, inter alia, Mr. Tucker's name and address.  Pl.'s Ex. N at 2.  In the same litigation, KPMG submitted, under seal, nearly 2,500 pages of material designated as Exhibit E.  Pl.'s Supp. PFUF ¶ 7.  Exhibit E contained tax returns, financial statements, bank statements, workpapers, internal KPMG memoranda, and other similar material that outlined: (i) the name, address, and taxpayer identification number of Mr. Tucker; (ii) the names, addresses, and taxpayer identification numbers of the other parties to Mr. Tucker's transactions; and (iii) specific information regarding the actual transactions entered into by Mr. Tucker.[39]  Id.

---

    [38]  Throughout its briefs, plaintiff asserts that as of April 14, 2004, defendant possessed the information requested in the SABW Summons with respect to Mr. Tucker.  See, e.g., Pl.'s Resp. & Reply 13.  However, defendant argues that the summons enforcement with respect to the DC and Texas Litigation are separate from the issue of whether and/or when SABW's response to the summons issued to it was finally resolved.  See, e.g., Def.'s Reply 10-12.

    [39]  Plaintiff maintains that Exhibit E contained all of the information expressly requested in the SABW Summons with respect to Mr. Tucker.  Pl.'s Supp. PFUF ¶ 8; Pl.'s Ex. N at 1 (name and address); Pl.'s Ex. O at 12 (taxpayer identification number).  Defendant denies the implication that the materials provided in Exhibit E were the equivalent of full resolution of the SABW Summons.  Def.'s Resp. to Pl.'s Supp. PFUF ¶ 8.  Further, defendant maintains that those materials were unsealed in the Texas Litigation, and involved KPMG's response to a summons served upon KPMG, not the SABW Summons.  Id.

    Defendant admits that the information contained in Exhibit E included the information set forth in the text above in (i) and (ii).  Def.'s Resp. to Pl.'s Supp. PFUF ¶ 7.  However, defendant objects to the description of the information described in (iii) as vague and misleading.  Id. While some information regarding the transaction was contained in Exhibit E, defendant argues

On April 12, 2004, the Northern District of Texas unsealed the declaration of Mr. Tucker and the approximately 2,500 pages that comprised Exhibit E.  Pl.'s Supp. PFUF ¶ 9.  Upon the unsealing of the record in the Texas Litigation on April 12, 2004, Mr. Gibson, counsel for the government as intervenor, arranged for an employee of the Office of the United States Attorney in Dallas to identify the two John Doe plaintiffs.  Gibson Decl. ¶ 9.  Clearly, Mr. Gibson acknowledges that he learned of Mr. Tucker's identity and that Mr. Tucker was a KPMG client who participated in one of the allegedly abusive tax shelters on April 12, 2004, information which he then passed on to an IRS agent.[40]  Id.  Due to the difficulties in copying nearly 2,500 pages of documents, Mr. Gibson states that an entire copy set of all the documents that comprised Exhibit E was not completed until April 13, 2004, and that he did not receive a copy of Exhibit E until later that week.  Id.  However, Mr. Gibson notes that:

> [T]he documents that KPMG filed under seal contain some, but by no means all, of the information concerning the KPMG tax shelter that [Mr.] Tucker participated in. I do not know whether the 2,499 pages file[d] by KPMG under seal in the [Texas] case are responsive in any way to the IRS summons issued to SABW, which was still pending before the court in Chicago on April 12, 2004.

Id. ¶ 7.

On April 13, 2004, Mr. Lindquist, counsel for the government in the Illinois Litigation, left a voice-mail message for Mr. Linguanti, counsel for John Does 1 and 2 in the Texas Litigation, the Baker Does in the Illinois Litigation, and SABW, in which he stated that he had learned that the "identities of the Texas Does had been made public and that, insofar as it appeared that the Baker Does were the same as the Texas Does, the Baker Does should withdraw their pending motion to intervene."  See Supplemental Declaration of John Lindquist ("Lindquist Supp. Decl.") ¶ 23.  According to plaintiff, Mr. Lindquist's April 13, 2004 voice-mail message is

---

that by no means was all of the information surrounding the transaction contained in Exhibit E. Id.; Gibson Decl. ¶ 7.

[40]  To support its assertion that the IRS knew Mr. Tucker's identity, plaintiff refers to an e-mail sent by David A. Hubbert, Chief of the Eastern Region of DOJ's Civil Tax Division, to DOJ and IRS personnel including Mr. Gibson.  Pl.'s Resp. & Reply 10 (citing plaintiff's Exhibit Q).  Plaintiff points out that one individual copied on that e-mail was Michael Halpert, the agent who issued a statutory notice of deficiency ("SNOD") to the Tuckers for tax year 2000 on April 15, 2004.  Id. (citing plaintiff's Exhibit R).  That SNOD contained the name, address, and taxpayer identification number of Mr. Tucker and forms the basis for the current litigation between Mr. Tucker and the IRS in the Tax Court.  Id.  Defendant admits that the SNOD contained the name, address, and taxpayer identification number of Mr. Tucker and that Mr. Tucker filed a petition in Tax Court with respect to that SNOD.  Def.'s Resp. to Pl.'s Supp. PFUF ¶ 13.  Defendant objects to the assertion that the SNOD "forms the basis of the current litigation" as vague.  Id.

conclusive proof that Mr. Gibson was aware that the Baker Does and the Texas Does were the same individuals, and, thus, defendant had all of the information responsive to the SABW Summons. Pl.'s Resp. & Reply 11. However, defendant offers a different interpretation. Mr. Lindquist flatly denies that he, as of April 13, 2004, knew that the Baker Does and the Texas Does were the same individuals. Lindquist Supp. Decl. ¶¶ 28-29. Similarly, Mr. Gibson states that he was not involved in the Illinois Litigation, and did not know the information sought by the government in that proceeding concerning Mr. Tucker. Gibson Decl. ¶ 8.

### 3. The SABW Summons Suspended the Section 6501(a) Statute of Limitations

Plaintiff argues that given the April 12, 2004 unsealing of 2,499 pages of documents by the Northern District of Texas, which were in the hands of the defendant by April 14, 2004, the government possessed all information responsive to the SABW Summons by April 14, 2004. Pl.'s Resp. & Reply 13, 15-16. Plaintiff additionally claims that the SABW Summons required only the "'name, address and taxpayer identification number' of that specific taxpayer," but did not request "the names of any entities through which such taxpayer may have invested."[41] Id. The timing of compliance with the subpoena is critical because section 7609(e)(2) provides for the suspension of the limitations period set forth in section 6501(a) if a subpoena enforcement action is ongoing. Here, plaintiff argues, section 7609(e)(2) did not suspend the period of limitations under section 6501 for Mr. Tucker's 2001 taxable year because the summons demand was satisfied within six months of its issuance. Id.

Conversely, defendant asserts that it had no knowledge of Mr. Tucker's identity nor that of Epsolon and Sligo until March 3, 2005. Def.'s Reply 3. Indeed, defendant contends that March 3, 2005, is the earliest possible date that SABW complied with the summons, and further, that it is reasonable to conclude that the period of suspension continued beyond that date. Id. Defendant grounds its argument on the fact that SABW "never provided Mr. Tucker's social security number, nor the taxpayer identification numbers of the entities. . . . If further information is later discovered by Sidley Austin and turned over to the Government, then the date of the later production will be the date of final resolution on which the suspension terminates." Id. at 3 n.6. Because defendant asserts that compliance, at the earliest, occurred on March 3, 2005, defendant concludes that section 7609(e)(2) suspended the 6501(a) period; thus, the government argues that it had until March 3, 2006, to issue the FPAA, and therefore the June 17, 2005 FPAA was timely issued. Def.'s Reply to Pl.'s Supp. Mem. 2.

---

[41] Plaintiff argues that "taxpayer" does not include entities such as Epsolon and Sligo. Neither the SABW Summons nor the rider to the summons define "taxpayer." However, the section 7701 of the Code, which provides a definition, is instructive. A "taxpayer" is "any person subject to any internal revenue tax." 26 U.S.C. § 7701(a)(14). Further, "person shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." Id. § 7701(a)(1). Thus, the court finds that the SABW Summons encompassed entities such as partnerships, and not just individuals.

To resolve the issue, plaintiff urges the court to apply the test enunciated in <u>United States v. Powell</u>, 379 U.S. 48 (1964). Pl.'s Surreply 2; Tr. 19. In <u>Powell</u>, the IRS summoned Max Powell to appear before the agency to give testimony and produce records relating to tax returns of the William Penn Laundry, for which Powell was president. 379 U.S. at 49. Powell appeared before the IRS but refused to produce the records, arguing, <u>inter alia</u>, that the three-year statute of limitations set forth in section 6501(a) had expired. <u>Id.</u> The IRS petitioned a federal district court for enforcement of the administrative summons. <u>Id.</u> The issue eventually made its way to the Supreme Court. <u>Id.</u> at 48. The Supreme Court's decision sets forth the requirements that the IRS must satisfy to enforce a summons:

> [The] Commissioner need not meet any standard of probable cause to obtain enforcement of his summons . . . . He must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required by the Code have been followed . . . .

<u>Id.</u> at 57-58.

Plaintiff is mistaken that the test set forth in <u>Powell</u> is relevant in this case. <u>Powell</u> involved a dispute surrounding a summons enforcement proceeding, not the suspension of a limitations period. <u>Id.</u> at 51. As described above, on April 28, 2004, the Northern District of Illinois applied the <u>Powell</u> test and granted the government's petition to enforce the SABW Summons. <u>SABW II</u>, 2004 WL 905930, at *3-4, 6. In its ruling, the court noted that the government had met its "'slight' burden." <u>Id.</u> at *4 (citation omitted). In that enforcement action, the court determined that the government had satisfied all four factors of <u>Powell</u>, including the requirement that the government aver that it did not possess the information sought by the subpoena. <u>Id.</u> at *3-4. Then, the court noted that "the 'heavy' burdens of production and of proof shift[ed] to the [Does] to show that the summons should not be enforced." <u>Id.</u> at *4. The Northern District of Illinois concluded that the Does failed to meet their burdens. <u>Id.</u> Thus, on April 28, 2004, the Northern District of Illinois directed enforcement of the SABW Summons, essentially holding that SABW had not complied with the summons. If this court applies <u>Powell</u> as plaintiff suggests, it would reopen the issue of summons enforcement to determine whether the Northern District of Illinois was correct in its determination that the four <u>Powell</u> factors had been satisfied and whether plaintiffs in that action had met their burden to show that the government possessed the information sought by the subpoena. In essence, plaintiff seeks a reversal of the Northern District of Illinois' ruling. To do so would violate the doctrine of res judicata. The court's role here is to determine when SABW complied with the summons for the purpose of determining whether the limitations period was suspended.

Further, assuming arguendo that the <u>Powell</u> test was applicable to these facts, the determination of whether the requested information was in the Commissioner's possession has been narrowly construed. <u>United States v. Tex. Heart Inst.</u>, 755 F.2d 469, 476 (5th Cir. 1985);

United States v. Linsteadt, 724 F.2d 480, 483 (5th Cir. 1984).  As explained by the Fifth Circuit in United States v. Davis:

> Read in context, we construe the 'already possessed' principle enunciated by Powell as a gloss on [26 U.S.C.] § 7605(b)'s prohibition on 'unnecessary' summonses, rather than an absolute prohibition against the enforcement of any summons to the extent that it requests the production of information already in the possession of the IRS.

636 F.2d 1028, 1037 (5th Cir. 1984) (insertion in original).  Under this standard, a taxpayer must prove that the IRS actually possessed the information sought by the summons, such that the enforcement of a summons was unnecessary.  The Texas Heart Institute court explained "that a mere showing by the taxpayer that the IRS has previously examined the taxpayer's own records is not sufficient to show either that the IRS possesses that information or that it possesses information in the custody of parties other than the taxpayer."  755 F.2d at 477.

Moreover, the facts of the case sub judice make clear that the purpose and public policy reasons that underpin the Powell test are to prevent the government's abuse of the administrative summons process and harassment of the taxpayer.  United States v. First Nat'l State Bank of N.J., 616 F.2d 668, 674 (3d Cir. 1980).  Such is not the case here.  As the First National court amplified:

> Where the Service requires the production of the name, address, or social security number of a taxpayer . . . , that information must be furnished . . . .  The clear import of these cases is that [the] I.R.S. may obtain such information by summons unless the facts disclose that the summons is not necessary to accomplish [the] I.R.S.'[s] purpose and is therefore being used to harass the taxpayer.

Id. at 675.  The record now before this court is devoid of any allegations of harassment.  To the contrary, Mr. Tucker expended significant time and resources to prevent his identity as a participant in an abusive tax shelter from being disclosed to the IRS.  There can be no serious dispute that the Commissioner has an obligation to enforce the provisions of the Code, including determining whether tax shelters are abusive, and, if so, to determine the identity of tax evaders and requiring those individuals to pay taxes as required by the Code.  Consequently, the conduct of the IRS in bringing subpoena enforcement actions to determine the identities of entities or individuals involved in alleged tax evasion schemes can hardly be construed as harassment.  As argued by the government in the Illinois Litigation, the IRS has a valid role in "protecting the public fisc."  However, as the Texas Litigation and Illinois Litigation demonstrate, Mr. Tucker fought the disclosure of his identity to the IRS every step of the way.  In addition, while fighting the disclosure of his identity, Mr. Tucker declined to sign the consent agreement provided by the IRS that would have stopped the running of the limitations period.  Of course, Mr. Tucker was within his rights to decline.  Nevertheless, engaging in "catch me if you can" with the IRS to avoid the payment of taxes by running out the limitations period clock cannot be construed as cooperating with an IRS investigation.  Accordingly, the court now must determine when the

summoned party, SABW, complied with the summons in order to establish whether section 7609(e)(2) suspended the section 6501(a) limitations period.

As described above, section 7609(e)(2) can suspend the 6501(a) limitations period when more than six months have elapsed from the date a summons was issued if the information requested by the summons has not been provided.  While the Northern District of Texas unsealed nearly 2,500 pages of material that contained some of the information requested by the SABW Summons on April 12, 2004, that action does not force the conclusion that SABW complied with the government summons.  Pursuant to section 7609(e)(2), the summoned party, SABW, was required to respond to the summons.  The government was not obligated to instantly sift through voluminous documents to determine whether the information produced in the Texas Litigation satisfied requests pending in other federal district courts, especially in light of the fact that the requests were not directly related to the SABW Summons.  It would impose too great a burden on the government to hold that the government counsel in the Illinois Litigation was required to review the approximately 2,500 pages of material produced in the Texas Litigation to determine whether SABW had complied with the summons in the Illinois Litigation.  Thus, plaintiff's argument that SABW complied with the summons in the Illinois Litigation in April 2004, when the record in the Texas Litigation was unsealed, is not persuasive.

On June 29, 2004, SABW provided the government with Mr. Tucker's name and his employer's address under the heading "Diversified - Spread Options," but Mr. Tucker's social security number was not contained in that information.  Def.'s Ex. 12 at 28-29; Lindquist Decl. ¶ 21.  According to the summons, which was enforced by the court, SABW was required to divulge the identities of taxpayers who were involved in a "listed transaction" or a "potentially abusive tax shelter," including entities such as Epsolon and Sligo.  Def.'s Ex. 2 at 6.  Not until at least March 3, 2005, did SABW provide the government with the names of Mr. Tucker, Epsolon, and Sligo.  See Def.'s Ex. 13 at 33; Lindquist Decl. ¶ 23.  However, based on the record before the court, it does not appear that SABW produced the taxpayer identification numbers.  Def.'s Reply 14 n.31.  Thus, because the earliest date on which SABW complied with the summons was March 3, 2005, section 7609(e)(2) suspended the section 6501(a) statute of limitations period from April 15, 2004 (six months after the SABW Summons was issued), until March 3, 2005.  When the section 6501(a) statute of limitations period was suspended, one year remained on the statute of limitations (from April 15, 2004, until April 15, 2005).  The section 6501(a) period began running again on March 3, 2005, the earliest date of compliance, and barring suspension by another section, ended one year later on March 3, 2006.  Accordingly, the June 17, 2005 FPAA was issued in a timely manner.

**C.  Did Issuing the FPAA Suspend the Section 6501(a) Statute of Limitations?**

### 1.  The Code

The third and final disputed issue is whether the IRS's issuance of the FPAA, pursuant to section 6229(d), suspended the statute of limitations set forth in section 6501(a).  Section 6229(d) provides:

> If notice of a final partnership administrative adjustment with respect to any taxable year is mailed to the tax matters partner, the running of the period specified in <u>subsection (a)</u> (as modified by other provisions of this section) shall be suspended –
>
> > (1) for the period during which an action may be brought under section 6226 (and, if a petition is filed under section 6226 with respect to such administrative adjustment, until the decision of the court becomes final), and
> >
> > (2) for 1 year thereafter.

26 U.S.C. § 6229(d) (emphasis added).

The parties disagree on whether the reference to "subsection (a)" in section 6229(d) refers to section 6229(a) or section 6501(a).  If the court determines that "subsection (a)" is a reference to section 6501(a), then the issuance of the June 17, 2005 FPAA would suspend the limitations period of section 6501(a) for the Tuckers' 2001 tax year until this court renders a decision and for one year thereafter.  As the court explains below, the language "subsection (a)" is a reference section 6501(a).

### 2.  Case Law

The Court of Federal Claims in <u>AD Global I</u> also analyzed section 6229(d) to determine if the mailing of an FPAA suspended the period set forth in section 6501(a).  67 Fed. Cl. at 694. The <u>AD Global I</u> court determined that because section 6229(a) can extend the limitations period set forth in section 6501(a), it logically follows that the "subsection (a)" language of section 6229(d) is a reference to section 6501(a).  <u>Id.</u>  Thus, <u>AD Global I</u> concluded that the issuance of the FPAA suspended the running of the section 6501(a) statute of limitations.  <u>Id.</u>

The <u>Grapevine</u> court also addressed whether the issuance of the FPAA under section 6229(d) would suspend the individual statute of limitations under section 6501(a).  71 Fed. Cl. at 333.  The court's capsule summary of plaintiffs' argument against suspension highlighted the fallacy of their position:

> Under [the plaintiffs'] view, the IRS would be obliged either to (i) issue the FPAA, complete all litigation with respect thereto (with the partnership incentivized to delay

that litigation), and issue an individual notice of deficiency all prior to the running
of the section 6501(a) limitations period; or (ii) attempt to bypass the TEFRA
partnership rules altogether and issue the partner an individual notice of deficiency
prior to resolving the partnership issues.

Id. at 334.  The court rejected plaintiffs' view to avoid frustrating the purpose of TEFRA, finding
that the issuance of the FPAA suspended the running of the statute of limitations in section
6501(a) as it applied to the partners.  Id. at 340.

        The Rhone-Poulenc court also found that "the issuance of the FPAA and the subsequent
partnership-level litigation would suspend the running of any applicable period of limitations."
114 T.C. at 552.  The Tax Court reasoned:

        [I]n arriving at our conclusion that section 6229(d) suspends the running of any
        applicable period of limitations when an FPAA is issued and during the pendency of
        litigation in this Court, we again apply the well-established rule stated by the
        Supreme Court in Badaracco v. Commissioner, 464 U.S. at 391-392: "Statutes of
        limitation sought to be applied to bar rights of the Government, must receive a strict
        construction in favor of the Government."

114 T.C. at 552-53.  The Rhone-Poulenc court noted that its "interpretation of section 6229(d)
. . . is consistent with the overall statutory scheme of the Code which is to suspend the running of
the applicable period of limitations for making assessments during the time when taxpayers are
permitted to contest the Government's determination and during which time the Government is
statutorily prohibited from making an assessment."  Id. at 554 (noting also that interpretation of
section 6229(d) to the contrary would seem to frustrate congressional intent).

### 3.  The FPAA Suspended the Section 6501(a) Statute of Limitations

        The parties disagree whether the issuance of the June 17, 2005 FPAA suspended the
section 6501(a) statute of limitations such that the March 22, 2006 assessment on the Tuckers
was timely.  Pl.'s Supp. Mem. 5-6; Defendant's Reply to Plaintiff's Supplemental Memo
("Def.'s Reply to Pl.'s Supp. Mem.") 2.

        Plaintiff argues that AD Global I and Grapevine, which held that the issuance of an
FPAA tolls the section 6501(a) statute of limitations period, were wrongly decided.  Pl.'s Resp.
& Reply 21.  Plaintiff contends that while AD Global II "does not directly address this legal
question of whether the issuance of an FPAA tolls the period of limitations of section 6501(a),
the language in the Federal Circuit's opinion indicates that it does not."  Pl.'s Supp. Mem. 5.  To
support its contention, plaintiff cites the following language in AD Global II: "§ 6229(a)
unambiguously sets forth a minimum period for assessment[s] of partnership items that may
extend the regular statute of limitations in § 6501[(a)]."  Pl.'s Supp. Mem. 6 (citing 2007 WL
624366, at *4).  Thus, plaintiff urges that AD Global II "indicates that the reference in section

6229(d) to section 6229(a) is not ultimately a reference to section 6501(a), but rather is a reference to the 'minimum period for assessment of partnership items' (i.e., the period of section 6229(a))." Id.  According to plaintiff, even assuming that a suspension occurred pursuant to section 7609(e)(2), the section 6501(a) assessment period would have ended on March 3, 2006, and, thus, the March 22, 2006 assessment on the Tuckers "was nineteen days beyond the March 3, 2006 deadline." Id. at 5.

Defendant recognizes that AD Global II does not address the question of whether section 6229(d) suspends the section 6501(a) period, but argues that plaintiff misreads that decision. Def.'s Reply to Pl.'s Supp. Mem. 4-5.  Defendant contends that the plain meaning of the statute and pertinent case law make plain that suspension is appropriate. Id. at 8.  Further, defendant asserts that at the earliest, the suspension was lifted on March 3, 2005; thus, the statute of limitations for the Tuckers' 2001 taxable year was open until at least March 3, 2006, since "there remained one year left to run on the [section 6501(a)] statute [of limitations]." Id. at 2. Accordingly, defendant claims, the FPAA was mailed timely on June 17, 2005; and the issuance of that FPAA suspended the running of the section 6501(a) statute of limitations for assessment, pursuant to section 6229(d). Id.  Thus, defendant insists that the assessment on the Tuckers on March 22, 2006, also was timely. Id.

The parties are correct that the Federal Circuit in AD Global II did not address whether the issuance of an FPAA suspends the general statute of limitations under section 6501. However, in holding that section 6501 is the general statute of limitations incorporated into section 6229(a), the Federal Circuit did state that this construction "is consistent with a statutory scheme that intends that adjustments to a partnership tax return be completed in one consistent proceeding before individual partners are assessed for partnership items." AD Global II, 2007 WL 624366, at *3.  Thus, if this court were to rule that section 6229(d)'s reference to "subsection (a)" was not a reference to the general statute of limitations in section 6501(a), such a holding would frustrate the purpose of TEFRA, by requiring the government to assess the individual partners before one "consistent proceeding" could be held.

In conjunction with the statutory scheme of TEFRA and persuasive authority, the court finds that the reference in section 6229(d) to "the period specified in subsection (a)" is a reference to the limitations period in section 6501(a), as extended by section 6229.  See Grapevine, 71 Fed. Cl. at 340; AD Global I, 67 Fed. Cl. at 692; Rhone-Poulenc, 114 T.C. at 552-53.  Accordingly, when the IRS issued the FPAA to the Tuckers, the statute of limitations of section 6501(a) was suspended until this court issues a final decision and for one year thereafter. See 26 U.S.C. § 6229(d).  As a result, the statutory notice of deficiency issued to the Tuckers on March 22, 2006, was timely.

### D.  The Parties' RCFC 56(f) Motions

Defendant requested that in the event that the court was inclined to rule in favor of plaintiff on its limitations arguments, then it wished to pursue discovery pursuant to RCFC 56(f)

to determine whether Mr. Tucker filed a false or fraudulent return.  Def.'s Cross-Mot. 26; Def.'s
Reply 20.  Facts demonstrating that Mr. Tucker filed a false or fraudulent return would be critical
evidence to defendant because it could assert that section 6501(c)(1), which has an unlimited
statute of limitations, applies.[42]  Def.'s Cross-Mot. 26; Def.'s Reply 20.  Thus, asserts defendant,
the FPAA would be timely.  Def.'s Cross-Mot. 28; Def.'s Reply 20.  However, defendant also
argues that discovery related to fraud will interfere with the criminal case in the Southern District
of New York.  Def.'s Cross-Mot. vi, 2.  Defendant notes that should the court determine that the
statute of limitations for assessing taxes attributable to partnership items was open for Mr.
Tucker's 2001 tax year because 7609(e)(2) suspended 6501(a)'s statute of limitations, then there
is no need to address whether Mr. Tucker filed a false or fraudulent return for purposes of
determining whether the FPAA was timely issued.  Id. at 3 n.3.  Because the court finds in favor
of defendant, the court need not address defendant's request for discovery pursuant to RCFC
56(f).

In Plaintiff's Response and Reply to Defendant's Cross-Motion, plaintiff seeks leave of
court to conduct discovery into various allegations made by defendant.  Pl.'s Resp. & Reply 1.
For example, plaintiff asserts that in the event the court was inclined to rule that the section 6501
period remained open on June 17, 2005, the court should defer ruling on the motions and allow
plaintiff discovery to identify further evidence relating to its alternative legal arguments.  Id. at
17.  Discovery is not needed to determine if and/or when the DOJ and the IRS communicated
regarding information available in the nearly 2,500 pages filed in the case before the Northern
District of Texas.  As noted above, the relevant issue is when SABW, the summoned party,
complied with the summons.

## V.  CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's Motion for Summary
Judgment, and GRANTS Defendant's Cross-Motion for Partial Summary Judgment.

No later than Friday, October 26, 2007, the parties shall confer and file a joint status
report suggesting further proceedings.

IT IS SO ORDERED.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[42]  Section 6501(c)(1) is an exception to the statute of limitations period in section
6501(a) and provides that: "In the case of a false or fraudulent return with the intent to evade tax,
the tax may be assessed, or a proceeding in court for collection of such tax may be begun without
assessment, at any time."  26 U.S.C. § 6501(c)(1).